IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| DONALD ANDREW BESS, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 3:16-CV-1150-D |
| v. | ) | |
| | ) | |
| LORIE DAVIS, Director, | ) | **THIS IS A CAPITAL CASE** |
| Texas Department of Criminal Justice, | ) | |
| Correctional Institutions Division, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**OPPOSED MOTION TO STAY AND ABEY FEDERAL HABEAS PROCEEDINGS TO
ALLOW PETITIONER TO EXHAUST CERTAIN CLAIMS IN FEDERAL COURT**

NOW COMES Petitioner, Donald Andrew Bess, by and through counsel, and hereby moves to stay and abey his petition for habeas corpus filed on April 12, 2017. Petitioner seeks to return to state court for the opportunity to develop and exhaust claims regarding the DNA evidence in this case, which were pled in Claim Four of his initial federal petition. Petitioner moves this Court to issue stay and abeyance in order to preserve his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C.§ 2254. In support of this Motion, Petitioner shows the following:

**I.    Newly Discovered Evidence**

Newly discovered evidence brings into serious question the prosecution's key evidence in this case, DNA. At trial, the prosecution alleged that sperm found inside the victim's vagina matched the DNA of Petitioner. (Vol. 42, Tp. 29, Vol. 45, Tpp. 69-80, Vol. 46, Tp. 119. DNA is the only evidence linking Petitioner to the crime; no other forensic evidence linking Petitioner to the crime scene or victim exists. No eyewitnesses saw Petitioner at or near the crime scene, nor

places Petitioner with the victim.  There were no inculpatory statements introduced in trial.  That being the case, should there be questions surrounding the reliability of DNA testing in this case, Petitioner's conviction is undermined.

Petitioner was first alerted to issues with DNA when the Office of the Dallas County District Attorney contacted undersigned counsel.  Counsel received a letter alerting him to matters related to DNA on December 20, 2016.  Subsequently, the defense received two updated reports from the laboratory that initially analyzed Petitioner's DNA, using updated interpretational methods and statistical computations.  On January 31, 2017, counsel received a SWIFS Amended Supplemental Test Report from the Dallas County District Attorney's Office.  The report, dated January 26, 2017 but filed January 31, 2017, indicated that Petitioner's buccal swap was reanalyzed based on updated interpretational methods and statistical computations.  (See Exhibit 1, January 26, 2017 SWIFS Amended Supplemental Test Report).

On March 17, 2017, Petitioner's counsel received a second revised report issued by SWIFS titled Amended and Corrected Supplemental Test Report from the Dallas County District Attorney's Office.  The second revised report, dated February 2, 2017 but filed March 17, 2017, indicated seven additional items of evidence were newly analyzed based on updated interpretational methods and statistical computations.  (See Exhibit 2, February 2, 2017 Amended and Corrected Supplemental Test Report).

Essentially these new reports acknowledge serious concerns regarding the methodology used in prior DNA analysis. While the revised results implicate Petitioner, the question, however, is whether the DNA results are reliable and trustworthy, or whether there are potential problems with those results as well.

Undersigned federal post-conviction counsel for Petitioner retained Dr. Maher Noureddine, PhD, MS, D-ABC, a forensic DNA and serology expert, to review this type of evidence in this

case.  Initially Dr. Noureddine concluded that he could not properly evaluate the SWIFS reports without reviewing additional documents to which Petitioner did not have access.  The date for Petitioner to file his habeas amendments was continued to allow for the defense to obtain these materials pursuant a discovery request, and then to provide Dr. Noureddine the opportunity to review documentation relevant to his analysis.

Dr. Noureddine has since received and reviewed supplemental discovery provided by the Office of the Dallas County District Attorney and SWFIS laboratory, including documentation related to newly implemented interpretation protocols and a series of validation studies conducted in 2015 and 2016.

According to the findings of Dr. Noureddine, the 2017 process of reinterpreting original DNA evidence reflects a flawed process of including the use of data previously believed to be unfit, or "not reproducible" for testing:

> Of particular interest, the DNA profile generated from sample K1 (*vaginal swab-Epithelial Cell Fraction*) was re-interpreted by the SIFS lab as shown in their 2017 reports. Apparently, this re-interpretation is reflected by additional hand-written notations placed on the legacy electropherogram (e-gram) sheet of that sample K1. Comparing the legacy e-gram to the newly provided e-gram (surmising that legacy notations are in black writing while newer notations are in blue), it appears that the analyst crossed several notations and added others in order to deconvolve the observed DNA mixture. One notation in particular indicates that **the analyst decided to accept peak 10 at marker D7S820 as a real/reliable allele and crossed out the "*not reproducible*" notation from the legacy interpretation**. On page 10 and 11 of 35 (in PDF 2017 *Amended Supplemental Supporting Documentation*), the analyst went as far as hand-annotating on the e-grams the peak as being allele 10 at Marker D7S820. As a justification for the decision to include peak 10, the analyst referenced the "*2016 STR analysis and interpretation guidelines*" as the reason to include that peak as a real allele, potentially relying on section 2.5 of the guidelines in particular.

Exhibit 3, Affidavit of Dr. Maher Noureddine, page 2 (emphasis added).

In effect, the 2017 reinterpretation offers **no new testing of evidence**. Instead, 2017 measures sought to 'clean up' protocols used in 2008 and 2010 by implementing updated guidelines. However, Dr. Noureddine disputes how 'new guidelines' can serve as the basis for allowing for the inclusion of data previously believed to be too weak for interpretation.

Dr. Noureddine refers to the analyst's practice as "highly questionable," and offers a more thorough and scientific approach to determine reproducibility.

> In my opinion, **the analyst's action regarding peak 10** at marker D7S820 **is highly questionable**. First, the analyst deemed that data point (peak 10) reproducible by simply looking at existing/legacy data under a new set of guidelines. To determine reproducibility, the analyst should have re-amplify the sample (K1: *vaginal swab-Epithelial Cell Fraction {ECF}*) to generate new data for interpretation under the newly validated protocols.

Exhibit 3, Affidavit of Dr. Maher Noureddine, page 2 (emphasis added).

Dr. Noureddine explains why peak 10 was, and should have continued to be, considered not reproducible in the evaluation of this data essential to the conviction of Petitioner:

> It is evident that peak 10 was deemed "*not reproducible*" in 2008 for very good reasons: First, it was detected once but then failed detection through several rounds of injection and at least two rounds of amplification. Second, Page 3 of 4 concordance for that peak 10 at marker D7S820 cannot be evaluated using data from the Cofiler kit: Sample K1 ECF was never typed with the Cofiler kit, nor do we know the true genotype for the victim at that marker. The victim's alternate standard (*K10: head hair*) never yielded reliable data for marker D7S820 using the Profiler Plus kit and Item K10 was not typed with the Cofiler kit. **If the SIFS lab impetus for performing additional validation studies and evidence reinterpretation is to demonstrate a more reliable approach that is based on hard science, then I believe the lab missed that point by including peak 10 at marker D7S820 as a real allele in the absence of proper replication and hard data**.

Exhibit 3, Affidavit of Dr. Maher Noureddine, pages 2-3 (emphasis added).

4

As such, if the objective of 2017 reinterpretation was to reflect a more sound scientific foundation of data analysis, then the analyst "missed the point" with presuming peak 10 was viable for inclusion.

Dr. Noureddine further noted serious concerns about the maintenance records of the equipment used to evaluate the DNA in this case:

> In response to my request for all maintenance records for the AB 310 capillary electrophoresis (CE) instrument used for evidence testing in this case (2008 timeframe), the SIFS lab provided a three (3) page document titled Equipment Maintenance & Repair Log which referenced instrument 310-B serial number 100001137. The document reveals maintenance entries for this particular instrument starting on 12/3/2003 and ending on 10/30/2009. However, it was not possible to ascertain from the lab files, particularly the CE injection sheets, whether this instrument (serial number 100001137) was actually used in testing the evidence. Starting on 5/28/2008 onwards, the SIFS lab apparently implemented a monthly instrument maintenance action. However, prior to 5/28/2008 and during testing of items K1 (vaginal swab), K11 (Fingernail clippings "R"), K12 (Fingernail clippings "L"), and item #1 (Buccal swab standard from Donald Bess), the instrument did not receive any monthly maintenance actions (i.e., period between 1/23/2008 to 5/2/2008). Curiously, a document provided by the SIFS lab (STR Equipment Maintenance and Calibration: effective 7/20/2012) lists the ABI 310 instrument among the "critical-use equipment used in STR testing." The document defines critical-use equipment as requiring "periodic maintenance and regular calibration checks to assure acceptable operation." No specific details were provided by the SIFS lab for the "program documentation for details of the maintenance and calibration schedules and standards."
>
> Therefore, I request that the SIFS lab provides those details, along with preparation/expiration dates of the reagents used to run the 310 CE (buffers, HiDi Formamide, POP-4) while evidence was being tested in this case in 2008. I also request that the lab provides confirmation that the 310-B serial number 100001137 was used to test the evidence in 2008 and in 2010. While testing evidence in 2008, the analyst documented multiple instances of bad injections, sample failures, and data not used because "it could not be bracketed." In my opinion, Page 4 of 4 those failures were quite excessive and could potentially being caused by the lack of regular instrument maintenance during the 2008 testing.

Exhibit 3, Affidavit of Dr. Maher Noureddine, pages 3-4.

Dr. Noureddine review of this newly received discovery also demonstrated that there was further evidence that needed to be reviewed in the case.

> In 2010, the SIFS lab documented the presence of semen (positive for P30) and sperm cells ("few heads") on Item K13D (Jumpsuit). According to the lab, subsequent DNA testing of that item (K13DT1) revealed no DNA profile in the sperm fraction and one detectable allele (13) at marker D8S1179 that could not have originated from Mr. Bess or from the victim. In my opinion, this item and the remaining (if any) extracts from K13D1 should be examined further using Y-STR typing.

Exhibit 3, Affidavit of Dr. Maher Noureddine, pages 4.

The amended SWIFS reports issued and received for the first time in 2017 are new material evidence in Petitioner's case. Petitioner was not in position to raise claims related to the new DNA reports in state habeas because this information had not been provided to Petitioner. Accordingly, Petitioner was not in a position to locate it with due diligence until after the state habeas proceedings were final. Given the importance of DNA in this case, the newly disclosed reports regarding revised DNA analysis, and the analysis issues determined by defense DNA expert Dr. Noureddine, the state court should be given the opportunity to review these claims. Petitioner seeks a return to state court to litigate the of the DNA evidence in the case, in light of the newly disclosed information and resulting lab reports.

### Argument

Petitioners seeking habeas corpus relief pursuant to 28 U.S.C. § 2254 are required to exhaust all claims before requesting federal collateral relief. 28 U.S.C. 2254(b)(1); *Fisher v. Texas*, 169 F.3d., 295, 302 (5th Cir. 1999). The exhaustion requirement is satisfied when the substance of habeas claims have been fully presented to the highest court in the state. *Morris v.*

*Dretke*, 413 F.3d. 484, 491 (5th Cir. 2005).  Such presentment takes place through direct appeal or state habeas proceedings.  *Id*. at 491.

When a habeas petitioner has not exhausted his claims in state court, the federal district court has the authority to issue a stay and abeyance in limited circumstances.  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).  The federal district court shall grant stay and abeyance when (1) there is good cause for the failure to exhaust, (2) the unexhausted claims are potentially meritorious, and (3) there is no indication that petitioner engaged in intentional dilatory litigation tactics.  *See id.* at 278. Since *Rhines*, numerous courts have stayed and abated federal habeas proceedings to allow unexhausted claims to be presented to the state courts, if these requirements are met. *See, e.g.*, *Devoe v. Stephens*, Case No. 1:14-cv-151 (W.D. Tex. 2014); *Garza v. Thaler*, Case No. 5:09-cv-528-OLG (W.D. Tex. 2009); *Hearn v. Quarterman*, Case No. 3:04-cv-560 (N.D. Tex. 2008); *Canales v. Quarterman*, Case No. 2:03-cv-69-TJW (E.D. Tex. 2007).

The questions surrounding DNA testing in this case raise serious concerns that warrant defense investigation, development, and litigation.  The proper forum for this litigation is state court.

> AEDPA explicitly provides that federal court review of the reasonableness of the state court's factual findings must be made in light of the evidence presented in the State court proceeding. Evidence presented for the first time in federal court is not relevant to whether the state court decision was contrary to, or involved an unreasonable application of clearly established federal law.  It is surely not "unreasonable" for the state court to base its decision on the only facts that have been put before it.  On the other hand, if the new evidence is of such a character that the federal court is presented with a substantially different issue, not decided by the state court, then no deference is due.  New evidence may produce a "new claim," but it cannot render the state court's determination of the same claim unreasonable.

*Fairchild v. Workman*, 579 F.3d. 1134, 1155 (5th Cir. 2009) (internal citations omitted). Thus, an order granting stay and abeyance for Petitioner's habeas petition promotes both federal comity and judicial efficiency.

Moreover, absent a stay and abeyance order from this Court, Petitioner would be unable to proceed with state court litigation. The Texas Court of Criminal Appeals has a judicially created doctrine known as the two-forum rule. This rule gives the state court the power to dismiss a filing if the petitioner also has pending federal court litigation, unless a stay and abey order has issued. *Ex parte Soffar*, 143 S.W.3d 804, 805 (Tex. Crim. App. 2004) (dismissing a subsequent state habeas petition while a federal petition was pending); *see also Ex parte Russell*, No. WR-78,128-02, 2017 WL 912158, at *1 (Tex. Crim. App. Mar. 8, 2017). Therefore, Petitioner requests this Court grant Petitioner's request and stay these proceedings to allow the defense the chance to litigate these issues appropriately in state court.

In his fourth claim for relief from his federal petition, Petitioner raised claims related to DNA. Those issues include claims based on ineffective assistance of counsel, *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and the need for a death sentence to be reliable under *Summer v. Shuman*, 483 U.S. 66 (1987). These claims are based on newly discovered evidence that Petitioner never had the opportunity to present in state court. Petitioner has good cause for failure to exhaust these claims, can establish that these claims are potentially meritorious, and is not being dilatory in raising these issues. Thus, Petitioner is asking this Court to stay and abate his federal proceeding so he can properly return to state court and exhaust his claims in the proper forum.

### A. Petitioner has good cause for his failure to exhaust

Petitioner's claims are based on materials not provided to Petitioner until after the filing deadline of his state habeas. As explained previously, Petitioner's claims are based in part of lab

reports that were not issues until 2016 and 2017, well after his previous state habeas application was filed. (*See* Exhibit 1, Exhibit 2). Petitioner could not have presented DNA issues that were unavailable, through no fault of his own, at the time of his prior state proceedings. As such, the timeline of this matter demonstrates good cause for not being raised previously in Texas state court.

##### B.  Petitioner's claims are potentially meritorious

Petitioner has three, currently unexhausted, state remedies that can be pursued regarding his DNA claims that could provide relief. First, he could file a subsequent application for writ of habeas corpus pursuant to Texas Code of Criminal Procedure, Article 11.071, Section 5. This provision outlines the requirements for presenting a subsequent writ in Texas. Two provisions can potentially allow for the litigation of Petitioner's claim's regarding DNA:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

> (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt.

TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(1-2).  Here, Petitioner's claims are based on materials not provided to Petitioner until after the filing deadline of his state habeas.  Thus, he can meet the threshold requirement from Section 5(a)(1) that the factual basis was not previously available when his prior state habeas writ was filed.  Additionally, these claims create a colorable argument that could meet the threshold innocence gateway from Section 5(a)(2).  Moreover, given that the conviction of Petitioner rests entirely on DNA testing, potential uncertainties with the reliability of DNA testing establishes a potentially meritorious claims that state court should have the

opportunity to review, as more thoroughly outlined previously and in Dr. Noureddine's report, Exhibit 3.

Second, Texas Code of Criminal Procedure, Article 11.073, provides a potentially meritorious basis for Petitioner's claims relating to DNA. In a similar fashion to the subsequent writ statute, this Article permits petitioners to present relevant scientific evidence that "was not available to be offered by a convicted person at the convicted person's trial." TEX. CODE CRIM. PROC. art. 11.073(a)(1). As Petitioner's claims revolve around, in part, new reports regarding DNA evidence, they could not have been presented at his trial.

Third, Chapter 64 of the Texas Code of Criminal Procedure provides an avenue for additional DNA testing to occur. The statute specifics the requirements for post-conviction DNA testing, which Petitioner could present to the convicting court. As explained in Dr. Noureddine's report, additional testing could occur on semen found on the victim's jumpsuit, which Petitioner was excluded as being the source of. (Exhibit 3 at 4.)  This additional testing could establish that there is a reasonable probability that Petitioner was not guilty of the underlying offense.

### C.  Petitioner has not engaged in dilatory tactics

Petitioner acknowledges in his habeas petition that claims related to DNA were not raised in state court.  Provided the date of issuance of the Amended Reports from SWIFS, paired with understanding that counsel worked diligently to develop this claim immediately upon receiving notice, it is clearly evident these claims are not being raised as intentional dilatory litigation tactics. Petitioner should not be prevented from exhausting these potentially meritorious claims as they recently became available.

WHEREFORE, Petitioner hereby moves for this Court to enter an order granting stay and abeyance of his federal habeas petition for the opportunity to exhaust his available state remedies.

Respectfully submitted, this 2nd day of February, 2018.

/s/Jonathan E. Broun
JONATHAN E. BROUN                      JASON D. HAWKINS
Senior Staff Attorney                       Federal Public Defender
North Carolina Prisoner Legal Services       Federal Public Defenders Office
NC Bar No. 18108                            TX Bar No. 00795763
PO Box 25397                               525 Griffin St., Suite 629
Raleigh, NC 27611                          Dallas, TX  75202
(919) 856-2200                             (214) 767-2746
Jonathan.e.broun@gmail.com                 Jason_Hawkins@fd.org

## Certificate of Conference With Opposing Counsel

Opposing counsel Assistant Attorney General Erich Dryden has informed undersigned counsel that they are OPPOSING this motion.

/s/ Jonathan E. Broun

_____
**Jonathan E. Broun**
Attorney for Petitioner

## Certificate of Service

I, Jonathan E. Broun, hereby certify that on the 2nd day of February, 2018, a copy of the foregoing motion was delivered via ECF to the Attorney General's Office, attention W. Erich Dryden at erich.dryden@oag.texas.gov.

/s/ Jonathan E. Broun

_____
**Jonathan E. Broun**
Attorney for Petitioner