# United States District Court

## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

DONALD ANDREW BESS     §
                   §
        v.             §     CIVIL ACTION NO. 3:16-CV-1150-S
                   §
LORIE DAVIS, Director TDCJ-CID     §

## MEMORANDUM OPINION AND ORDER

Petitioner Donald Andrew Bess filed this federal habeas corpus action pursuant 28 U.S.C. § 2254 challenging his June 2010 Dallas County conviction for capital murder and sentence of death. For the reasons discussed below, Bess is not entitled to federal habeas corpus relief or a Certificate of Appealability from this Court.

## I. BACKGROUND

### A. The Offense

The facts and circumstances of Bess's capital offense are set forth in significant detail in the Texas Court of Criminal Appeals' opinion affirming his conviction and death sentence. *Bess v. State*, No. AP-76,377, 2013 WL 827479, at *1-11 (Tex. Crim. App. Mar. 6, 2013), *cert. denied*, 571 U.S. 1132 (2014). Bess was serving a term of life imprisonment for an unrelated aggravated sexual assault when he was convicted in June 2010, based on DNA evidence of the capital murder of Angela Samota in October 1984. The uncontroverted evidence presented at trial showed that Samota's nude body was discovered covered in blood on her bed inside her locked condominium by law enforcement officers responding to a call from Samota's boyfriend, who became concerned after she called him in the early morning hours of October 13, 1984, to say she had allowed a man into her apartment, suddenly hung up after promising to call him right back, but then failed to do so.[1] Samota's autopsy and subsequent forensic examination revealed that she had been stabbed

---

[1] Samota's boyfriend Benjamin McCall testified without contradiction at the guilt-innocence phase of Petitioner's 2010 capital murder trial that (1) he had been dating Samota since January 1984; (2) Samota was very

eighteen times in the chest, and Petitioner's semen (including a large number of intact sperm) was

found in her vaginal vault.[2]

---

active in her sorority, taking a challenging double major, and working part time; (3) Samota invited him to go out with her and some friends the evening before her murder but he declined because he had a business appointment early the next morning; (4) the evening before her murder, Samota called him and asked him to get her and her friends into a private club in which McCall had a membership; (5) he made the call but did not go to the club; (6) around one-thirty the next morning, Samota knocked on the door of his apartment; (7) when he answered the door, Samota playfully stated that she had come by to bug him on her way home; (8) they engaged in a very brief conversation and Samota left; (9) about fifteen minutes later, Samota called him and said "talk to me"; (10) she explained that she had allowed a man into her condo to use the bathroom and make a call; (11) after asking McCall if he thought there was a payphone at a convenience store located near her residence, Samota hung up abruptly after promising to call him right back; (12) when Samota failed to do so, McCall called Samota but could not get an answer; (13) McCall threw on clothes and drove to Samota's condo, calling her from a cell phone in his truck; (14) he was unable to get an answer; (15) McCall arrived at her condo around two a.m. but was unable to get a response when he beat on her locked front door; (16) he checked her back door but found it locked as well; (17) he drove to the convenience store she had mentioned in their brief telephone call and then returned to her condo; (18) he found her car in the parking lot and telephoned police (the audio recording of McCall's call to police at 2:17 a.m. on October 13, 1984 was admitted into evidence and played for the jury); (19) when police arrived, they waited for one of the officers to obtain a key to Samota's condo from a manager; (20) he remained just inside the front door while police searched the condo and found Samota's body; and (21) he gave police a full statement and consented to searches of his truck and apartment as well as giving hair and DNA samples. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), test. of Benjamin Waring McCall, vol. 42 at 178-218; vol. 43 at 8-33.

The two Dallas Police Officers dispatched to Samota's condo testified that (1) they met McCall outside Samota's condo at 2:40 a.m. and obtained a key after they were unable to get a response at Samota's locked door; (2) when they searched Samota's condo they found her lifeless body lying on her bed face up with her eyes open, unclothed and covered in blood; (3) her legs were hanging off the bed; (4) blood residue was observed in the bathroom adjacent to her bedroom; (5) a single woman's shoe was found in the living area; and (6) her other shoe and Samota's clothing was found on the floor beside her bed. S.F. Trial, test. of Kenneth Budjenska, vol. 43 at 53-103; testimony of Janice Crowther, vol. 43 at 104-20.

---

[2]  The forensic pathologist who performed Samota's autopsy testified that (1) there was dried blood on Samota's chest and neck; (2) blood was smeared on Samota's face and leg along with some blood spatter on her body; (3) Samota suffered several deep chest wounds; (4) Samota suffered eighteen stab wounds to the chest and breast area with a single-edged knife or knife-like object, many of which overlapped; (5) it appeared that a hand or some other object had covered Samota's face during the stabbing; (6) eight of the stab wounds entered Samota's heart and five of those wounds entered Samota's heart and left lung; (7) two of Samota's chest wounds went through the sternum, requiring considerable force; (8) the deepest stab wound penetrated four to seven inches deep and completely penetrated the heart; (9) it was not possible to determine the order in which the stab wounds occurred; (10) Samota's blood alcohol level was .09 and her vitreous alcohol level was .30; (11) viscous material was collected from both Samota's mouth and vagina; (11) swabs were obtained from Samota's mouth and vagina; (12) in living individuals, semen breaks down from its own enzymes and vaginal enzymes under an hour; (13) there was nothing about the appearance of the viscous material (described as a "sticky blob") obtained from Samota's vagina suggesting that the material had begun to liquefy; (14) laboratory examination of the vaginal swab revealed both a high concentration of phosphates and a large number of intact sperm, which confirmed that Samota had intercourse at or near the time of her fatal injuries; (15) because Samota's body was lying down, it did not appear that anything had drained out of her body post-intercourse; (16) while there were no injuries to Samota's cervix or external genitalia, the absence of such injuries is not determinative of whether there was consensual versus non-consensual intercourse; (17) the secretions in Samota's mouth were not semen; (18) the physical evidence established Samota was killed very close in time to her having intercourse; and (19) the manner of Samota's death was homicide and the cause of her death was multiple stab wounds to her chest. S.F. Trial, test. of Dr. M.G.F. Gilliland, vol. 43 at 165-239; vol. 44 at 14-31.

## B. The Indictment

On January 20, 2010, a Dallas County Grand Jury indicted Petitioner on a single count of capital murder—intentionally causing Samota's death by stabbing Samota with a knife, or an object unknown to the grand jury, in the course of committing and attempting to commit sexual assault upon Samota.[3]

## C. Guilt-Innocence Phase of Trial

### 1. Prosecution's Case

In addition to the testimony summarized above, the prosecution presented testimony during the guilt-innocence phase of Petitioner's capital murder trial from a pair of Samota's acquaintances detailing Samota's movements the day before her murder, including her movements in the hours immediately preceding her death.[4]    A Dallas Police Department cold case officer testified that

---

The forensic serologist who examined materials collected during Samota's autopsy, including the rape kit, and other physical evidence testified that (1) there was no trace of blood or hair in McCall's fingernail scrapings; (2) Samota's bed sheets contained blood but no seminal fluid; (3) McCall and another of Samota's former boyfriends were excluded as possible sources of the semen found inside Samota's vagina because of their blood type; (4) two other male acquaintances of Samota were excluded as possible sources because they were both non-secretors; (5) Samota's vaginal swab was loaded with intact sperm, establishing the sample was taken at or near the time of intercourse because both the high concentration of acid phosphates and large number of intact sperm in the vaginal swab; (6) seminal fluid and sperm begin to deteriorate within three hours in a living victim; and (7) no DNA analysis of Samota's vaginal swab was done in 1986. S.F. Trial, test. of Sarah Williams, vol. 44 at 53-81.

A veteran OBGYN with experience conducting hundreds of sexual assault examinations testified as an expert that (1) the vast majority of sexual assault victims show no sign of injury or trauma to the external genitalia; (2) she would not expect to find intact sperm inside a sexual assault victim within four to six hours after an assault; and (3) she had seen patients within one to two hours after a sexual assault and had never seen a large number of intact sperm or coagulum (congealed semen) because semen liquefies very quickly after intercourse in a live woman due to natural movements, gravity, urination, and bowel movements, which all cause drainage. S.F. Trial, test. of Dr. Claudia Werner, vol. 44 at 90-116.

[3] Petitioner's indictment appears among the state court records submitted by Respondent at page 00002 of the first volume of the Clerk's Record. In addition to the capital murder charge, Petitioner's indictment included an enhancement paragraph alleging Petitioner had been convicted in Harris County in March 1978 of the offense of aggravated rape. For unknown reasons, Respondent failed to electronically file the volume of state court records containing Petitioner's indictment.

[4] A partner in a Houston law firm, Ana Kadala, who had been friends with Samota at SMU testified that (1) on October 12, 1984, she and Samota went to a late lunch with one of their professors, and then went to Samota's residence and took a nap; (2) they planned to go out that evening; (3) Samota put on a black silk jumpsuit and black pumps; (4) Samota's friend Russell Buchanan joined them at Samota's condo; (5) she, Samota, and Buchanan went

she interviewed Petitioner in 2008, that Petitioner admitted he was in the Dallas area around the time of Samota's murder, and that she obtained a search warrant for a buccal swab from Petitioner.[5] The forensic biologist who examined Samota's vaginal swab and Petitioner's buccal swab testified without contradiction that Petitioner's DNA matched the DNA found in the sperm fraction of Samota's vaginal swab.[6]

## 2. The Defense's Evidence

The defense presented testimony from an employee of the Rio Room club and a field agent for the Dallas County Medical Examiner's office.[7] The defense then called a forensic pathologist

---

to Buchanan's place so that he could change before they went out; (6) the three of them went to Bennigan's restaurant, Studebaker's (a nightclub), and then to the Rio Room (another nightclub); (7) Samota drank but not excessively as she was driving; (8) they left the Rio Room sometime between midnight and twelve-thirty; (9) Samota had to be up early the next morning to travel to Waco to attend a college football game; (10) Samota dropped off Buchanan at his residence; (11) Samota then went by her apartment to collect a curling iron and then took Kadala home, dropping her off between twelve-forty-five and one-thirty in the morning; (12) she learned of Samota's murder the following day after she returned to Dallas from the football game in Waco; and (13) Samota spoke often about McCall and her other male acquaintances but never mentioned knowing Petitioner. S.F. Trial, test. of Ana Elena Kadala, vol. 42 at 69-133.

Russell Buchanan testified that (1) he met Samota in early-October 1984 through his roommate's girlfriend; (2) Samota called to invite him to join her and a female friend for drinks; (3) he walked to Samota's residence but discovered he was underdressed; (4) they went back to his place so he could change; (5) they then went out to the Boardwalk Beach club and then to the Rio Room; (6) they stayed at the Rio Room until one or one-thirty and then went home; (7) they were not drinking heavily because the bar was crowded; (8) he attended a wedding in Dallas the next morning and then flew home to Houston; (9) he did not learn of Samota's murder until he returned to Dallas and police officers arrived at his front door; (10) he furnished blood and saliva samples and cooperated with police for many months until he retained an attorney; and (11) neither Samota nor her female friend appeared to be intoxicated when they dropped him off that night. S.F. Trial, test. of Russell Buchanan, vol. 42 at 134-76.

[5] An officer with the Dallas Police Department's cold case unit testified without contradiction that (1) a former roommate of Samota's contacted the cold case unit in July 2006 about the case; (2) she contacted the Southwest Institute of Forensic Sciences ("SWIFS") and learned a vaginal swab from Samota's autopsy had been preserved; (3) she obtained a search warrant for Petitioner's DNA and, in April 2008, interviewed Petitioner after *Mirandizing* Petitioner; (4) she obtained a buccal swab from Petitioner; (5) Petitioner signed a statement in which he admitted to being in the Dallas area in March 1984; (6) Petitioner's demeanor during their interview changed dramatically when she informed him that she was investigating an offense committed on October 13, 1984; and (7) the results of Petitioner's DNA test results came back in May 2008. S.F. Trial, test. of Linda Crum, vol. 45 at 21-63.

[6] The former SWIFS forensic biologist who examined Petitioner's buccal swab and Samota's vaginal swab testified without contradiction that (1) the DNA profile for the sperm fraction of Samota's vaginal swab showed a single male contributed that sample and (2) the DNA profile of the sperm cell fraction of Samota's vaginal swab matched the DNA profile of Petitioner. S.F. Trial, test. of Angela Fitzwater, vol. 45 at 64-84.

[7] An employee of the Rio Room nightclub testified that (1) he knew Samota through his girlfriend and Samota did not need McCall's assistance to enter the club when he was working; (2) Samota came in the night of her murder

4

who testified that (1) Samota's blood alcohol level was out of line with her vitreous alcohol level; (2) ejaculate liquefies in fifteen to thirty minutes; (3) sperm survives in cervical mucous longer than in vaginal secretions; (4) just because there were viscous secretions in the vagina did not mean sexual activity occurred in close proximity to death; (5) in living individuals, spermatozoa can survive twenty-four to seventy-two hours; (6) intact sperm can be found twenty-three to one-hundred-twenty hours after intercourse in living individuals; (7) the viscous material in Samota's vagina was more likely cervical mucous than ejaculate; (8) high levels of acid phosphate are possible up to four days after intercourse; (9) if sex occurred near the time of Samota's death, he would expect to find leakage from the vaginal vault and secretions on the bed sheets; (10) sperm can remain motile up to sixteen hours in cervical mucous but Samota's autopsy report makes no mention of sperm motility; (11) there is only a slim chance of finding motile sperm after twelve hours after sex; (12) if a hand had been placed over Samota's mouth, he would expect to find damage and bruising to the lips; (13) this case is atypical of a sexual assault because there was no bruising to the inner aspects of the thighs or head; (14) it appeared to him that, based upon his review of the autopsy report and photographs from autopsy and the crime scene, Samota was stabbed while sitting in an upright position and fell toward the head board; and (15) the number of stab wounds suggested to him that this was "overkill," a result of jealous frenzy.[8]

---

without McCall wearing a backless outfit; (3) Samota left after midnight; and (4) Samota did not appear to be under the influence. S.F. Trial, test. of David Skelton, vol. 45 at 91-104.

A former field agent for the Dallas County medical Examiner's office testified that (1) he pronounced Samota dead at the crime scene; (2) Samota's telephone appeared to have been wiped clean; and (3) a note was found at the crime scene, stating that Samota had a date with someone other than her boyfriend and her boyfriend was jealous. S.F. Trial, test. of Michael Darst, vol. 45 at 105-14.

[8] S.F. Trial, test. of Dr. James Traylor, vol. 46 at 23-61, 93-101. On cross-examination, Dr. Traylor admitted that (1) sperm last longer post-mortem than in a living vaginal vault; (2) he had trouble with the prosecution's rape scenario because there was no external trauma to Samota's genitalia; (3) he could not tell the time of intercourse from examination of a vaginal smear because there were no studies discussing the quantity of intact sperm over time; (4) he did not examine Samota's vaginal swab; (5) his opinions regarding the location of Samota's body were based on

### 3. The Verdict

On June 14, 2010, the jury returned its verdict, finding Petitioner guilty of capital murder, as charged in the indictment.[9]

### D. Punishment Phase of Trial

The punishment phase of Petitioner's capital murder trial commenced on June 15, 2010.

### 1. Prosecution's Case-in-Chief

At the punishment phase of Petitioner's capital murder trial, the prosecution presented testimony from (1) a former Houston police officer regarding Petitioner's January 1977 aggravated kidnapping with intent to commit sexual assault (an offense to which Petitioner pleaded guilty and for which he received a sentence of 25 years);[10] (2) the victim of Petitioner's unrelated September 1977 Harris County sexual assault (another offense to which Petitioner pleaded guilty and for which he received a 25-year sentence);[11] (3) a retired TDCJ employee regarding an August 20,

---

the crime scene photographs; (6) this case is atypical of sexual assault because Samota's legs were together, and there was no bludgeoning of the head or strangulation or mutilation; (7) only a small percentage of rapes involve genital injury; (8) he was unaware of Samota's activities in the hours leading up to her murder; (9) the presence of sperm in Samota's vaginal vault does not resolve the issue of consensual versus non-consensual intercourse; (10) he did not believe sex occurred on the bed because no seminal fluid was recovered from the sheets; and (11) the average length of time sperm can be detected inside a dead body ranges from twenty-three hours to five days. *Id.* at 61-93.

[9] *Id.* at 164-65. The jury's verdict form from the guilt-innocence phase of Petitioner's trial appears among the state court records at page 85 of the first volume in the Clerk's Record.

[10] More specifically, the former Houston police officer testified that (1) he received a call about an aggravated kidnapping on January 20, 1977; (2) when he interviewed the victim, initially, she was hysterical; (3) eventually, she identified her assailant as 25-30 years old, 230 pounds, and about six feet tall with a large frame, gold rimmed glasses, a beard and mustache, and dark brown with gray hair; (4) the victim described the suspect's vehicle as a 1975 Ford pickup truck; (5) after Petitioner was arrested in September 1977, the victim identified Petitioner in a lineup; and (6) Petitioner pleaded guilty and received a sentence of 25 years. S.F. Trial, test. of Ronald Masterson, vol. 47 at 39-42; vol. 48 at 4-11.

[11] Another of Petitioner's victims testified that (1) in September 1977 she lived in the Montrose section of Houston an apartment owned by Petitioner's aunts; (2) late on the evening of September 1, 1977, Petitioner came to her door and asked for a glass of water; (3) when she turned to get him the water, he stepped inside and locked her door behind him; (4) after she gave him the water, he grabbed her face with his hand, covering her mouth, and told her to go the bedroom; (5) he threw her on the floor; (6) she became passive; (7) he then grabbed her and raped her on the bed; (8) she was in shock afterward but managed to call a friend who took her to the police; (9) on September

6

1983 incident in which Petitioner (a) directed vulgar language toward a guard; (b) when confronted, replied that he would talk about guards any way he felt like; (c) pleaded guilty during an ensuing disciplinary proceeding to using vulgar language; and (d) received a loss of access to the prison craft shop;[12] (4) another retired TDCJ employee about (a) a July 6, 1988 incident in which Petitioner defiantly refused to obey orders that he stand behind a line and (b) a February 10, 1977 incident in which Petitioner defiantly refused to obey repeated orders to put up gym equipment and stop washing his tee shirt in a sink;[13] (5) another retired TDCJ employee about an October 3, 1986 incident in which Petitioner directed profanity toward a guard;[14] (6) a pair of former correctional officers about an incident on December 30, 1996, in which Petitioner refused a female officer's order to close a door and responded to that order by stating "Bitch, I don't have to do a goddam thing you tell me to do. I've got a life sentence, and no one's gonna tell me what to do";[15] (7) a TDCJ correctional officer about an incident on November 5, 1997, in which

---

13, 1977 she identified Petitioner in a police lineup; (10) during the assault, she managed to bite Petitioner's hand; (11) in 1978, Petitioner pleaded guilty in her case and received a 25-year sentence; and (12) she was living in another state and was not contacted when Petitioner was tried on a separate charge in 1986. S.F. Trial, test. of B___ F___, vol. 48 at 12-38.

[12] S.F. Trial, test. of Clifton Palmer McClendon, vol. 48 at 39-48.

[13] S.F. Trial, test. of Norma Bienvenue, vol. 48 at 49-66, 75-77. On cross-examination, Petitioner's trial counsel elicited testimony from Bienvenue that (1) both of the disciplinary infractions in question were considered minor; (2) Petitioner's punishment in both cases was a loss of commissary privileges; (3) from 1988 to 1997, Petitioner's housing status declined and he was moved from the most favorable to the least favorable housing unit in his prison unit; and (4) no weapon was involved in either of Petitioner's infractions. *Id.* at 67-75, 77-78.

[14] S.F. Trial, test. of Donna Pavelock, vol. 49 at 6-11, 14-15. Pavelock also testified on direct examination that (1) Petitioner's demeanor on the date in question was "evil" and (2) Petitioner was never respectful, never asked for anything but, instead, was always demanding. *Id.* at 10-11. On cross-examination, Ms. Pavelock admitted that the only punishment Petitioner received as a result of the incident in question was a loss of 15 days of commissary privileges. *Id.* at 11-14.

[15] S.F. Trial, test. Jerry Dominy, vol. 49 at 16-20, 21-22. Dominy also testified on direct that Petitioner's verbal tone on the date in question was aggressive and loud; (2) Petitioner's reputation at the TDCJ's Elis Unit was consistent with what he witnessed that day; and (3) Petitioner had more problems with female guards than male guards. *Id.* at 18-19, 22. On cross-examination, Petitioner's trial counsel elicited testimony from Dominy that this was the only incident Dominy ever witnessed involving Petitioner during the many years he worked at the Ellis Unit. *Id.* at

Petitioner joined a large group of inmates who refused to get off a truck and go to work in the fields despite numerous orders and threats from guards;[16] (8) a female TDCJ employee about an incident January 15, 1999, in which Petitioner was charged with threatening an officer verbally and received 15 days in solitary, a loss of 6 days of good conduct time, and a loss of 30 days of commissary privileges;[17] (9) a Dallas police officer who interviewed Petitioner in April 2008 about the 1984 capital murder of Angela Samota, who testified Petitioner (a) denied ever being violent during sex; (b) initially displayed a defiant, arrogant demeanor during the interview; but (c) changed his demeanor and became "more forward" when she asked about his activities on October 12-13, 1984;[18] (10) a TDCJ inmate and another witness who each testified about an incident April 16, 2010, during which Petitioner called the inmate a "f—ing piece of s—t" and made a slashing gesture across his own throat when Petitioner saw the inmate in a holding cell at the Dallas County Jail;[19] and (11) a nurse employed at a TDCJ Unit about an incident on

---

21, 22-23.

   S.F. Trial, test. of Charie Driscol Porter, vol. 50 at 7-18, 21-22. Porter also testified on direct that (1) Petitioner displayed a really bad attitude" and used "real hateful speech toward people," especially toward female officers; (2) in 1996 Petitioner was a large, stout, man who wore glasses and was extremely intimidating; (3) she found the incident in question very scary; and (4) at present well over fifty percent of TDCJ guards are women. *Id.* at 16-17, 22. On cross-examination, Petitioner's trial counsel elicited admissions from Porter that (1) this was the only report she ever wrote up on Petitioner and (2) Petitioner never attacked her. *Id.* at 18-21, 23.

   [16] S.F. Trial, test. of Rupert S. Robert, vol. 49 at 23-37. More specifically, Officer Robert testified on direct and cross-examination that (1) Petitioner was one of 93 inmates he wrote up who refused to go to work in the fields after being transported outside on the date in question and (2) after pleading guilty, Petitioner received a day or two in solitary and thirty days loss of commissary privileges. *Id.* at 27-31, 35.

   [17] S.F. Trial, test. of Angela Jeter, vol. 49 at 38-52. Jeter testified that (1) she served as Petitioner's counsel substitute on the major case; (2) Petitioner was charged with cursing a guard and telling the guard that he "should kick his ass" during a verbal dispute over changing the television channel; and (3) Petitioner was also charged with approaching the officer aggressively. *Id.*

   [18] S.F. Trial, test. of Linda Crum, vol. 49 at 52-59.

   [19] S.F. Trial, test. of Henry Aguilar, vol. 49 at 60-66. A TDCJ gang intelligence officer also testified that he had dealt with inmate Aguilar and had received reliable information from Aguilar in the past. S.F. Trial, test. of David Crippin, Volume 49 at 66-69. A Dallas Sheriff's Office Special Response Team member testified that he heard Petitioner curse another inmate while he was escorting Petitioner past a series of individual holding cells at the Dallas

November 17, 2007, during which (a) Petitioner appeared in the Unit clinic complaining of chest pains; (b) when Petitioner persisted in yelling and cursing at a TDCJ security officer, the nurse responded that Petitioner would not be yelling if he were in pain; (c) Petitioner then responded "black mother f—er bitch. You don't have to talk to me like that"; and (d) Petitioner then walked out of the clinic.[20]

## 2. *The Defense's Case in Mitigation*

Petitioner's defense team first called Petitioner's younger brother Gary, who testified that (1) their father was an encyclopedia sales representative who organized sales areas and traveled a lot; (2) when he was young their family moved around quite frequently; (3) he attended thirteen different schools growing up; (4) as a result, he and Petitioner both had very few friends but developed a close brotherly relationship; (5) eventually their family moved into construction and settled down; (6) their mother was a stay-at-home parent when they were young; (7) their mother would often blow up over minor infraction and cause Petitioner's father to punish Petitioner and Gary unfairly and excessively; (8) when their father did punish them, their mother would then say "I didn't mean they were that bad"; (9) Gary was their mother's favorite, possibly because of a congenital defect in his arm; (10) Petitioner was their father's favorite until their younger sister was born and she quickly became their father's favorite; (11) Petitioner stopped playing football because he did not like people yelling at him; (12) growing up, Petitioner was active in Boy Scouts;

---

County Jail on April 16, 2010. S.F. Trial, test. of Clifford Johnson, vol. 49 at 70-79. Officer Johnson also testified that after the incident in question, inmate Aguilar initially refused to be removed from his holding cell and escorted the same direction Petitioner had gone. *Id.* at 75-66.

[20] S.F. Trial, testimony of Nikki Anderson, Volume 50, at 24-30. On cross-examination, Petitioner's trial counsel elicited testimony from the nurse that the female security guard who interposed herself between Petitioner and the nurse did not mace or have to handcuff Petitioner to prevent Petitioner from behaving violently. *Id.*, at 31-33.

(13) Petitioner was also Gary's defender and protector; (14) once their father stopped traveling, their father worked days, their mother worked nights, and he and Petitioner looked after their younger siblings; (15) their mother was an alcoholic whose drinking became worse when she began working evenings; (16) when their mother drank, she was a lot more self-centered and mean; (17) mental illness (bi-polar and schizophrenia) is common on their mother's side of the family; (18) their mother had, and possibly their younger brother has, some form of mental illness; (19) when they grew older, their sister took over responsibility for taking care of their younger brother, a responsibility she continues to exercise now that their parents are gone; (20) Petitioner has always taken care of himself; (21) Petitioner has experienced a couple heart attacks, suffers arthritis in his knee from a football injury, and has diabetes and other medical issues; (22) Petitioner is not a threat to anyone; (23) it was not until he married that Gary learned to model a good marital relationship, learning by watching his wife's parents interact; (24) he has been Petitioner's only constant relationship throughout life; (25) he believes the jury should allow Petitioner to die a death by natural causes; and (26) Petitioner has two stents and is able to do little recreational activity beyond watching television and reading.[21]

The defense called a cardiologist who had recently treated Petitioner and who testified that (1) Petitioner had a stent installed in 2007 and another installed just days before trial began; (2) Petitioner has mildly depressed heart function; (3) Petitioner has significant coronary disease

---

[21] S.F. Trial, test. of Gary Wayne Bess, vol. 50 at 36-57, 71-75. On cross-examination, Gary Bess testified that (1) he is unaware that Petitioner has any mental problems; (2) Petitioner is not bi-polar and not manic; (3) Petitioner was not physically abused as a child except for spankings; (4) Petitioner was never sexually abused; (5) they lived in rent homes growing up but pretty much always had food; (6) Petitioner has a temper but is not violent; (7) Petitioner received a 25-year sentence for two crimes in 1977 but was out in seven years; (8) Petitioner found a job after getting out of prison in 1984; (9) he does not believe Petitioner is guilty of the rapes for which Petitioner was convicted; (10) Petitioner has said he is sorry he is in prison but has not expressed remorse to Gary for his crimes; (11) he does not discuss Petitioner's crimes with him; and (12) he does not believe Petitioner is guilty of the capital murder for which Petitioner was convicted. *Id.* at 57-70, 76-77.

diffusely scattered throughout his blood vessels; (4) Petitioner has swelling in his legs and experiences shortness of breath; (5) he diagnosed Petitioner with coronary heart disease and chronic systolic heart failure; (6) Petitioner is also diabetic and has a blockage of eighty percent in his carotid artery; and (7) surgery to clean out Petitioner's carotid artery would be extremely risky.[22]

An exonerated former TDCJ inmate who resided with Petitioner in the same cell block for many years testified that (1) he worked with Petitioner in their prison laundry and resided with Petitioner for more than ten years; (2) he got to know Petitioner in prison and they became friends; (3) a lot of inmates had issues with female guards, especially when the female guards began monitoring inmates in the showers; (4) lots of rough language is used in prison and it is socially acceptable, including racially charged language; (5) Petitioner got along with a black inmate who also worked in the laundry; (6) Petitioner is not a gang member; and (7) over the years Petitioner has become significantly less physically active.[23]

Petitioner's mental health expert, clinical psychologist Dr. Mark P. Vigen, then testified that (1) the TDCJ is a well-run prison system which has controlled and has the ability to continue to control Petitioner so that Petitioner will not be a danger to others within the prison system; (2) he and former TDCJ official S.O. Woods interviewed six TDCJ officers and reviewed Petitioner's TDCJ disciplinary records; (3) Petitioner accumulated 29 disciplinary infractions over a 32-year period; (4) Petitioner was incarcerated in the TDCJ system from May 1978 to March 1984 and

---

[22] S.F. Trial, test. of Dr. Sandeep Rom Das, vol. 50 at 85-112.

23 S.F. Trial, test. of Johnny Earl Lindsay, vol. 50 at 113-36, 149. On cross-examination, Lindsay admitted that (1) during his years in TDCJ, he never received a disciplinary infraction for being disrespectful to a guard; (2) Petitioner has an attitude; (3) the guards had a real problem with Petitioner; (4) Petitioner was a loner and a lot of people did not like him; and (5) Petitioner talked a lot of trash, especially to the guards. *Id.* at 137-48.

then again from September 1986 to May 2008; (4) Petitioner pleaded guilty during those time frames to multiple charges of speaking defiantly, using vulgar language, and disobeying an order; (5) Petitioner also pleaded guilty to a wide variety of infractions, including fighting with a dust pan and broom, being out of place, standing outside a designated area, possession of contraband (specifically food), lying to an officer, bathing in a sink, oversleeping, verbally threatening an officer, refusal to go to optometry, whistling and talking in a hallway, stealing hot dogs, and failing to enter the day room; (6) all of Petitioner's infractions were minor disciplinary infractions which led to Petitioner losing commissary privileges or being confined to his cell, but did not result in Petitioner losing good conduct time credits or suffering a reduction in classification status; (7) Petitioner had no violent infractions or sexual violations; and (8) elderly inmates tend to have fewer deviant, compulsive, or hostile infractions than younger inmates.[24]

When Dr. Vigen attempted to recite some of the things various TDCJ employees had told him during their interviews, however, the prosecution objected on hearsay grounds and the trial court excused the jury while counsel argued the issue.[25]    Near the conclusion of that hearing, the prosecution offered to allow Dr. Vigen to summarize for the jury what he had been told by the TDCJ employees whom he interviewed but not give verbatim recitations of everything his interview subjects' had told him.[26]    Dr. Vigen then testified as follows in front of the jury:

> Q.    With the rules in effect from our conversation, did you have a chance to interview some guards?
> A.    Some corrections officers, yes.
> Q.    Excuse me.    My apologies.    Corrections officers.
> A.    Yes.

---

[24] S.F. Trial, test. of Dr. Mark P. Vigen, vol. 51 at 14-53.

[25] *Id.* at 53-64.

[26] *Id.* at 62-64 .

Q. Let's start with number one that you have on your list.

A. Yes.

Q. Who did you interview?

A. Corrections officer Janet Ebner.

Q. And what was her duty in the system?

A. At the time I interviewed her, she was chief of Unit Classification at Ellis one year and she had about 27 years of experience.

Q. Okay. Did she express - - did she have any problems dealing with Bess?

A. No.

Q. Okay. Who was the next one - - when I say "Bess" I mean Andy Bess. Donald Bess, the defendant; is that right?

A. Yes, sir.

Q. Okay. Who's the second person?

A. Sergeant Cynthia Johnson.

Q. And what was her assignment?

A. She's the laundry manager in charge of all the supervision of the laundry facilities at Ellis.

Q. Okay. And do you know how long she'd been employed or worked in the system?

A. She was a sergeant. She probably has extensive experience. Let's see . . . I think certainly longer than - - she probably started prior to 1992.

Q. Okay. And she had - - she's had contact with the Defendant; is that correct?

A. Daily contact since 2001 to the present.

Q. Has she had any problems dealing with Mr. Bess?

A. No.

Q. And, physically, how would you describe her. Is she a small person? Large person?

A. She is a small woman, about five-foot four. Average build. Neatly groomed. Articulate. She has a very good command presence about her.

Q. Is she white or black or Hispanic?

A. She's a black woman.

Q. Who's the next person on your list?

A. Sergeant Johnny Mahone. Mahone or Mahoney.

Q. Okay. What are his duties and responsibilities in the system?

A. He's been involved with laundry management and necessities, which are managing laundry and facilities like that.

Q. And how long has he been in contact with Donald Bess?

A. He has known him for 21 years.

Q. Has he had any problems dealing with Mr. Bess?

A. No.

Q. Okay. Who will be the next person that you talked to? Or on your list, rather.

A. Corrections officer David Fransaw.

Q. And what duties does he have?

A. He's been a corrections officer since 1987 and he had various positions.

Q. Okay.

A. He met Mr. Bess in 1993.

Q. Has Mr. - - has David had any problems dealing with Mr. Bess?

A. No.

Q. Okay. Who was the next person on your list?

A. Sergeant Chad Crippin.

Q. Do you know what his assignment is?

A. He is head of the Security Threat Group since 1999 at Elis, and he's been at Ellis since 1986. He's a sergeant.

Q. Has he had any problems dealing with Mr. Bess?

A. No problems with him.

Q. Okay. You personally talked to him, right?

A. Yes.

Q. Okay. Who's the next one on your list?

A. He is the last one that I interviewed personally. S.O. Woods interviewed one additional officer, when I was not able to be there.

Q. Okay. And what's the next one on your list?

A. His name is Kelly Bybee.

Q. Okay. And what's his responsibility?

A. He is a unit laundry manager.

Q. Okay. Has he indicated how long he'd known Mr. Bess?

A. Yes. Since 1990.

Q. Okay. Did he have any problems dealing with Mr. Bess?

A. No.

Q. Now, there's two other people that were interviewed; is that correct?

A. Yes.

Q. Harry Sturgess (phonetic) and James Jose?

A. Yes.

Q. And is it fair to say that they had no remembrance of any problems dealing with Mr. Bess?

A. Yes.

Q. Okay. In other words, the idea being that if they had problems they would have had significant memory about him.

A. Let me say it clearly. They did not remember Mr. Bess. Even though Sergeant Sturgess, who's now retired, did write a disciplinary action on him. They didn't remember him and, as a result of not remembering him, they had no memory of anything negative to say about him.[27]

Dr. Vigen concluded his direct examination by opining that, based upon Petitioner's advanced age, declining health, and confinement history, all of which could be considered mitigating factors, he

---

[27] *Id.*

believed Petitioner would not pose a risk of future dangerousness.[28]   Following extensive cross-examination,[29] Dr. Vigen also opined that nothing in Petitioner's records suggests he had ever used a weapon except possibly for one incident in which a dust pan and brush were involved in an altercation with another inmate, and nothing in Petitioner's records suggested he had ever been involved in an escape attempt.[30]   After the conclusion of Dr. Vigen's testimony, Petitioner's defense team rested.[31]

### 3.   The Prosecution's Case in Rebuttal

The prosecution then called Petitioner's ex-spouse, who testified that (1) she married Petitioner in 1969, when she was eighteen; (2) Petitioner's attitude towards her changed shortly after they married, and he became disrespectful, insulting, demeaning, and prone to violent outbursts that had nothing to do with his use of alcohol; (3) Petitioner threw her against a wall

---

[28] *Id.* at 69-71.

[29] During cross-examination, Dr. Vigen testified that (1) clinical psychology is a field that looks for the best in people; (2) there is no DSM-IV diagnosis for "psychopathy"; (3) it is generally believed that psychopaths are very dangerous and untreatable; (4) about 75% of men in prison between the ages of 18 to 24 are diagnosed as displaying Antisocial Personality Disorder ("ASPD"); (5) by age 55, however, that 75% figure is reduced by about 75% to a figure of about 25%; (6) he interviewed corrections officer and reviewed Petitioner's disciplinary records; (7) the crime scene photos of Petitioner's capital offense reflect a very violent offense; (8) he reviewed Petitioner's 29 disciplinary cases but did not interview any of the officers involved in those incidents; (9) he made the decision not to pressure any of the officers he interviewed to talk with him; (10) all of Petitioner's violations were minor in nature; (11) vulgar language is certainly hostile but still a minor infraction; (12) Petitioner has made threats and defied orders, common behavior among older inmates, but threats are not acts of violence; (13) the best predictor of what Petitioner will do in prison is what he has done over the past 22 years; (14) the chances are low that Petitioner will be violent in prison; (15) Petitioner is a large man who has been more defiant with female guards than with male guards; (16) Petitioner has been more violent toward women than men; (17) because the Texas prison system is well-run, there is a low likelihood Petitioner will hurt anyone in prison; (18) Petitioner would potentially be very dangerous in the free world, (19) alcohol and drugs have been confiscated within the Texas prison system, as have cell phones; (20) human error occurs within the Texas prison system and Texas prisons are not perfect; (21) escapes have occurred from Texas prisons; (22) there is violence and the opportunity for violence within Texas prisons; (23) he cannot be one hundred percent certain what will happen; and (24) prior to that day, he had never seen Petitioner.  *Id.* at 106, 122-42.

[30] *Id.* at 142-47.

[31] *Id.* at 147.

when she was five months pregnant, causing her to suffer a blow to the back of her head which left her with two black eyes; (4) she went to live with her parents briefly but then returned to Petitioner; (5) during a subsequent marital counseling session, their pastor told her not to go home with Petitioner but she did anyway; (6) when their daughter was about five months old, Petitioner responded to their daughter crying by kicking their daughter's crib from one side of her bedroom to the other with their daughter inside the crib; (7) she waited until Petitioner went to work and then left with their daughter, despite the fact she was then pregnant with their son; (8) she never returned to Petitioner; (9) when she gave birth to their son, Petitioner offered to take and raise their son but said he did not want their daughter; (10) thereafter, Petitioner paid a grand total of twenty-five dollars in child support, and had nothing to do with their children; (11) Petitioner's mother was an alcoholic who treated Petitioner's brother Gary much better than she treated Petitioner; (12) Petitioner never smoked and they did not have alcohol in their house when they were married; (13) when she was eight-months pregnant with their daughter, a woman approached her and told her "I am so sorry. I did not know he was married and I did not know he was having a child"; and (14) after their divorce, Petitioner gave up his parental rights to their children.[32]

The prosecution then called another of Petitioner's rape victims, who testified about the January 1977 night on which Petitioner (1) approached her from behind on the street, put his hand over her mouth, displayed a knife, and threatened her; (2) took her to a blue truck with a white camper and forced her into the truck, telling her, "you are the victim of my aggression. You get in the truck"; (3) announced that he was going to rape her and demanded that she direct him to her house; (4) located her address in her purse after she attempted to misdirect him; (5) placed her in

---

[32] S.F. Trial, test. of Dianne Cotie, vol. 51 at 148-67.

fear for her life; (6) told her that if anyone else was at her apartment when they arrived, she and the other person would be dead; (7) forced her into her apartment at knifepoint and directed her to disrobe, (8) raped her, (9) took her back to her vehicle, and (10) told her that if she called police, she would pay for it.[33] The same witness then described how, despite Petitioner's threat, she called the police, and months later went to a police station, where she met two other victims of Petitioner and immediately identified Petitioner as her assailant.[34]

Finally, the prosecution called Samota's older sister, who testified that (1) Samota was the youngest child in their family and involved in a very happy relationship with Ben at the time of her death, (2) she was responsible for packing her sister's apartment after Samota's murder and still has many household items belonging to Samota, (3) based in considerable part upon what happened to her younger sister, she decided not to have children, and (4) when she heard an arrest had finally been made in Samota's murder, she experienced a "Twilight Zone" feeling.[35] Both parties then rested and closed.[36]

### 4. *The Defense's Bill of Exceptions*

Outside the jury's presence, Petitioner's defense team presented additional testimony from S.O. Woods and Dr. Vigen. Woods testified that (1) the defense team obtained a court order for prison personnel records, (2) he and Dr. Vigen got names from Petitioner's disciplinary records and went to the TDCJ's Ellis Unit to talk with people named in those records, (3) he was surprised

---

[33] S.F. Trial, test. of E___ A___ K___, vol. 51 at 168-77.

[34] *Id.* at 174-77.

[35] S.F. Trial, test. of Gail Samota, vol. 51 at 178-85.

[36] *Id.* at 185-86.

at how many prison personnel came forward to talk with them when requested, (4) the prison correctional officers were reluctant to talk with him and Dr. Vigen until they explained they would not have to testify in court, (5) he doubted many of the officers would have cooperated without that assurance, (6) prison officials and employees fear appearing in court, and (7) for a criminal defense counsel to subpoena TDCJ personnel would cut the information flow to defense counsel in all cases.[37]

Dr. Vigen then took the stand, and the following took place:

<u>BY MR. FRANKLIN:</u>
Q.    I'm going to hand you, Dr. Vigen, what's been marked as Defendant's Exhibits 20 through 25, and ask you if you can identify those exhibits?
A.    Yes.    These are copies of my notes that I took during interviews with these corrections officers.
Q.    And those are the actual notes that you took, as you were doing the interview; is that right?
A.    Yes, sir.    They're contemporaneous notes.
        MR. FRANKLIN:    Okay.    We will offer these for the record.    Judge, for purposes of this Bill of Exceptions.
        THE COURT:    Be admitted.
        MR. TATUM:    Would you have him just read what the individual officers - - he would have stated what they said, having been allowed to do that, for each one.
Q.    (BY Mr. Franklin)    Will you just go through there and state the name and briefly what they would have said, had you been able to testify.
A.    Yes.    Janet Ebner gave her credentials and had 27 years experience.    She said - - she would have said - - she did say that she knows Bess by sight only. Knows of no problems with him.    She reviewed his chart.    He had a low number of disciplinaries.    She said two majors.    And then she listed:    A: Verbal staff assault.    B: Destroyed boots.    Then C: Not going to work.    And D: Failure to work.
Q.    Okay.    Next.
A.    Next was Cynthia Johnson.    She gave her credentials and said how long she had known Bess.    She said that he followed all of her directions; that she had no problems with him; that she had never seen him cause any type of problem, and she labeled him a - - quote - - "normal inmate."
Q.    Okay.    Next.

---

[37] S.F. Trial, Sub Rosa Examination of S.O. Woods, Volume 51, at 186-96.

A.   Next one is Sergeant Johnny Mahoney or Mahone.   She described her experience.   Known him for 21 years.   She saw Bess everyday.   Bess was a clothing handler.   She'd been in laundry back in 2001.   Bess was there at that time for two and-a-half years more than she.   She knew that he worked in the shower area.   She said he did what he was told to do.   There were no problems from him.   He liked to eat cakes and pies.   His reputation was, he got along with inmates and most staff and he was not a troublemaker.

Q.   Okay.   Next one.

A.   Next one was David Fransaw, F-r-a-n-s-a-w (spelling).   Fransaw.   He gave his credentials, then he said that he met Bess in 1991 also in the laundry.   He had -- he worked the south end of the main corridor.   Had very little contact with Bess. Saw him in the halls.   Saw him in the chow halls.   Saw him going to showers. He said Bess loved to eat.

He, the Officer Fransaw, would go shake down the north end and Bess was housed in J22 and he saw him, Bess, during those shakedowns.   Bess had a good reputation, and no big problems.

Q.   All right.   Next one.

A.   The next one was Sergeant Chad Crippin.   He gave his credentials.   He said he had known Bess since 1986.   He said Bess was a big guy and that Bess had showed him a Texas Monthly article that had mentioned Crippin as a corrections officer.

Bess apparently had that copy and brought it up and showed it to him.   He described Bess as friendly.   Went to work in the laundry.   No problems with him. Good-natured.   And he said, "I couldn't say anything bad about him."

He said that there was a note or a letter in the file, dated 6/15/93 - - an Aryan Brotherhood letter - - that said he might be a potential member.   But that was apparently written by other people.

Q.   Is that all?   I mean, is that all of the corrections officers that you were able to talk to?

A.   Yes.   And then Woods - - Mr. Woods interviewed this last one, Kelly Bybee. Now, I also talked to two others who had retired.

Q.   Okay.   Did they have anything positive to say about him?

A.   They were supervisors in the prisons, like, Harry Sturgess.   And they would have known more about him, they said, had he been a problem.   The fact is they didn't remember him, which indicated to them that he wasn't much of a problem.

Harry Sturgess was one of the men who had written one of the disciplinaries.   We showed him the disciplinary report, and he still did not remember Bess.

Q.   Do you believe, had the jury been able to hear these specific renditions of what you were told by these corrections officers, that it would have helped to make their determination of future danger?

A.   I would say it might have, yes.

Q.   Okay.   Because we do have positive input from individual corrections officers about inmate Donald Bess; is that correct?

A.   That's correct.

Q. All right. Now, you've been doing this for quite some time. Have you ever known of an instance where the Defense lawyers were able to actually go in, interview the corrections officers, get positive feedback from a corrections officer, have that correction officer say, "You subpoena me, and I'll gladly come to court and testify for you," and have that actually happened [sic], if we have a correction office [sic] with positive things to say show up in a courtroom, in a death penalty, and say something positive about the inmate?

A. No.

Q. And why is that, in your opinion?

A. Well, I just haven't - - it's not an opinion. I just haven't seen that happen.

Q. How much trouble do you have in interviewing these correction officers?

A. Well, I've interviewed corrections officers regarding Mr. Robertson's trial that was held here in front of Judge Thompson earlier. And then regarding this inmate.

Many of the officers - - some of the officers in the Robertson trial did not want to be interviewed. And the warden told us that.

Q. Right.

A. We didn't feel like we should ask them to do anything against their wishes.

In this trial, these men and women came forward, you know, at the behest of the warden. And I don't know if anybody declined to come forward, that may have been asked.

Q. All right. Again, you had to make a deal with these correction officers in order to get information from 'em; and the deal being that you wouldn't be calling 'em in to court to testify.

A. Well, I explained very clearly that it was not our intention - - Mr. Woods or my intention - - to call them as witnesses and that it would - - you know, that would be left - - that you, Defense lawyers, left that up to us to tell them that.

But then, at the same time, I couldn't guarantee that these men and women wouldn't be subject to subpoena. I don't have that power to say that.

I mean, we were essentially saying to them "we want your observations. We want you to say whatever you want to say."

We asked them their observations, and they told us what they were. And then I said, "May I write these observations?" And they said, "Yes." And then I read the observations back to them.

We didn't in any way want to be coercive to them. We said it was our intention that they will not be called as witnesses. But we also said we can't guarantee that. We don't have the power of the Court and the lawyers to make that absolute assurance. So I think it was clear to them that we were there to learn from them, but that we would not be asking them to come.

Q. Now, we have discussed with wardens - - you and I and other lawyers have discussed with wardens in the system what is happening in the death penalty trials across the state. Where they have had inmates who are being tried in death penalty cases.

We have discussed with them that there are people who come and testify what a pathetic, ill-run system that they're operating, have we not?

A. Yes, we have.

Q. One of 'em, A.P. Merlot [sic], we talked about quite a bit with these wardens; is that right?

A. Yes.

Q. And we tell the wardens what Merlot [sic] says about their prisons.

A. Yes.

Q. But they won't come in here and defend their particular units, will they?

A. I haven't met a warden or an administrator, a regional director or a head of a division that really has known much about criticisms of the prisons that are being made in courts. They're generally not aware of that.

Q. And, yet, they don't want to come in here and defend when they know about it, do they?

A. You know, I don't know that I can speak for the wardens and say what they're willing - - what they will or won't do. Several of them said they don't want to come to court and testify.

Q. Right.

A. I mean, they've said that. But I don't know all they're thinking about it. We just don't want to put a corrections officer in jeopardy and ask him to do something that may be politically incorrect for him or not in the best interest of his career opportunities, if he were seen to be offering testimony for a Defense witness or a Defense lawyer that may have a negative impact on him, in what he does in his career.

We don't want to - - we're just not there to hurt anybody and their careers. We're just there to understand the inmate.

Q. And it's been kind of your impression that if we were to force these people to really help us, and they were willing - - I mean, we can't - - it's difficult to get somebody who wants to help us; it that true?

Because we're Defense lawyers and, for some reason, there's sort of a systemic - - I don't want to call it "rule" - - feeling that if they help the Defense, they're going to get in trouble.

A. I think that's true. They have been very willing to help me in my research efforts and what I've been wanting to do in the prison system. But I think you're accurate in the implications of your question.

Q. And we are - - we even are afraid to, for example, use S.O. Woods in certain aspects of really testifying full board [sic] for the Defense, for fear that he may lose his access to the system and access to help - - the help that we can get from people within the system; is that correct?

A. Yes, sir.[38]

---

[38] S.F. Trial, Sub Rosa Examination of Dr. Mark P. Vigen, vol. 51 at 197-205.

## 5.   *Closing Jury Arguments*

In their closing jury arguments at the punishment phase of Petitioner's capital murder trial, the prosecution team emphasized (1) the extreme level of violence and brutality involved in Petitioner's capital offense; (2) the level of horror Petitioner inflicted upon his surviving sexual assault victims; (3) the violence Petitioner inflicted on his own wife and child; (4) Petitioner's continued pattern of hostile behavior, as exemplified by his recent encounters with a nurse and female security guard inside the Ellis Unit infirmary and with Henry Aguilar inside the Dallas County Jail; (5) Petitioner's previous success in manipulating the system to gain his release; (6) Petitioner's words to a female TDCJ employee that a life sentence meant he did not have to obey any rules; (7) that Petitioner's ill-health and weight were matters largely the products of his life choices; (8) the eerily similar details of each of Petitioner's sexual assaults; (9) the flippant manner with which Dr. Vigen dismissed Petitioner's prison disciplinary cases as "traffic tickets," despite the fact they included an assault on another inmate and multiple verbal assaults on prison guards; (10) the fact defense witness Johnny Lindsay was also a convicted rapist; and (11) the absence of any evidence showing the existence of compelling mitigating circumstances.[39]

---

[39] Multiple attorneys argued for both sides at the closing of the punishment phase of trial. Prosecuting attorney Healy's closing argument at the punishment phase of Petitioner's capital murder trial (1) reminded the jury of the promises they all made during voir dire to apply the law and answer the capital sentencing special issues if the case progressed that far; (2) emphasized the solemn responsibility they would bear on so doing; (3) mentioned the number of women Petitioner had sexually assaulted, both before and after he went to prison the first time; (4) repeatedly reminded the jury of the extreme level of violence inflicted upon Petitioner's capital murder victim; (5) argued Petitioner's actions in murdering his victim were deliberate; (6) reminded the jury that Petitioner orgasmed inside his capital murder victim; (7) reminded the jury of the violence Petitioner inflicted on his ex-wife and daughter; (8) reminded the jury Petitioner was released from prison after serving only seven years on a pair of 25-year sentences, and, within just a few months, raped and murdered a new victim before raping yet another woman; (9) threatened both Henry Aguilar and a TDCJ Nurse only months before his capital murder trial; and (10) reminded the jury that the Petitioner's own brother did not believe Petitioner had committed any of his criminal offenses, including the ones for which Petitioner pleaded guilty. S.F. Trial, vol. 52 at 8-28.

Prosecuting attorney Kirlin argued (1) the facts of Petitioner's capital offense alone fully justified affirmative answers to the first two special issues and a negative answer to the final special issue; (2) Petitioner is a master manipulator who succeeded in gaining his freedom during his first term of incarceration, despite having assaulted another inmate and having verbally assaulted prison staff on multiple occasions; (3) Petitioner's pattern of minor

The defense (1) emphasized the importance and seriousness of the jury's duty; (2) reminded the jury of the things they had discussed with counsel during voir dire, including the role of individual jurors in standing firm in their views; (3) emphasized the broad range of mitigating evidence; (4) reminded the jury that individual jurors need not agree on what constitutes mitigating evidence; (5) argued the jury could dispense mercy; (6) reminded the jury that the death penalty was reserved for only those whom the state proved beyond a reasonable doubt would be a continuing threat to society; (7) argued Petitioner's record of only minor disciplinary infractions and verbal assaults while in prison for 32 years showed that he was not a future danger; (8) reminded the jury of Dr. Vigen's testimony that the Texas prison system was capable of controlling Petitioner; (9) argued Petitioner had never used a weapon during any of his verbal prison incidents; (10) reminded the jury that Petitioner was now old and in ill health; and (11) conceded that this capital murder was deliberate but insisted Petitioner was not a future danger.[40]

---

prison disciplinary infractions were a part of Petitioner's efforts to obtain release yet again; (4) Petitioner hates women; (5) Petitioner's poor health resulted directly from Petitioner own life choices, including his theft of hot dogs and cheese despite his having diabetes; (6) Dr. Vigen was unfamiliar with Petitioner's personality and unreasonably dismissive of all of Petitioner's disciplinary infractions as minor "traffic tickets"; (7) defense witness Johnny Lindsay was also a convicted rapist; (8) all of Petitioner's rapes bore eerily similar details showing Petitioner's penchant for the manipulation of others; and (9) Petitioner's statement to a female TDCJ staff person that his life sentence meant he did not have to obey any rules were a clear indicator of how Petitioner would behave if granted yet another life sentence and locked in a prison facility guarded by women. *Id.* at 49-66.

[40] Defense attorney John G. Tatum emphasized the seriousness and importance of the jury's role at the punishment phase of trial, argued the jury should consider a broad range of evidence to be mitigating, and urged the jury to dispense mercy. *Id.* at 27-31.
Petitioner's lead defense counsel, attorney Richard K, Franklin, argued (1) Petitioner's record of only verbal, non-physically violent disciplinary infractions over his 32 years in prison demonstrated Petitioner was not a future danger; (2) Petitioner's verbal outbursts were consistent with what Dr. Vigen described older inmates do, i.e., they mouth off but are not violent; (3) Dr. Vigen had spoken with female prison guards who did not have a problem with Petitioner; (4) Petitioner's disciplinary infractions were relatively minor, some so minor they were never written up; and (5) that while the capital offense was deliberate, the state had failed to prove beyond a reasonable doubt that Petitioner was a future danger. *Id.* at 32-49.

## 6. *The Verdict*

On June 18, 2010, the jury returned its verdict at the punishment phase of Petitioner's capital murder trial, (1) finding beyond a reasonable doubt that he caused Samota's death deliberately and with reasonable expectation that her death or the death of another would result; (2) finding beyond a reasonable doubt that there is a probability he would commit criminal acts of violence that would constitute a continuing threat to society; and (3) finding that, taking into consideration the circumstances of the offense, the Petitioner's character and background, and his personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment.[41]

## E. *Direct Appeal*

Petitioner appealed. On July 5, 2011, two of Petitioner's trial counsel, attorneys John Tatum and Robbie McClung, filed their Brief for Appellant, presenting fifty-two points of error.[42]

---

[41] *Id.* at 72-73. Petitioner's punishment phase jury verdict form appears among the state court records at pages 91-93 of the first volume of the Clerk's Record.

[42] As points of error on direct appeal, Petitioner argued (1) the trial court erred in overruling Petitioner's *Batson* objection to the prosecution's peremptory strike of venire member Margaret Austin (point of error No. 1); (2) the trial court erred in denying Petitioner's challenges for cause to fourteen named members of the jury venire (points 2 through 15); (3) the jury as constituted violated Petitioner right to due process (points 16-17); (4) the trial court erred in admitting over Petitioner's objection the opinion testimony of medical examiner Dr. Gilliland regarding her opinion that Samota engaged in intercourse contemporaneously with her death (points 18-19); (5) the trial court erred in admitting crime scene photographs (points 20-21); (6) because there was no semen found on Samota's bed sheets, there was insufficient evidence to establish capital murder (point 22); (7) the trial court erred in failing to instruct the jury on the lesser-included offense of aggravated sexual assault (point 23); (8) the trial court erred in overruling Petitioner's objections to prosecutorial jury argument at the guilt-innocence phase of trial regarding the location of intercourse (point 24); (9) the trial court erred in denying Petitioner's motion for mistrial at the guilt-innocence phase of trial after the trial court sustained Petitioner's objection to the prosecution's closing jury argument (point 25); (10) the trial court erred in overruling Petitioner's objection to the prosecution's closing guilt-innocence phase jury argument regarding lesser-included offenses (point 26); (11) the trial court erred in sustaining the prosecution's hearsay objection to the defense's proffer of Dr. Vigen's testimony regarding statements made to him by prison guards (points 27-28); (12) the evidence was insufficient to support the jury's affirmative answer to the future dangerousness special issue (point 29); (13) the trial court erred in denying Petitioner's motion for mistrial after the trial court sustained a defense objection to a prosecution question to a prosecution witness regarding Petitioner's demeanor (and apparent lack of remorse) (point 30); (14) the trial court erred in allowing the prosecution to impeach defense witness Lindsay with a prior conviction that was more than ten years old (point 31); (15) the trial court erred in admitting over the defense's objection a self-authenticating document relating to one of Petitioner's prior

24

In an unpublished opinion issued March 6, 2013, the Texas Court of Criminal Appeals affirmed

Petitioner's conviction and sentence. *Bess*, 2013 WL 827479. The United States Supreme

Court denied Petitioner's certiorari petition on January 13, 2014. *Bess*, 571 U.S. at 1132.

### F. State Habeas Corpus Proceeding

On May 21, 2012, attorney Catherine Clare Bernhard filed Petitioner's initial application

for state habeas corpus relief, urging fourteen grounds for relief.[43] The state trial court held an

---

convictions (point 32); (16) the trial court erred in admitting over Petitioner's hearsay objection testimony at the punishment phase of trial relating to the demeanor one of the Petitioner's previous victims (points 33 & 37); (17) the trial court erred in denying Petitioner's motion for mistrial after the trial court sustained Petitioner's objection to prosecutorial argument regarding Petitioner's threat against prosecution witness Aguilar (point 34); (18) the trial court erred in overruling Petitioner's objection and denying Petitioner's motion for mistrial at the punishment phase of trial regarding the prosecution's jury argument alluding to parole (points 35-36); (19) the trial court erred in overruling Petitioner's objections to punishment phase prosecutorial jury arguments that addressed facts outside the record (points 38-39); (20) Petitioner's due process rights were violated by virtue of the absence of state appellate review of the evidentiary sufficiency underlying the jury's answer to the mitigation special issue (points 40-41); (21) the trial court erred in failing to mandate a life sentence for Petitioner based upon the Supreme Court's holding in *Smith v. Texas* (points 42-43); (22) Petitioner's equal protection rights were violated by virtue of the prosecutorial discretion exercised by local prosecutors throughout the State of Texas (point 44); (23) the Texas capital sentencing statute is unconstitutional because it imbues the jury with too much direction (point 45); (24) the Texas capital sentencing statute's mitigation special issue violates the Supreme court's holding in *Penry* (point 46); (25) absence of a burden of proof in the Texas capital sentencing statute's mitigation special issue violates the Constitution (points 47 & 52); (26) the Texas capital sentencing statute's twelve/ten rule violates the Eighth Amendment (point 48); (27) the presence of vague and undefined terms in the Texas capital sentencing special issues violates the Eighth Amendment (point 49); and (28) the Texas capital sentencing statute violates both federal and state constitutional prohibitions including the Eighth Amendment and Due Process Clause (points 50-51).

[43] As grounds for relief in his state habeas corpus application, Petitioner argued that (1) his Fifth and Eighth Amendment rights were violated when he was charged with a capital offense committed more than twenty years prior to his indictment (ground 1); (2) his death sentence violated due process principles and the Supreme Court's holdings in *Roper v. Simmons* because of Petitioner's advanced age and poor health (ground 3); (3) Petitioner's constitutional rights were violated by virtue of the fact his defense team was unable to interview prison officials and employees (ground 5); (4) his trial counsel rendered ineffective assistance by (a) failing to adequately raise a claim based on preindictment delay (ground 2); (b) failing to challenge the admission of DNA evidence (ground 4); (c) failing to investigate exculpatory evidence regarding scorch marks in the bathtub of McCall (ground 6); (d) conceding Petitioner's guilt without Petitioner's consent (ground 7); (e) failing to challenge the absence of a definition of "probability" in the future dangerousness special issue (ground 8); (f) failing to challenge the use of the deliberateness special issue in the punishment phase jury charge (ground 9); (g) failing to challenge as too narrow the Texas capital sentencing statute's definition of the term "mitigating evidence" (ground 10); (h) failing to object to the trial court's "no sympathy" jury instruction (ground 11); (i) failing to argue the Texas capital sentencing statute violates the Supreme Court's holdings in *Apprendi, Ring,* and *Blakely* and (j) failing to challenge the trial court's failure to inform the jury of the consequences of a single holdout juror; and (5) his appellate counsel rendered ineffective assistance by failing to challenge the absence of a sentencing option of life without parole under the Texas capital sentencing scheme applicable to Petitioner's offense. Petitioner's state habeas corpus application appears among the state court records submitted by Respondent at pages 2-134 of the second volume of the transcript from Petitioner's state habeas corpus

evidentiary hearing on June 28 and July 1-3, 2013, and heard testimony from multiple witnesses, including all three attorneys who represented Petitioner at trial. On October 18, 2013, the state trial judge issued an order containing his findings of fact, conclusions of law, and recommendation that Petitioner's state habeas corpus application be denied.[44] The Texas Court of Criminal Appeals denied state habeas relief based upon the trial court's findings and conclusions. *Ex parte Bess*, WR-81,572-01, 2016 WL 1470356 (Tex. Crim. App. Apr. 13, 2016).

### G. Proceedings in this Court

On February 12, 2018, Petitioner filed his first amended federal habeas corpus petition, *see* ECF No. 23, urging eleven grounds for relief, including multiple claims Petitioner had never raised in any state court proceeding.[45] Respondent filed her answer on July 30, 2018. *See* ECF No. 30. Petitioner filed his reply on October 26, 2018. *See* ECF No. 34.

---

proceeding ("State Habeas Transcript, Volume II").

[44] The state trial court's order issued October 18, 2013, appears among the state court records submitted by Respondent at pages 40-135 of the first volume of the transcript from Petitioner's state habeas corpus proceeding ("State Habeas Transcript, Volume I").

[45] As grounds for relief in his first amended federal habeas corpus petition Petitioner argued that (1) new questions exist regarding the reliability of the DNA evidence and test results in Petitioner's case which satisfy the "actual innocence" standard (ground 4); (2) the trial court erred in excluding hearsay statements from Texas Department of Criminal Justice ("TDCJ") employees and officials to the effect that Petitioner was not a future danger (ground 5); (3) the prosecution's use of a peremptory challenge against venire member Margaret Austin violated the Supreme Court's holding in *Batson* (ground 7); (4) the trial court erred in admitting unreliable testimony from prosecution experts that Angela Samota had intercourse shortly before or contemporaneously with her death (ground 8); (5) Petitioner's due process rights were violated by virtue of the 23-year delay in his indictment (ground 9); (6) the Eighth Amendment precludes the execution of a person such as Petitioner who is of advanced years and in poor health (ground 11); and (7) his trial counsel rendered ineffective assistance by (a) failing to adequately investigate Petitioner's background and present available evidence showing that (i) Petitioner grew up in a dysfunctional family with a family history of alcoholism and mental illness, and experienced childhood trauma from abusive parents (ground 1) and (ii) Petitioner suffers from deteriorating mental health but does not suffer from anti-social personality disorder ("ASPD") (ground 2); (b) disparaging Petitioner in closing jury argument at the punishment phase of trial and conceding Samota's murder was deliberate (ground 3); (c) failing to challenge the trial court erroneous admission of evidence limiting the scope of defense expert Dr. Vigen's punishment phase testimony regarding statements made to him by TDCJ employees (ground 5); (d) conceding without Petitioner's permission that Petitioner sexually assaulted Samota (ground 6); and (e) failing to investigate evidence showing Ben McCall committed Samota's murder (ground 10).

26

On February 2, 2018, Petitioner filed a Motion for Stay. *See* ECF No. 22. On December 6, 2018 Petitioner filed a motion for discovery. *See* ECF No. 37. In an Order issued March 19, 2019, this Court denied Petitioner's motions for discovery and stay. *See* ECF No. 47. On April 10, 2019 Petitioner filed a motion for an evidentiary hearing. *See* ECF No. 48. Petitioner filed a motion for reconsideration on April 19, 2019. *See* ECF No. 49. In an Order issued April 23, 2019, this Court denied Petitioner's motion for reconsideration. *See* ECF No. 50.

## II. STANDARD OF REVIEW

Because Petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of Petitioner's claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Petitioner federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Brown v. Payton*, 544 U.S. 133, 141 (2005); *see also Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded that the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially

indistinguishable facts. *See Brown*, 544 U.S. at 141; *see also Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court's failure to cite Supreme Court authority does not, per se, establish that the state court's decision is "contrary to" clearly established federal law. Indeed, "[t]he state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16 (citation omitted).

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010); *see also Wiggins*, 539 U.S. at 520-21. An "unreasonable" application is different from a merely "incorrect" one. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner."). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 101(2011)).

Legal principles are "clearly established" for purposes of AEDPA review when, as of the time of the relevant state-court decision, Supreme Court holdings, as opposed to the dicta, establish

those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003))).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. 28 U.S.C. § 2254(d)(2) provides that federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." (emphasis in original)). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *See Wood*, 558 U.S. at 301; *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, section 2254(e)(1) provides a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)); *Rice*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" (same)). At this juncture, it

remains unclear whether section 2254(e)(1) applies in every case presenting a challenge to a state

court's factual findings under section 2254(d)(2). *See Wood*, 558 U.S. at 300-01 (choosing not to

resolve the issue of section 2254(e)(1)'s possible application to all challenges to a state court's

factual findings); *Rice*, 546 U.S. at 339 (same).

The deference to which state-court factual findings are entitled under AEDPA does not

imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S.

231, 240 (2005) (the standard is "demanding but not insatiable" (quoting *Miller-El v. Cockrell*,

537 U.S. 322, 340 (2003))).

In this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a

claim for relief pursuant to AEDPA must focus exclusively on the propriety of the ultimate

decision reached by the state court, and may not evaluate the quality, or lack thereof, of the state

court's written opinion supporting its decision. *See Evans v. Davis*, 875 F.3d 210, 216-17 (5th

Cir. 2017), *cert. denied*, 139 S. Ct. 78 (2018).

Absent a showing that there is an absence of an available state corrective process or that

circumstances exist that render such process ineffective to protect the rights of a petitioner, this

Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not

been fairly presented to the state courts. *See Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (the

exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state

court conviction without first according the state courts an opportunity to correct a constitutional

violation). Nonetheless, this Court is authorized to deny federal habeas relief on the merits

notwithstanding a petitioner's failure to exhaust available state court remedies. *See Rhines v.*

*Weber*, 544 U.S. 269, 277 (2005) (citing 28 U.S.C. § 2254(b)(2)). When a petitioner claims that

the state court failed to adjudicate a claim on the merits (such as claims (1) the state courts

summarily dismissed under the Texas writ-abuse statute or other Texas rules of procedural default or (2) which the Petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated claim is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (citation omitted) (holding de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *see also Wiggins*, 539 U.S. at 534 (same).

## III. AGE AND HEALTH BARRIERS TO EXECUTION

### A. The Claim

In his eleventh claim for federal habeas corpus relief, relying upon the Supreme Court's holdings in *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), Petitioner argues that the Eighth Amendment precludes his execution because of his advanced age and poor physical health.[46]

### B. State Court Disposition

Petitioner presented essentially the same claim as his third claim for state habeas corpus relief.[47]    The state habeas trial court concluded that Petitioner procedurally defaulted on this claim by failing to raise it in a timely manner at trial or on direct appeal and, alternatively, concluded Petitioner's constitutional claim lacked any merit.[48]    The Texas Court of Criminal Appeals denied relief based, in part, upon the trial court's findings and conclusions. *See Ex parte Bess*, 2016 WL 1470356, at *1.

---

[46] First Am. Pet. 83-84.

[47] Pet'r's App. for Writ of Habeas Corpus 49-53; State Habeas Tr., vol. II at 64-68.

[48] State Habeas Trial Court's Findings & Conclusions 27-32; State Habeas Tr., vol. I at 70-75.

## C. Teague *Foreclosure*

Respondent correctly points out that this claim is precluded by the Supreme Court's holding in *Teague v. Lane*, 489 U.S. 288 (1989), which forecloses adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings. Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (explaining that a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final" (emphasis omitted)). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: (1) the court must determine when the petitioner's conviction became final; (2) the court must survey the legal landscape as it then existed and determine whether a state court, considering the petitioner's claim at the time his conviction became final, would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and (3) if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the nonretroactivity principle. *Caspari*, 510 U.S. at 390 (collecting authorities).

The only two exceptions to the *Teague* nonretroactivity doctrine are reserved for (1) "new rules 'forbidding criminal punishment of certain primary conduct and rules prohibiting a certain

category of punishment for a class of defendants because of their status or offense,'" and (2) "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding," i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell*, 521 U.S. at 157 (citations omitted). Petitioner's proposed new rule barring the imposition of the death penalty for all condemned murderers who are of advanced age or in ill health satisfies neither of these two exceptions. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the period for filing a certiorari petition expires. *Caspari*, 510 U.S. at 390. Petitioner's conviction became final for *Teague* purposes no later than January 13, 2014, i.e., the date the United States Supreme Court denied Petitioner's petition for writ of certiorari following the Texas Court of Criminal Appeals' affirmation of his conviction and sentence. *See Beard v. Banks*, 542 U.S. 406, 411-12 (2004) (recognizing that a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.")

*Teague* remains applicable after the passage of AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Evans v. Davis*, 875 F.3d 210, 219 n.7 (5th Cir. 2017) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA). As of the date Petitioner's conviction and sentence became final for *Teague* purposes no federal court had ever held a Texas criminal defendant was entitled to have his capital

sentence vacated on Eighth Amendment grounds because the defendant suffered from ill health or was of advanced age. Thus, under *Teague*, Petitioner's final claim does not warrant federal habeas corpus relief under even a de novo standard of review.

### D. AEDPA Review

As of the date the Texas Court of Criminal Appeals rejected on the merits Petitioner's Eighth Amendment challenge to his capital sentence, i.e., April 13, 2016 (the date that the state appellate court denied Petitioner's state habeas corpus application), there was no clearly established federal law set forth in Supreme Court precedent forbidding the execution of a condemned murderer based upon the convicted defendant's advanced age, ill health, or any combination of those factors. *See Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017) (holding that the Eighth Amendment does not preclude the execution of the mentally ill and that the state court properly applied Supreme Court precedent when it refused to extend the Supreme Court's Eighth Amendment holding in *Atkins v. Virginia* beyond the intellectually disabled), *cert. denied*, 138 S. Ct. 215 (2017); *Shore v. Davis*, 845 F.3d 627, 634 (5th Cir. 2017) (holding that an Eighth Amendment claim premised upon the petitioner's alleged brain injury was not only barred by the holding in *Teague* but also at odds with well-settled Fifth Circuit jurisprudence recognizing that the Eighth Amendment does not preclude the execution of those with brain problems that do not rise to the level of intellectual disability), *cert. denied*, 138 S. Ct. 88 (2017); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (holding that neither the Supreme Court's holding in *Atkins* nor its holding in *Roper* created a constitutional rule making the execution of mentally ill persons unconstitutional); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (same). Thus, the state habeas court's rejection on the merits of Petitioner's Eighth Amendment challenge to his death sentence

was wholly consistent with clearly established federal law and does not furnish a basis for federal habeas relief under the AEDPA.

### E. Conclusions

Neither *Atkins* nor *Roper* was a federal habeas corpus case governed by the narrow standard of review under the AEDPA. Instead, both were proceedings in which the Supreme Court reviewed constitutional holdings made by state appellate courts on direct appeal. Neither of those opinions nor any of the other opinions cited by Petitioner in his pleadings and briefs in this Court recognized a constitutional prohibition on the execution of condemned prisoners who have reached advanced age or suffer from ill health at the time of a scheduled execution. In sum, Petitioner's eleventh claim for relief seeks to expand the scope of the Supreme Court's holdings in *Atkins* and *Roper* beyond the contexts of those two cases and into an entirely new realm. This relief Petitioner seeks is not available on collateral review, such as this federal habeas corpus proceeding.

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's Eighth Amendment challenge to his capital sentence was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. Whether viewed under the AEDPA or a de novo standard of review, Petitioner's eleventh and final claim for federal habeas corpus relief is without arguable merit.

## IV. PRE-INDICTMENT DELAY

### A. The Claim

In his ninth claim for federal habeas relief, Petitioner argues that his due process and Eighth Amendment rights were violated when the State of Texas prosecuted him for capital murder more than two decades after Samota's murder.[49]

### B. State Court Disposition

Petitioner's trial counsel did not move to quash the indictment against Petitioner based upon pre-indictment delay. Likewise, Petitioner did not present a point of error on direct appeal challenging the delay in his indictment. In his first claim in his state habeas corpus application, Petitioner argued that his trial for capital murder more than twenty years after Samota's murder violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.[50] The state trial court concluded that Petitioner procedurally defaulted on this claim by failing to timely raise it at trial or on direct appeal and, alternatively, the claim was meritless because Petitioner failed to identify any prejudice arising from his pre-indictment delay and failed to allege any facts showing prosecutors intentionally delayed Petitioner's prosecution to gain a tactical advantage.[51] The Texas Court of Criminal Appeals denied relief based upon the trial court's findings and conclusions. *Ex parte Bess*, 2016 WL 1470356, at *1.

---

[49] First Am. Pet. 80-82.

[50] Pet'r's App. for Writ of Habeas Corpus 21-46; State Habeas Tr., vol. II at 36-61.

[51] State Habeas Trial Court's Findings & Conclusions 15-27; State Habeas Tr., vol. I at 58-70.

## C. Clearly Established Federal Law

The Supreme Court has never recognized, explicitly or implicitly, an Eighth Amendment right to be indicted for a capital offense within any particular time frame following the commission of a capital offense.

The Supreme Court has addressed the issue of preindictment delay on several occasions. In *United States v. Marion*, 404 U.S. 307 (1971), the Supreme Court held (1) the Sixth Amendment's Speedy Trial provision affords no protection from pre-indictment delay in a criminal prosecution,[52] *id.* at 313-21, (2) the applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges,[53] *id.* at 321, but (3) the Due Process Clause of the Fifth Amendment would require dismissal of an indictment if it were shown that the pre-indictment delay caused substantial prejudice to the defendant's rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused, *id.* at 324.[54] In *United States v. Lovasco*, 431 U.S. 783 (1977), the Supreme Court drew a clear distinction between pre-indictment delay intended to deprive the defendant of due process and investigative delay designed to permit law enforcement authorities to gather relevant evidence, thoroughly determine the potential involvement of others in an offense without tipping off other perpetrators, and make an informed decision whether to proceed with a particular prosecution: "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over

---

[52] "[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Marion*, 404 U.S. at 321.

[53] *Id.*

[54] In *Marion*, the 38-month delay between the end of the fraudulent scheme charged in the indictment and the date the defendants were indicted did not extend beyond the applicable statute of limitations and there was no claim that undue delay violated Due process principles. *Id.* at 325.

the accused.'" *Id.* at 795 (quoting *Marion*, 404 U.S. at 324). "[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. at 796.

### D. AEDPA Review

As a practical matter, delay in bringing a capital charge makes it more difficult for both (1) the defense to assemble potentially mitigating evidence about the defendant's background or character, and (2) the prosecution to assemble aggravating evidence showing the defendant's propensity for committing future acts of violence, history of other criminal misconduct, and lack of remorse. In both instances, there is the potential for witnesses' memories to fade, witnesses to become unavailable, and relevant documentary evidence to become unavailable or more difficult to obtain. Thus, pre-indictment delay has the potential to harm both the prosecution and defense in a capital case. Pre-indictment delay is neither more inherently advantageous nor prejudicial to either party in a capital prosecution. That is why the mere passage of time is insufficient to support a due process claim based on pre-indictment delay, even if the time lapse prejudiced the defense. *See United States v. Seale*, 600 F.3d 473, 479 (5th Cir. 2010) ("Although more than forty years elapsed from the date of the alleged crime to Seale's indictment, this fact alone does not establish a due process violation.").

To support a Fifth Amendment due process challenge, the Fifth Circuit requires a showing that (1) the prosecution intended to delay obtaining an indictment for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other bad faith purpose and (2) the improper delay caused actual, substantial prejudice to the defense. *Woodfox v. Cain*, 609 F.3d 774, 804 (5th Cir. 2010); *Seale*, 600 F.3d at 479; *United States v. Crouch*, 84 F.3d 1497, 1512-13 (5th Cir. 1996) (en banc) (recognizing that "grounding a due process violation

on the basis of good faith but inadequate, ineffective, or insufficient governmental personnel or management leading to preindictment delay runs counter to two basic constitutional principles . . . . [First], historically th[e] guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property[;] and [second], the Due Process Clause . . . is not implicated by the lack of due care of an official causing unintended injury . . . ." (emphasis in original) (internal citations and quotation marks omitted)).

The state habeas trial determined there is no statute of limitations for murder in Texas.[55] This construction of state law, adopted by the Texas Court of Criminal Appeals when it accepted the trial court's recommendation, is binding in this federal habeas corpus proceeding. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citations omitted) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding that a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas case).

The state habeas trial court also found that (1) the prosecution did not intentionally delay Petitioner's indictment to gain a tactical advantage;[56] (2) the entirety of the 23-year gap between Samota's murder and Petitioner's indictment was the product of investigatory delay;[57] (3) the prosecution did not develop Petitioner as a suspect in Samota's murder until 2008 when it undertook DNA testing of the vaginal swab obtained during Samota's autopsy and compared the

---

[55] State Habeas Trial Court's Findings & Conclusions at 16; State Habeas Tr., vol. I at 59.

[56] State Habeas Trial Court's Findings & Conclusions at 25; State Habeas Tr., vol. I at 68.

[57] State Habeas Trial Court's Findings & Conclusions at 25, 45-47, 49-51; State Habeas Tr., vol. I at 68, 88-90, 92-94.

sperm fraction of that sample with Petitioner's known DNA;[58] and (4) Petitioner did not suffer

actual, substantial prejudice as a result of the pre-indictment delay.[59]   Petitioner has presented this

Court with no specific factual allegations, much less clear and convincing evidence, showing that

any of the state habeas court's factual findings on these subjects were incorrect.   Under such

circumstances, the state habeas court's factual findings are presumed correct.   *See Schriro*, 550

U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state

courts' factual findings unless applicants rebut this presumption with 'clear and convincing

evidence.'" (quoting 28 U.S.C. § 2254(e)(1)); *Rice*, 546 U.S. at 338-39 (same); *Miller-El*, 545 U.S.

at 240 (same); 28 U.S.C. §2254(e)(1).

---

[58] *Id.*

[59] State Habeas Trial Court's Findings & Conclusions at 18-25; State Habeas Tr., vol. I at 61-68.   Having
independently reviewed the entirety of the record from Petitioner's state habeas corpus proceeding, this Court
concludes the state habeas court's conclusion and factual findings were fully supported by the record before that court.
Petitioner presented no evidence showing that the 23-year gap in connecting Petitioner to Samota's murder was the
product of anything more than investigatory delay.   The State habeas trial court found that Petitioner's DNA was not
loaded into the CODIS database until January 2002 and DNA testing was not begun on the vaginal swab until January
2008.   State Habeas Trial Court's Findings & Conclusions at 25, 45-47, 49-51; State Habeas Tr., vol. I at 68, 88-90,
92-94.   Petitioner did not present the state habeas trial court with any evidence contradicting this factual finding.
   Petitioner did argue before the state habeas court, and once again argues in this Court, that at least some
potential witnesses became unavailable during the 23-years between his capital offense and the date of his capital
murder trial.   The state habeas court found that Petitioner failed to establish that any of the unavailable witnesses
could have presented the jury with any additional mitigating evidence not otherwise available to Petitioner at the time
of his capital murder trial.   *See* State Habeas Trial Court's Findings & Conclusions at 24; State Habeas Tr., vol. I at
67:
> The Court finds that while some of the unavailable records and individuals may have
> provided information about applicant's background, upbringing, and influences, it would not have
> altered or improved his mitigation defense.
> The Court finds that, in all likelihood, the individuals and records would have provided
> information similar to that successfully obtained elsewhere.   And even if they had provided some
> novel information, there is no reasonable probability that it would have altered the jury's answers
> to the special issues.

   Furthermore, Petitioner gained several advantages during that time period: he aged and suffered from
ailments that may have made him more sympathetic, *id.*, and, one of the Petitioner's rape victims passed away prior
to the trial and, therefore, did not testify against him.

### E. Conclusions

Petitioner's complaint of preindictment delay does not satisfy either prong of the due process analysis outlined in the Supreme Court's *Marion-Lovasco* line of cases. Petitioner has identified no clearly established Supreme Court precedent establishing an Eighth or Sixth Amendment right to expeditious indictment following the commission of a capital offense.

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's complaint of pre-indictment delay was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. Petitioner's ninth claim for federal habeas corpus relief is without arguable merit.

## V. ADMISSION OF DR. GILLILAND'S TESTIMONY

### A. The Claim

In his eighth claim, Petitioner argues that the state trial court erred in admitting the expert opinion testimony of prosecution witness Dr. Gilliland, who opined that "the intercourse was not consensual, and contemporaneous with the murder."[60]

### B. State Court Disposition

Petitioner argued in his eighteenth and nineteenth points of error on direct appeal that the state trial court erred in admitting Dr. Gilliland's opinion testimony because it was unreliable.[61] The Texas Court of Criminal Appeals concluded that Petitioner procedurally defaulted on this

---

[60] First Am. Pet. 79-80. Dr. Gilliland's actual trial testimony is summarized in detail in note 2 above.

[61] Br. for Appellant 63-65.

complaint by failing to contemporaneously object and, alternatively, concluded that the state trial court correctly applied Texas evidentiary rules when it admitted Dr. Gilliland's testimony.  *Bess*, 2013 WL 827479, *25-26.

### C.  Clearly Established Federal Law

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court.  *Estelle*, 502 U.S. at 67-68; *Lewis*, 497 U.S. at 780; *Pulley*, 465 U.S. at 41.

> When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730 (1991) (citations omitted).

Insofar as Petitioner argues his state trial court erroneously accepted Dr. Gilliland as an expert witness and improperly allowed Dr. Gilliland to express an opinion regarding the contemporaneous nature of Samota's act of intercourse and murder, Petitioner's complaints turn initially on interpretations of state evidentiary rules.  The Texas Court of Criminal Appeals' conclusion in the course of Petitioner's direct appeal that Dr. Gilliland's testimony was admissible under applicable state evidentiary rules is binding upon this Court in this federal habeas corpus proceeding.  *See Bradshaw*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). Thus, the question before this Court is not whether the state trial court properly applied state evidentiary rules, but, rather, whether Petitioner's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters. *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005) (holding that federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the U.S. Constitution).

### D. AEDPA Review

The scope of this Court's review of Petitioner's complaints about the admission of Dr. Gilliland's testimony is narrow:

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."
> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without AEDPA's added level of deference.

*Gonzales v. Thaler,* 643 F.3d 425, 430-31 (5th Cir. 2011) (footnotes omitted).

The admission of Dr. Gilliland's testimony did not render Petitioner's capital murder trial fundamentally unfair. Dr. Gilliland's testimony was admissible under state evidentiary rules. Furthermore, contrary to Petitioner's assertions in his eighth claim, Dr. Gilliland did not testify

that Samota had non-consensual intercourse; rather, Dr. Gilliland testified that (1) the absence of visible injuries to Samota's cervix and genitals did not preclude a finding that Samota was the victim of a non-consensual sexual assault; (2) the nature of Samota's chest wounds suggested she struggled while being stabbed; (3) there was no evidence the viscous material observed in Samota's vaginal vault had liquified; (4) because of the lack of drainage from Samota's vaginal vault, it did not appear she had moved since having intercourse; (5) there were no injuries to Samota's cervix or external genitalia; and (6) based upon the condition of Samota's body and the contents of Samota's vaginal vault, she believed Samota had intercourse at or near the time of her murder.[62]

Another prosecution expert, veteran OBGYN Dr. Claudia Werner, testified at trial without contradiction that the vast majority of sexual assault victims she had examined showed no signs of injury or trauma to the external genitals.[63] Dr. Werner also (1) opined that she would not expect to see intact sperm more than four-to-six hours after intercourse; (2) testified that she had never seen large numbers of intact sperm during a sexual assault examination; and (3) testified she had never seen congealed semen in her clinical practice, possibly because semen liquifies and clears the vagina very quickly after intercourse in live women due to gravity, urination, and bowel

---

[62] S.F. Trial, test. of Dr. M.G.F. Gilliland, vol. 43 at 179-81, 184-86, 191-96, 204-22; vol. 44 at 34-36, 40-41. On cross-examination, Dr. Gilliland testified that (1) the lab found phosphates and a very large number of intact sperm in Samota's vaginal swab; (2) while it is possible to find isolated intact sperm cells up to seventy-two hours after intercourse, sperm usually break down within six hours; (3) the high concentration of phosphates in Samota's vaginal swab was consistent with recent intercourse, as was the visible blob of material in Samota's vaginal vault; (4) semen begins to liquefy within an hour; and (5) it was not possible to determine the order in which Samota suffered her injuries. S.F. Trial, Test. of Dr. M.G.F. Gilliland, vol. 43 at 233-37; Volume 44, at 18-23.

[63] S.F. Trial, Test. of Dr. Claudia Werner, vol. 44 at 94-96.

movements.[64]   Petitioner presented the state trial court, and presents this Court with absolutely no evidence, showing that he ever had consensual intercourse with Samota.

The jury was free to infer the nonconsensual nature of the sexual assault upon Samota from the uncontradicted evidence showing (1) Samota called her boyfriend in distress shortly before her body was discovered to inform him that she had allowed a man into her residence; (2) shortly after that telephone call ended abruptly, Samota's lifeless body was found lying nude in her bed inside her dark, locked residence; (3) Samota had eighteen chest wounds; (4) the crime scene photographs and blood spatter evidence suggesting that something had been placed at least partially over Samota's face while she was being stabbed; (5) the defensive injuries to Samota's hands; (6) the large number of intact sperm found in Samota's vaginal swab at autopsy; and (7) the lewd manner in which her body had been posed.   The jury was free to infer that Samota was sexually assaulted at or near the time of her murder from the foregoing expert testimony, as well as testimony of Samota's friends (Ana Elena Kadala, Russell Buchanan, and Benjamin McCall) establishing Samota's movements in the hours immediately before her murder.[65]

Petitioner's expert pathologist Dr. James Traylor opined that (1) just because there were viscous secretions in Samota's vagina did not mean there was sexual activity in close proximity to her death; (2) intact sperm can be found up to 120 hours after intercourse; (3) in living individuals, sperm can survive even longer in cervical mucous; (4) the viscosity of Samota's vaginal swab was more likely due to cervical mucous than the presence of ejaculate; (5) if Samota had intercourse at or near the time of her death, he would have expected to find leakage from her vagina on her sheets; (6) he could not determine from the record whether a woods lamp had been used to examine

---

[64] *Id.* at 97-101.

[65] Kadala was with Samota shortly before the murder.

Samota's perianal region or bed sheets (for vaginal leakage); (7) Samota's case was atypical of sexual assault cases because there was no damage to her head or the inside of her thighs; (8) from the crime scene photographs, he believed Samota was sitting upright when initially attacked and she collapsed on her side toward her headboard; (9) the number of stab wounds suggested a jealous frenzy; (10) he had trouble with the prosecution's rape scenario because of the absence of external injuries; (11) he could not say to a medical degree of certainty that Samota engaged in sexual activity in close proximity to her death; and (12) he could not say that sexual activity took place on Samota's bed.[66]  Petitioner did not present the trial court with any evidence showing the sperm fraction of Samota's vaginal swab came from anyone other than Petitioner.

Thus, both parties presented the jury with expert opinions regarding the temporal proximity of sexual activity and Samota's murder.  Petitioner's jury was free to judge the relative credibility of the parties' dueling experts.  Petitioner presented the state courts, and presents this Court, with no evidence showing Dr. Gilliland's trial testimony was incredible as a matter of law.

In fact, Dr. Werner gave essentially the same opinions as Dr. Gilliland and even more compelling explanations as to why it was unreasonable to believe that Samota had intercourse a substantial amount of time before her lifeless, nude body was discovered on her bed in her residence with Petitioner's semen (including a large number of intact sperm) inside her vagina. Petitioner does not challenge the admissibility of Dr. Werner's testimony as a matter of constitutional principle.  Though Petitioner's expert Dr. Traylor had a different take on the forensic evidence than Dr. Gilliland and Dr. Werner,  the experts' disagreement does not render Dr. Gilliland's testimony inadmissible under federal constitutional principles.  *See Wood*, 503

---

[66] S.F. Trial, Test. of Dr. James Traylor, vol. 46, at 23-101.

F.3d at 414 (the erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant, factor in the defendant's conviction). In light of the multitude of circumstantial evidence the prosecution presented establishing that Samota was sexually assaulted in close proximity to her murder,[67] the admission of Dr. Gilliland's opinion testimony was not a critical or highly significant factor in bringing about Petitioner's conviction. *See Green v. Johnson*, 160 F.3d 1029, 1047 (5th Cir. 1998).

Furthermore, given the entirety of the evidence presented during the guilt-innocence phase of Petitioner's capital murder trial, the admission of Dr. Werner's testimony rendered harmless any error in the admission of Dr. Gilliland's testimony regarding the likelihood that Samota was murdered at or near the time she engaged in sexual activity. *See Brecht v. Abrahamson*, 507 U.S. 619, 623-24 (1993) (the test for harmless error in federal court is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict").

### *E. Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's complaint about the admission of Dr. Gilliland's testimony was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's direct appeal. Petitioner's eighth claim for federal habeas corpus relief is without arguable merit.

---

[67] This includes the forensic evidence showing the presence of substantial number of *intact* sperm in Samota's vagina at autopsy, the number of stab wounds inflicted upon Samota, and the fact she was discovered lifeless and nude in her bed only a short time after she was last seen alive by McCall and then minutes later spoke with him on the telephone.

## VI.  EXCLUSION OF DR. VIGEN'S HEARSAY TESTIMONY

### A.  *The Claim*

In a portion of his fifth claim, Petitioner argues the state trial court erroneously excluded the hearsay portion of defense expert Dr. Mark Vigen's testimony and thereby deprived Petitioner of critical mitigating evidence in violation of due process principles.[68]

### B.  *State Court Disposition*

Petitioner presented challenges to the trial court's rulings on his trial counsels' unsuccessful attempts to introduce hearsay testimony from defense expert Dr. Vigen as Petitioner's twenty-seventh and twenty-eighth points of error on direct appeal.[69]   The Texas Court of Criminal Appeals rejected these complaints on the merits, concluding (1) the trial court properly excluded the hearsay portion of Dr. Vigen's proffered testimony under state evidentiary rules[70] and (2) exclusion of the hearsay portion of Dr. Vigen's proffered testimony did not violate Petitioner's constitutional rights to due process, compulsory process, or the opportunity to investigate and develop potentially mitigating evidence. *Bess*, 2013 WL 827479, at *33-36.

### C.  *AEDPA Analysis*

The same constitutional principles that guided this Court's review of Petitioner's complaints about the admission of Dr. Gilliland's testimony discussed above, *see supra* § V, govern Petitioner's complaints about the exclusion of the hearsay portion of Dr. Vigen's proffered

---

[68]  First Am. Pet. 71-75.   For a summary of Dr. Vigen' testimony, *see supra* §§ 1.D.2, 1.D.4.

[69]  Br. for Appellant 82-87.

[70]  *Bess*, 2013 WL 827479, at *34 ("Admission of the complained of statements would have inappropriately shifted the focus of Vigen's testimony from his conclusion that Appellant would not be a future danger to the opinion of correction officers who never appeared as witnesses in either party's case-in-chief.").

testimony. Having reviewed the entirety of the record from Petitioner's trial, the Court concludes the exclusion of Dr. Vigen's proffered hearsay testimony did not render Petitioner's trial fundamentally unfair. The state trial court permitted Dr. Vigen to identify and offer extensive summaries of comments favorable to Petitioner from the TDCJ employees whom Dr. Vigen and Mr. Woods interviewed. A comparison of Dr. Vigen's actual punishment phase testimony and his testimony proffered during the Bill of Exceptions hearing amply demonstrates that, in terms of potentially mitigating evidence, little-to-nothing of substance was excluded. The jury was presented with ample testimony from Dr. Vigen, establishing that several TDCJ employees who knew Petitioner had expressed to Dr. Vigen that they had no problems with Petitioner and had not witnessed Petitioner engage in any violent behavior while incarcerated.

The Court concludes that the exclusion of the hearsay portion of Dr. Vigen's proffered testimony did not rise above the level of harmless error.[71] *See Brecht*, 507 U.S. at 623-24.

---

[71] Petitioner's reliance upon the Supreme Court's holdings in *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Green v. Georgia*, 442 U.S. 95 (1979), and *Taylor v. Illinois*, 484 U.S. 400 (1988), are unpersuasive.

In *Chambers*, a murder defendant was denied the opportunity to cross-examine a person who had repeatedly confessed to the murder with which the defendant was charged. The defendant was also precluded from calling multiple witnesses to whom the declarant had confessed on separate occasions. The Supreme Court held it was improper to deny Chambers the right to cross-examine the declarant based upon the declarant's prior inculpatory statements made against penal interest because those statements were made spontaneously, shortly after the offense, were corroborated by other evidence, and were made under circumstances which the Supreme Court believed establish an indicia of reliability. *Chambers*, 410 U.S. at 300-01. The Supreme Court emphasized the exclusion of the evidence of the declarant's statements against penal interest was critical to the defendant's defense and the denial of the right to cross-examine the declarant when called at trial by the defense, combined with the prohibition on presenting testimony showing the declarant's multiple confessions to the offense, deprived Chambers of a fair trial:

> The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony was also critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated the hearsay rule may not be applied mechanistically to defeat the ends of justice.

*Chambers*, 410 U.S. at 302.

In *Green*, a capital murder defendant sought to introduce prior testimony given in a co-defendant's earlier trial in which an acquaintance of the co-defendant testified that the co-defendant confessed that he had killed the victim while Green was away running an errand. The Supreme Court held that the exclusion of the hearsay testimony violated Green's due process rights because it was highly relevant to a critical issue at the punishment phase of Green's capital murder trial (i.e., whether Green himself pulled the trigger) and substantial reasons existed to assume its reliability, including (1) the fact that the co-defendant made his inculpatory statement spontaneously to a close friend;

49

Virtually all the potentially mitigating information, save for a few plainly hearsay detailed comments, that Dr. Vigen proffered during his Bill of Exceptions testimony was already before Petitioner's jury through Dr. Vigen's actual trial testimony. Petitioner proffered Dr. Vigen's hearsay testimony in an obvious attempt to convince the jury to return a negative answer to the future dangerousness special issue. The exclusion of Dr. Vigen's hearsay testimony did not have a substantial and injurious effect or influence in determining the jury's verdict at the punishment phase of Petitioner's capital murder trial. Nothing in Dr. Vigen's excluded hearsay testimony was sufficient to counteract the aggravating impact (in terms of establishing future dangerousness) of the graphic testimony of Petitioner's ex-spouse and two of Petitioner's aggravated sexual assault victims given during the punishment phase of trial.[72] Those witnesses gave detailed and dramatic

---

(2) ample evidence corroborated the co-defendant's confession; (3) the statement was clearly against penal interest; (4) there was no reason to believe the co-defendant had an ulterior motive in making it; and (5) the statement had been introduced at the co-defendant's trial and relied upon by the prosecution in obtaining the co-defendant's conviction and death sentence. *Green*, 442 U.S. at 97.

Unlike the situations in *Chambers* and *Green*, none of the hearsay testimony Petitioner sought to introduce through Dr. Vigen contained any indicia of reliability underlying longstanding exceptions to the hearsay rule. The hearsay statements of the TDCJ employees Dr. Vigen interviewed were not against penal or pecuniary interest. Nor were they independently corroborated by other evidence before the trial court or made under circumstances which tended to establish their reliability. On the contrary, both Mr. Woods and Dr. Vigen testified outside the jury's presence that they obtained the cooperation of TDCJ employees through assurances those employees would not be called to testify at Petitioner's trial. In *Chambers*, the declarant had given (and then repudiated) a formal written confession to the same fatal shooting of a police officer with which Chambers was charged. In *Green*, the prosecution had relied upon the very same hearsay testimony about the co-defendant's confession that Green sought to introduce at his own trial. Unlike the critical evidence excluded in *Chambers* and *Green*, given the extensive nature of Dr. Vigen's actual punishment phase testimony, the excluded hearsay declarations added very little of additional mitigating value to the case Petitioner's trial counsel presented at the punishment phase of Petitioner's capital trial.

The last of these cases affords Petitioner's legal argument even less support than the first two. In *Taylor*, the Supreme Court affirmed a trial court order which excluded as a discovery sanction the testimony of a potential defense witness after the trial court concluded the defendant's trial counsel deliberately failed to timely amend the defense's witness list. In so doing, the Supreme Court expressly rejected the argument that the Compulsory Process Clause abrogates state rules of evidence: "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410.

[72] For the testimony of Petitioner's ex-spouse detailing Petitioner's assault upon her while she was pregnant, see *supra* § I.D.4. For the testimony of Petitioner's sexual assault victims, see *supra* notes 1, 33, and accompanying text. In addition, a Houston law enforcement officer also testified during the punishment phase of Petitioner's capital murder trial that Petitioner used a knife during a separate January 1977 sexual assault for which Petitioner subsequently pleaded guilty. S.F. Trial, test. of Ronald Masterson, vol. 47 at 4-11.

accounts of Petitioner's brutal physical and sexual assaults upon them, which featured Petitioner's use or threatened use of force and furnished a factual template from which the jury could readily have inferred how Petitioner utilized similar force or threats to induce Samota not to resist his effort to sexually assault her.

The punishment phase evidence established that Petitioner was a remorseless, unrepentant, predator who committed other violent felonies both before and after his murder of Samota. The evidence of Petitioner's capital offense was likewise compelling on the issue of future dangerousness. Petitioner stabbed Samota eighteen times, which even defense expert Dr. Traylor described as "overkill." The punishment phase testimony was replete with incidents in which Petitioner verbally threatened TDCJ personnel, particularly female personnel. Had Dr. Vigen's hearsay testimony been admitted, the prosecution had a compelling counter-argument available: the fact that some TDCJ personnel who had met Petitioner during his decades of incarceration were unaware of his many acts of violent or threatening behavior, including his convictions for multiple sexual assaults in the free world, reflected the lack of knowledge of these individuals, as opposed to a lack of future dangerousness on Petitioner's part.

### D. Conclusions

The exclusion of the hearsay portion of Dr. Vigen's testimony did not render the punishment phase of Petitioner's capital murder trial fundamentally unfair and, even if erroneous, did not rise above the level of harmless error. The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's complaint about the exclusion of the hearsay portion of Dr. Vigen's testimony was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence

51

presented in Petitioner's direct appeal. This portion of Petitioner's fifth claim for federal habeas corpus relief is without arguable merit.

## VII. *BATSON* CLAIM

### A. *The Claim*

In his seventh claim, Petitioner argues that the prosecution improperly used a peremptory strike against a black female venire member because of her race, in violation of the equal protection principle the Supreme Court announced in *Batson v. Kentucky*, 476 U.S. 79 (1986).[73]

### B. *State Court Disposition*

After the voir dire examination of venire member M_ A_ (venire member No. 41H), the prosecution exercised a peremptory strike, and Petitioner's trial counsel raised a timely objection, arguing the prosecution improperly struck this venire member because of her race.[74] The prosecution responded by explaining (1) it had never accepted any juror in a capital case who was a "five" on the death penalty scale; (2) it had never accepted a juror who believed the death penalty was used too often; (3) it had never accepted a juror who stated they did not like to judge others or seemed hesitant to participate in this type of process; (4) the venire member had indicated she

---

[73] First Am. Pet. 78.

[74] S.F. Trial, vol. 32 at 92-94. The voir dire examination of venire member No. 41H, M_ A_ appears at S.F. Trial, vol. 32 at 70-92. During her voir dire examination, venire member No. 41H, M_ A_ (1) testified that she had answered a juror questionnaire question asking "Do you want to serve as a juror in this case?" with "no," *id.* at 73; (2) volunteered that "I just didn't want to have someone's life in my hands, really," *id.*; (3) testified that she responded to a written question asking her "If you believe in using the death penalty, how strongly, on a scale of one to ten, one being the least, ten being the most, do you hold that belief?" with a "five," *id.* at 74-75, 78-79; (4) testified that she had answered a question asking whether she thought the death penalty is used too often in Texas with a "yes," *id.* at 75; (5) explained that she believed "it seems that Texas has a history of convicting innocent people," *id.*; (6) testified that she had answered another question "too many people [are] imprisoned unfairly" and explained "I think it's just too many people that do not have legal representation," *id.* at 78; (7) testified that she believed the role of prosecutors was to put people in jail, *Id.*, at 79; (8) testified that she believed a lot of criminals are victims of society, *id.* at 80; (9) testified that she disagreed with the statement that "The criminal justice system fairly protects the right [sic] of persons accused of committing a crime," *id.*; and (10) testified that she answered a question inquiring about her feelings about her previous jury service with the statement "I don't like judging others," *id.*, 82-83.

had problems with the criminal justice system in Dallas County and felt too many people are imprisoned unfairly; (5) the venire member indicated that she felt defendants did not get adequate defense; (6) the venire member thought prosecutors put people in jail while defense lawyers "get you out trouble"; and (7) the venire member's demeanor suggested that she was not happy to be there and appeared "put out" at times while answering voir dire questions.[75] In response, Petitioner's trial counsel argued that the venire member had qualified some of her questionnaire answers reflecting her concerns with the criminal justice system and suggested that the venire member's "flat affect" during voir dire was not a sign of hostility but, rather, merely a product of the venire member's personality.[76] The state trial judge denied Petitioner's *Batson* challenge.[77]

Petitioner presented this same *Batson* claim as his first point of error on direct appeal.[78] The Texas Court of Criminal Appeals rejected this argument on the merits, concluding (1) it would defer to the trial court's credibility determination, particularly where those evaluations turned on the trial court's evaluation of the venire member's demeanor; (2) the record reflected that no one who rated themselves lower than a "7" on the death penalty scale was accepted by the prosecution; (3) found that while the prosecution did accept one juror who also felt the death penalty was used too often, unlike M_ A_, who reaffirmed that view during her individual voir dire, the juror the prosecution accepted had clarified during voir dire that she believed the death penalty was used too often *only* if wrongly administered; and (4) while the prosecution did accept other jurors who

---

[75] S.F. Trial, vol. 32 at 94-95.

[76] *Id.* at 95-96.

[77] *Id.* at 97.

[78] Br. for Appellant 26-31.

expressed concerns with the criminal justice system, unlike M_ A_, those other jurors were confident in the system and did not think that criminals were victims of society or that too many people were unfairly imprisoned. *Bess*, 2013 WL 827479, at *11-13.

## C. Clearly Established Federal Law

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of African Americans from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection. *See Batson*, 476 U.S. at 89. *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: (1) the defendant must make out a *prima facie* case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; (2) once the defendant makes the *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the arguably targeted class; and finally, (3) the trial court must determine if the defendant established purposeful discrimination by the prosecution. *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016); *Snyder v. Louisiana*, 552 U. S. 472, 476-77 (2008); *Miller-El*, 545 U. S. at 239; *Batson*, 476 U. S. at 94-98.

## D. AEDPA Review

A trial judge's findings in connection with a *Batson* challenge turn primarily upon an evaluation of the prosecutor's credibility and are entitled to deference. *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) ("The opponent of the strike bears the burden of persuasion regarding racial motivation and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to 'great deference.'" (quoting *Felker v. Jackson*, 562 U.S. 594, 598 (2011)); *Batson*, 476 U.S. at 98 n.21 (same). Under the AEDPA, even more

deference must be shown. *Davis*, 135 S. Ct. at 2199-2200.

Here, Petitioner has failed to identify any non-minority venire members against whom the prosecution failed to exercise a peremptory strike who were similarly situated in terms of their questionnaire answers and voir dire testimony to venire member M_ A_. In his pleadings in this Court, Petitioner did not specifically identify any other members of his jury venire whom he alleges were similarly situated to venire member M_ A_. Having independently examined the voir dire testimony given by M_ A_ and the other venire members identified in Petitioner's trial counsels' *Batson* objection and state appellate brief in support of his direct appeal, this Court finds the voir dire testimony given by both venire member M_ A_ and the other venire members fully supported the race-neutral reasons given by the prosecution, and accepted by the state trial and appellate court, for peremptorily striking M_ A_. In her answer to question 14 on page 3 of her juror questionnaire, venire member M_ A_ listed herself as a 5 on a scale of one to ten with regard to her belief in the death penalty. In response to question 19 on the same page, M_ A_ answered that she did not believe the death penalty is applied fairly in the State of Texas and wrote "Texas has a history of convicting innocent people." In her answer to question 20 on the same page, which asked whether she believed the death penalty in Texas was used too often or too seldom, M_ A_ answered "Too often, some cases do not warrant death penalty - rehab." In her answer to question 27 on page 4 of her questionnaire, M_ A_ responded to a question asking her to identify "the biggest problem in our criminal justice system today" with "Too many people imprisoned unfairly." While M_ A_ did give some answers that were similar to other members of the jury venire whom the prosecution accepted, given the scope of the juror questionnaire (18 pages with 131 questions), that is hardly surprising. Thus, the fact M_ A_ gave similar answers to many jurors who ultimately served on Petitioner's jury in response to questions 33 and 34 on page 6 (two

55

more scales regarding punishment in the criminal justice system) does not render any less efficacious the prosecution's reliance upon M_ A_'s questionnaire answers on page 3.

Specifically, the Court finds that the prosecution accurately asserted that it struck venire members who rated themselves a "five" or lower on the death penalty scaler or felt that the death penalty was used too frequently. Additionally, even Petitioner's counsel described M_ A_ as having a "flat affect," and the state court was entitled to "take into account, among other things, any observations of the juror that the judge was able to make during *voir dire*." *Thaler v. Haynes*, 559 U.S. 43, 48 (2010). No party is required to accept a reluctant juror, particularly in a capital proceeding with its potentially solemn consequences and the likelihood that trial will last considerably longer than in a typical criminal trial. The state trial court's rejection of Petitioner's *Batson* challenge was fully supported by the evidence before that court. The same is true for the record before the Texas Court of Criminal Appeals on direct appeal. Petitioner has failed to present this Court with clear and convincing evidence showing the state trial court's implicit credibility findings (regarding the prosecution's race-neutral reasons for its peremptory strike of venire member M_ A_) were erroneous. In sum, the state trial and appellate courts reasonably could have believed credible the prosecution's concerns that venire member M_ A_ was at best a reluctant juror with a potentially negative view of the Dallas County criminal justice system's treatment of criminal defendants generally.

### E. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's *Batson* claim on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in his trial and direct appeal.  Petitioner's seventh claim does not warrant federal habeas corpus relief.

## VIII.  ACTUAL INNOCENCE, *BRADY,* & *GIGLIO/NAPUE* CLAIMS

### A.  *Overview of the Claims*

In his fourth claim, Petitioner argues (citing facts and evidence in some instances never before presented to any other court) that questions about the validity of the DNA testing performed in Petitioner's case render his conviction invalid.[79]

### B.  *State Court Disposition*

Petitioner presented a variation on his fourth claim for federal habeas corpus relief as his fourth claim for state habeas relief.[80]  More specifically, Petitioner argued in his state writ application that his state trial counsel rendered ineffective assistance by failing to adequately challenge (through the testimony and report of Dr. Christopher Nulf, a former employee of the Southwestern Institute of Forensic Sciences ("SWIFS")) the admission of the DNA evidence establishing an exact match between the DNA in Petitioner's buccal swab and the DNA in the sperm fraction of Samota's vagina swab obtained during her autopsy.[81]  After hearing testimony from Dr. Nulf, two of Petitioner's trial counsel, and the deputy chief of physical evidence at SWIFS, the state habeas trial court (1) found Dr. Nulf never worked in the SWIFS DNA lab; (2)

---

[79] First Am. Pet. 42-56.

[80] Pet'r's App. for Writ of Habeas Corpus 54-72; State Habeas Tr., volume II at 69-87.

[81] The exact match between the DNA in both Petitioner's buccal swab and the sperm fraction of Samota's vaginal swab obtained during her autopsy is reflected in more than just the trial testimony of the SWIFS forensic biologist who conducted the DNA testing in question found at S.F. Trial, test. of Angela Fitzwater, vol. 45 at 64-84.  Several SWIFS reports attached as exhibits to Petitioner's First Amended Petition verify the continuing efficacy of Ms. Fitzwater's conclusion that Petitioner's DNA was found inside Samota's vaginal vault.  *See* ECF Nos. 23-15, 23-16, 23-19, 23-20.

found Dr. Nulf had no personal knowledge regarding the analysis of Samota's vaginal swab or Petitioner's buccal swab or the CODIS match that resulted; and (3) concluded there was no legitimate basis for a legal challenge to the DNA evidence in Petitioner's case.[82]   The state habeas trial court recommended denial of Petitioner's fourth claim for state habeas relief.[83]   In the course of Petitioner's state habeas corpus proceeding, the Texas Court of Criminal Appeals rejected all of Petitioner's ineffective assistance claims.

## C.  *De Novo Review of New Evidence and New Legal Arguments in Federal Court*

For the first time in any court, Petitioner's fourth claim herein asserts that alleged defects and deficiencies in SWIFS procedures and practices identified in external audit reports, by Dr. Nulf, or in affidavit of Dr. Maher Noureddine attached as Exhibit 18 to Petitioner's First Amended Petition warrant reversing Petitioner's conviction and sentence.   Petitioner also argues for the first time in any court that (1) the prosecution withheld potentially beneficial information

---

[82] State Habeas Trial Court's Findings & Conclusions 47-62; State Habeas Tr., Vol. I at 90-105.   More specifically, the state habeas trial court found that (1) Dr. Nulf worked briefly in the serology section of SWIFS but never worked in SWIFS' DNA lab and did not assert any complaints about the conditions of the DNA lab or the performance of any DNA analysts at SWIFS; (2) Dr. Nulf had no personal knowledge of the manner in which Ms. Fitzwater conducted her DNA extraction, testing, or analysis in Petitioner's case; (3) while Petitioner did furnish the state habeas court with external audit reports from February and June 2008 suggesting problems existed with SWIFS' procedures, there was no evidence linking any of those problems with the DNA testing performed in Petitioner's case; (4) neither of those external audit reports furnished Petitioner's trial counsel with a credible basis for attacking the admission of the DNA evidence in Petitioner's case; (5) the Petitioner's defense team retained its own DNA expert, Dr. Robert Benjamin, who reviewed not only the records from SWIFS but also Dr. Nulf's testimony at a hearing on a motion for new trial in a separate Dallas County capital murder case; (6) Dr. Benjamin had no problems with the DNA testing in Petitioner's case; (7) Dr. Benjamin reported to Petitioner's defense team that he did not believe Dr. Nulf's claims and he did not believe Dr. Nulf's allegations had any bearing on the DNA issues in Petitioner's case; (8) two of Petitioner's trial counsel, attorneys Richard Franklin and Robbie McClung attended all or portions of the hearing where Dr. Nulf testified; (9) attorneys Franklin and McClung both reasonably concluded that Dr. Nulf's testimony would not help Petitioner's defense at trial; and (10) the resulting decision by Petitioner's trial counsel not to use Dr. Nulf's testimony at trial did not fall below an objective level of reasonableness.   *Id.*   Petitioner has not presented this Court with any specific facts, much less any clear and convincing evidence showing that any of the state habeas trial court's foregoing factual findings were erroneous.   Nor has Petitioner presented this Court with any specific facts showing that any of the state habeas court's legal conclusions regarding the meritless nature of Petitioner's ineffective assistance claim were objectively unreasonable.

[83] State Habeas Trial Court's Findings & Conclusions 62; State Habeas Tr., vol. I at 105.

from Petitioner's defense team regarding alleged defects in SWIFS procedures and practices in violation of the principles the Supreme Court announced in *Brady v. Maryland*, 373 U.S. 83 (1963), and (2) utilized false testimony to secure Petitioner's conviction in violation of the principles announced in *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), and *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959). Petitioner acknowledges that these claims are all unexhausted but argues the ineffective assistance of his state habeas counsel prevented the fair presentation of the claims during Petitioner's state habeas corpus proceeding and excuses his procedural default on these new substantive claims.[84] Petitioner is in error.

### *1.* **Martinez v. Ryan** *&* **Trevino v. Thaler** *Unavailable*

Insofar as Petitioner argues the Supreme Court's holdings in *Martinez v. Ryan,* 556 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), allow him to litigate his unexhausted *Brady* and *Giglio/Napue* claims in this Court, Petitioner misconstrues the narrow scope of the holdings in those opinions. The Supreme Court's holding in *Martinez v. Ryan* and *Trevino v. Thaler* furnish a narrow avenue for circumventing a procedural default. They require a showing that the performance of a federal habeas petitioner's state habeas counsel was so deficient as to preclude state court merits review of a meritorious claim of *ineffective assistance by trial counsel*, thus permitting a federal habeas court to undertake a merits review of the otherwise procedurally defaulted complaint of *ineffective assistance by state trial counsel*. *See In re Edwards*, 865 F.3d 197, 207-08 (5th Cir. 2017) ("To show cause for procedural default under *Martinez* and *Trevino*, 'the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is "substantial" (i.e., "has some merit"); and (2) that his habeas counsel was ineffective for failing to

---

[84] First Am. Pet. 55-56.

present those claims in his first state habeas application.'" (quoting *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014)), *cert. denied*, 137 S. Ct. 909 (2017); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017) (holding that the Supreme Court's rulings in *Martinez* and *Trevino* created a narrow exception to the general rules of procedural default that applies only to a claim of ineffective assistance by state trial counsel), *cert. denied*, 138 S. Ct. 649 (2018).

The Supreme Court has expressly declined to extend the holdings in *Martinez* and *Trevino* beyond the context of procedurally defaulted complaints of ineffective assistance by state trial counsel. *See Davila v. Davis*, 137 S. Ct. 2058, 2065-66 (2017). The holdings in *Martinez* and *Trevino* do not furnish a vehicle for obtaining de novo federal habeas review of unexhausted substantive constitutional claims such as Petitioner's *Brady* and *Giglio/Napue* claims.

### 2. Brady & Giglio/Napue *Claims Meritless on De Novo Review*

Absent circumstances not present in Petitioner's case, this Court is statutorily precluded from granting Petitioner federal habeas relief on his unexhausted substantive federal claims. *Davila v. Davis*, 137 S. Ct. at 2064 ("a state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court."); 28 U.S.C. § 2254(b)(1)(A). Nonetheless, this Court does retain the authority to deny relief on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2). For the reasons discussed below, Petitioner's unexhausted *Brady* and *Giglio/Napue* claims are plainly meritless.

### a. Brady *Claim*

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady*, 373 U.S. at 87). The Supreme Court has consistently held the prosecution's duty to

disclose evidence material to either guilt or punishment applies even when there has been no request by the accused. *Banks*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676, 685, (1985). The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "'[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281-82. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks*, 540 U.S. at 698-99. A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith*, 565 U.S. at 75; *Kyles*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the

suppressed evidence would have resulted in the defendant's acquittal. *See Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland* analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. Third, once materiality is established, harmless error analysis has no application. *Id.* at 435-36. Finally, materiality must be assessed collectively, not item by item. *Id.* at 436-37.

Petitioner argues that his new DNA expert, Dr. Maher Nourreddine, raises doubts as to the reliability of the DNA re-testing and re-interpretation performed on Petitioner's buccal swab and the sperm fraction of Samota's vaginal swab in 2015-17. Dr. Nourreddine's affidavit (attached as Exhibit 18 to Petitioner's First Amended Petition and dated January 31, 2018) does raise several questions about the efficacy of the DNA re-interpretations performed in 2015-17. He also questions whether adequate maintenance records were maintained on a particular machine apparently present in the SWIFS lab in 2008 (but he does not allege that this machine was actually utilized to evaluate any of the DNA in Petitioner's case). At no point in his affidavit, however, does Dr. Nourreddine allege there was anything factually inaccurate in either (1) the trial testimony of prosecution witness Angela Fitzwater or (2) the conclusions reached by Fitzwater and subsequent SWIFS analysts (in 2015-17) regarding the identical nature of the DNA found in Petitioner's buccal swab and the sperm-fraction of Samota's vaginal swab. Dr. Nourreddine's assertions regarding alleged errors in the reinterpretation of DNA testing performed in 2015-17 cannot form the basis for a *Brady* claim since there is no allegation, much less any evidence, showing that the reports from the 2015-17 reinterpretations with which Dr. Nourreddine takes exception were available (and hence could have been "withheld" by the prosecution) at the time of Petitioner's 2010 capital murder trial.

Petitioner alleges no facts showing that, but for the failure of the prosecution to disclose to Petitioner's defense team any information available at the time of Petitioner's 2010 capital murder trial, there is a reasonable probability the outcome of either phase of Petitioner's trial would have been any different. For the same reasons discussed at length in the Court's Order issued March 19, 2019, *see* ECF No. 47, speculation about whether a particular machine was or was not used to evaluate DNA in Petitioner's case and whether adequate maintenance records were maintained for that machine in question does not satisfy the *Brady* materiality standard. Petitioner has failed to allege any facts showing the prosecution withheld any information from the defense prior to or during Petitioner's June 2010 capital murder trial that satisfies the *Brady* materiality standard. In fact, Petitioner does not allege that the prosecution withheld from Petitioner's defense team any of the SWIFS maintenance records from calendar years 2003-09 on which Dr. Nourreddine relies on in his 2018 affidavit.

### *b.* Giglio/Napue *Claim*

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio*, 405 U.S. at 153-54; *Napue*, 360 U.S. at 269-70. To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony; (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury; and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio*, 405 U.S. at 153-54; *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir. 2011); *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

There is no fact-specific allegation currently before this Court, much less any evidence, showing that the trial testimony of prosecution witness Angela Fitzwater (identifying Petitioner's DNA as identical to the DNA contained in the sperm-fraction of Samota's vaginal swab) was factually inaccurate. Nor has Petitioner presented this Court with any specific facts or evidence showing that the prosecution knowingly used any factually inaccurate testimony by Ms. Fitzwater or any other prosecution witness to secure Petitioner's capital murder conviction or death sentence. Petitioner has alleged no specific facts and presented this Court with no evidence showing that the prosecution *knowingly* used perjured testimony to secure Petitioner's conviction or capital sentence.

### 3. Actual Innocence Claim Meritless

Furthermore, the Court finds that the new evidence Petitioner has presented for the first time does not satisfy the standard for showing that he is actually innocent of the offense for which he was convicted *House v. Bell*, 547 U.S. 518, 537 (2006), or that he is "actually innocent of the death penalty" under *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).[85] The Fifth Circuit does not

---

[85] Alternatively, Petitioner's "new evidence" accompanying his First Amended Petition does not even begin to satisfy the standard set forth in either *House v. Bell* or *Sawyer v. Whitley*. A mere showing of the existence of additional or new mitigating evidence does not, per se, satisfy the *Sawyer* standard: "the 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." *Sawyer*, 505 U.S. at 347. Likewise, Dr. Nourreddine's problems with the 2015-17 DNA reinterpretations do not constitute new evidence showing Petitioner's actual innocence under either the *House* or *Sawyer* standards. Dr. Nourreddine's criticism (in ¶ 1, at pp. 2-3 of his affidavit) of the reinterpretation of the vaginal swab-*epithelial* fraction is non sequitur. It was the identical nature of the *sperm* fraction of Samota's vaginal swab and Petitioner's buccal swab that established Petitioner's guilt, not the genetic relationship between Petitioner's buccal swab and Samota's epithelial fraction. Likewise, Dr. Nourreddine fails to allege any facts showing how the failure of SWIFS to properly maintain records of its maintenance on its machines in 2008 could possibly have resulted in an inaccurate reinterpretation of DNA samples in the 2015-17 time frame (which verified the identical nature of the DNA in Samota's *sperm* fraction vaginal swab and the DNA in Petitioner's buccal swab). Finally, given the lack of any evidence showing that Samota put her black jumpsuit back on *after* she was sexually assaulted but prior to her murder, Dr. Nourreddine's assertions (in ¶ 3, at p. 3 of his affidavit) of the need for further testing of the DNA obtained from Samota's jumpsuit offer no rational basis for a finding that Petitioner is actually innocent of anything. Petitioner alleges no facts, and presents no evidence, showing the sperm found inside Samota's vaginal fault came from anyone other than Petitioner.

recognize federal habeas claims based on freestanding assertions of actual innocence. *See Floyd v. Vannoy*, 894 F.3d 143, 155 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 573 (2018); *Coleman v. Thaler*, 716 F.3d 895, 908 (5th Cir. 2013); *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014).

### D. *Conclusions*

Petitioner's unexhausted *Brady* and *Giglio/Napue* claims are plainly meritless and do not justify a stay, much less federal habeas corpus relief. Petitioner's fourth claim does not warrant federal habeas relief.

## IX. INEFFECTIVE ASSISTANCE CLAIMS

### A. *Overview of the Claims*

In his first through third, fifth, sixth, and tenth claims, Petitioner argues that his trial counsel rendered ineffective assistance by: (1) failing to adequately investigate Petitioner's background and present potentially mitigating evidence showing Petitioner's dysfunctional family and traumatic background;[86] (2) failing to develop and present available mitigating evidence showing Petitioner's deteriorating mental health and that Petitioner does not display anti-social personality disorder;[87] (3) engaging in closing argument at the punishment phase of trial that disparaged Petitioner's character, failed to focus on Petitioner's age and poor health, and conceded the murder was deliberate;[88] (4) failing to adequately litigate the trial court's exclusion of the hearsay portion of Dr. Vigen's testimony;[89] (5) conceding that Petitioner sexually assaulted Samota;[90] and

---

[86] First Am. Pet. 11-30.

[87] *Id.* at 30-39.

[88] *Id.* at 39-42.

[89] *Id.* at 66-71.

[90] *Id.* at 75-78.

(6) failing to adequately investigate and present evidence showing that Ben McCall murdered Samota.[91]

## B. *Clearly Established Federal Law*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins*, 539 at 521; *Williams*, 529 U.S. at 390-91. In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688-89). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the

---

[91] *Id.* at 82-83.

exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694.

In instances where the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005).

Under AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U.S. at 101 (citations omitted).

### C. *Failure to Present Evidence Showing McCall Did It*

#### 1. *The Claim*

In his tenth claim, Petitioner argues that his trial counsel rendered ineffective assistance by failing to present the jury available evidence tending to show that Samota's boyfriend Ben McCall was responsible for her murder.[92]

#### 2. *State Court Disposition*

In his sixth claim for state habeas relief, Petitioner argued his trial counsel should have presented available evidence showing that Samota's boyfriend had a jealous motive to kill Samota, that a sorority sister of Samota observed a mark in the bath tub of McCall's apartment subsequent to Samota's funeral that caused her to speculate that McCall had burned clothing containing

---

[92] First Am. Pet. 82-83.

Samota's blood in the tub, and failing to interview the sorority sister in question.[93]  The state

habeas trial court (1) heard testimony from Samota's former sorority sister,[94] another friend of

Samota's who was prepared to refute the sorority sister's recollection of relevant events,[95] one of

Petitioner's prosecutors,[96] and three of Petitioner's trial counsel;[97] (2) found that Petitioner's trial

---

[93] Pet'r's App. for Writ of Habeas Corpus 80-82; State Habeas Tr., vol. II at 95-97.

[94] During the evidentiary hearing held in Petitioner's state habeas corpus proceeding, the trial court heard testimony from a former sorority sister of Samota's named Joy Hosey, who testified that (1) she was Samota's big sister in their sorority; (2) Samota and McCall were very much in love, very happy together, and showed no indications of jealousy; (3) she went back to McCall's apartment after having drinks and McCall wept over Samota's death; (4) while in McCall's bath room, she noticed a rag that appeared to have been used to clean the bath tub and a spot in the bath tub that looked like something possibly had been burned there; (5) there was no debris or ashes and the mark could have been made by grease; (6) she told no one about the incident for six or seven months; (7) eventually she told a police officer named Janice Crowther about the mark in the tub but never told Crowther that she believed bloody clothing had been burned in the tub; (8) she never believed anything associated with Samota's murder was burned in McCall's bath tub.  S.F. State Habeas Hearing, Test. of Joy Husey, vol. 2 at 9-33.

[95] More specifically, George Fredrick Boehme testified at the evidentiary hearing in Petitioner's state habeas corpus proceeding that (1) he lived in Dallas in 1984 and had attended SMU; (2) he knew both Samota and McCall, whom he described as "best friends" and "very close"; (3) McCall was not jealous of Samota but, rather, wanted Samota to have fun with her friends; (4) when he heard that Samota had been murdered, he drove to McCall's apartment where McCall asked him to keep others out; (5) McCall was grief stricken and expressed guilt over sending Samota away when she arrived at his apartment shortly before her murder; (6) he recalled meeting Samota's big sister in her sorority, a person named Joy, after Samota's murder; (7) Joy never told him that anything had been burned in McCall's bath tub; and (8) he never saw any scorch marks in McCall's bath tub.  S.F. State Habeas Hearing, Test. of George Fredrick Boehme, vol. 4 at 5-24.

[96] Attorney Patrick Kirlin, one of the prosecutors at Petitioner's capital murder trial, testified during Petitioner's state habeas corpus hearing that (1) Dallas police officer Janice Crowther maintained contact with several of Samota's friends over the years following the murder; (2) one of Samota's friends told him that Joy had claimed to have seen ashes in McCall's bath tub; (3) he then spoke with Joy, who claimed to recall seeing scorch marks in McCall's bath tub and telling George Boehme about what she had seen; (4) when he contacted Boehme, he denied that Joy ever told him she had seen anything in McCall's tub and said he was willing to testify at trial that the conversation with Joy never happened; (5) McCall was dumbfounded when questioned about the alleged marks in his bath tub; (6) he contacted Petitioner's defense counsel and informed them about Joy's allegations and filed a written notice with the trial court; (7) Joy gave him a cell phone number and he passed that number on to Petitioner's defense team; (8) both Boehme and McCall were prepared to contradict Joy's account and to impeach her if they been called upon to do so at Petitioner's trial; and (9) Joy never told police that she had seen scorch marks in McCall's bath tub. S.F. State Habeas Hearing, Test. of Patrick Kirlin, vol. 4 at 24-59.

[97] Attorney Richard Franklin testified at Petitioner's state habeas evidentiary hearing that (1) the defense team was aware of Joy Hosey and made attempts through defense expert Dr. Kristi Compton to contact Hosey, but she refused to cooperate with them; (2) Dr. Compton contacted several of Samota's sorority sisters; (3) the defense team decided not to call any of Samota's sorority sisters as witnesses at trial because some were hostile to the defense, some were "a mess," and some had their own criminal histories to deal with; (4) Joy Hosey's suspicions about McCall never made any sense to him because the police had searched McCall's apartment and truck immediately after the

counsel (a) reasonably investigated the evidence allegedly showing McCall's guilt (including making reasonable attempts to contact Samota's former sorority sister); (b) reasonably chose not to present the sorority sister's testimony because she refused to cooperate with the defense and another witness was available to refute the sorority sister's speculative testimony; (c) Samota's sorority sister could not have testified that McCall burned clothing (bloody or otherwise) in his bath tub and could not have implicated McCall in Samota's murder; and (d) the evidence showing Petitioner sexually assaulted and murdered Samota was overwhelming; (3) concluded Petitioner's complaints failed to satisfy either prong of the *Strickland* standard; and (4) recommended denial of this claim on the merits.[98] The Texas Court of Criminal Appeals denied the claim when it denied Petitioner's state habeas application. *Ex parte Bess*, 2016 WL 1470356, at *1.

---

murder; (5) Hosey would not return Dr. Compton's phone calls and would not cooperate with the defense team over the phone; and (6) the defense team made the decision not to subpoena Hosey or call her as a witness at trial. S.F. State Habeas Hearing, Test. of Richard Franklin, vol. 2 at 49-50, 65-67, 75-78.

Attorney Robbie McClung testified that (1) Dr. Compton did a psychological background on the victim but was unable to get much cooperation from Samota's sorority sisters; (2) the prosecution notified the defense team regarding Joy Hosey's observations; (3) Dr. Compton was unable to get Joy to call her back; and (4) the defense team was concerned that putting Joy Hosey on the stand as a defense witness could affect their credibility with the jury. S.F. State Habeas Hearing, Test. of Robbie McClung, vol. 2 at 88-89, 98.

Attorney John Tatum testified that (1) Dr. Compton attempted to contact Joy Hosey but never got a response; (2) the defense team's mitigation and fact investigators were very thorough; and (3) the defense made efforts to locate and contact Joy. S.F. State Habeas Hearing, Test. of John Tatum, vol. 3 at 21, 44, 56.

[98] State Habeas Trial Court's Findings & Conclusions 62-73; State Habeas Tr., vol. I at 105-16. More specifically, the state habeas trial court concluded that (1) Joy Bolin Hosey was uncooperative with the efforts of Petitioner's defense team to interview her; (2) based upon Hosey's lack of cooperation, Petitioner's defense team reasonable determined not to continue its efforts to interview her and reasonably chose not to call her to testify at trial; (3) Hosey's animus toward Petitioner during her testimony at the state writ hearing was palpable; (4) the report that Ben McCall burned clothing in his bath tub after the murder lacked credence; (5) Hosey could only recall a "feeling" that McCall may have burned clothing with Samota's blood on it; (6) because Hosey did not report what she had observed to the police, and the fact that police searched both McCall's truck and apartment within hours of the murder, the theory that McCall burned clothing containing Samota's blood in his bath tub weeks after Samota's funeral "did not ring true"; (7) Hosey gave different accounts of what she had seen in McCall's bath tub to different people at different points in time and claimed to have told Boehme about what she had seen while Boehme denied that any such conversation ever took place; (8) Hosey's testimony would not have established that McCall burned clothing containing Samota's blood in his bath tub; (9) Petitioner's trial counsel's decision not to further investigate what Hosey claimed to have seen in McCall's bath tub constituted sound professional judgment; (10) Hosey's testimony would not have implicated McCall in Samota's murder; (11) if Petitioner's trial counsel had attempted to develop evidence that McCall destroyed evidence in his bath tub, such effort would have caused said counsel to lose credibility with the jury; (12) the prosecution's evidence that Petitioner sexually assaulted and murdered Samota was

### 3. AEDPA Review

The state habeas court reasonably concluded the decision by Petitioner's defense team not to further investigate Joy Hosey's alleged observation of either scorch marks or ashes in McCall's bath tub weeks after Samota's funeral did not amount to ineffective assistance of counsel. The state habeas court reasonably found that Samota's sorority sister Hosey could offer no testimony establishing that anything even remotely relevant to Samota's murder or establish that anything had ever been burned in McCall's tub. The state habeas court reasonably found Hosey could offer no testimony implicating McCall in Samota's murder. To date, Petitioner has failed to offer any court any evidence implicating McCall in Samota's murder. Petitioner has failed to present this Court with any fact-specific allegations, much less clear and convincing evidence, showing any of the state habeas court's factual findings were erroneous.

The evidence is uncontroverted that (1) it was McCall who called police to Samota's residence on the night of her murder; (2) McCall explained to police his concerns for her safety; (3) Petitioner's DNA is a perfect match for the sperm fraction of Samota's vaginal swab; and (4) McCall consented to searches of his truck and apartment immediately after the discovery of Samota's body and subsequently voluntarily gave police a blood sample. Given this evidence and the lack of evidence incriminating McCall in the murder, Petitioner's defense team reasonably concluded that attempting to present evidence linking McCall to Samota's murder was not merely folly but likely to damage the defense team's credibility before Petitioner's jury. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). The state habeas court reasonably concluded that

---

overwhelming; and (13) Petitioner was not prejudiced by his trial counsel's decision not to further investigate Hosey's observations or other evidence showing McCall committed Samota's murder. *Id.*

Petitioner's defense team acted in an objectively reasonable manner in choosing the witnesses to present during the guilt-innocence phase of Petitioner's capital murder trial.

Furthermore, it does not appear that Joy Hosey, nor any other witness identified by Petitioner in this Court, could have furnished Petitioner's jury with persuasive evidence implicating McCall or anyone other than Petitioner in Samota's murder. On the other hand, Petitioner left irrefutable evidence of his guilt behind at the crime scene: his DNA. Retesting of the relevant DNA in the 2015-17 time frame did not exculpate Petitioner. The state habeas court reasonably concluded that this complaint of ineffective assistance also failed to satisfy the prejudice prong of the *Strickland* standard.

### 4. Conclusions

After reviewing the entirety of the record from Petitioner's trial and state habeas corpus proceeding, this Court independently concludes Petitioner's complaints about his trial counsel's failure to further investigate and present evidence showing someone other than Petitioner sexually assaulted and murdered Samota fail to satisfy either prong of the *Strickland* standard. The Texas Court of Criminal Appeals' rejection on the merits during Petitioner's state habeas corpus proceeding of this ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. Petitioner's tenth claim does not warrant federal habeas corpus relief.

## D.  Conceding Petitioner Sexually Assaulted Samota

### 1.  The Claim

In his sixth claim, Petitioner argues that his trial counsel rendered ineffective assistance by making a closing jury argument at the guilt-innocence phase of trial that effectively conceded Petitioner sexually assaulted Samota.[99]

### 2.  State Court Disposition

At the conclusion of the guilt-innocence phase of Petitioner's capital murder trial, the prosecution argued (1) the evidence did not support the theory that Samota died as a result of a jealous rage; (2) the evidence showed that Petitioner forced Samota to undress, forced her to have nonconsensual intercourse, and then stabbed Samota eighteen times; (3) murderers should not benefit from killing the only witness to a crime; (4) the time lines offered by Samota's friends about the night of the murder were generally consistent; (5) the behavior of McCall on the night in question was reasonable; (6) it was not credible to believe the 20-year-old Samota had consensual sex with the 36-year-old Petitioner; (7) the jury should rely on reason and common sense; (8) there was no evidence showing Samota ever had consensual sex with Petitioner; (9) the defense was attempting to cast aspersions on Samota's character by pointing out Samota was not wearing a bra the evening before her murder; (10) it was unreasonable to believe Samota's sexual assault was unrelated to her murder; (11) there was only a 45-minute window in which the sexual assault and murder could have occurred; (12) McCall had no reason to testify falsely about Samota's telephone call to him on the night of her murder; and (13) the physical evidence at the

---

[99] First Am. Pet. 78.

crime scene and the testimonies of trace evidence expert David Spence and medical expert Dr. Werner supported Dr. Gilliland's opinions, as did the DNA evidence.[100]

Petitioner's co-counsel at trial, attorney Robbie McClung then addressed the jury and urged the jurors to be dispassionate and accept Dr. Traylor's interpretation of the evidence.[101]  She then argued as follows:

> You know, when you talk about proof beyond a reasonable doubt, you're talking about proof to each and every one of the elements.  And let me, first, tell you that I don't remember one time anyone saying from the Defense table that we believe that Donald Bess had consensual sex with Angela Samota.  That never was said.  And if that's what Ms. Bennett thinks she heard, that's her impression.  But it definitely didn't come from me.  And it's not my job to prove whether it was consensual or nonconsensual.  It's not my job to prove how they met.  Ms. Bennett is right.  It's not my job.  It's theirs.[102]

During the prosecution's subsequent jury guilt-innocence phase argument, the following exchanges took place in the course of responding to the defense's prior argument suggesting the prosecution's case against Petitioner had been fabricated:

> MR. KIRLIN:  For all those years, he [prosecution witness Virgil Sparks] carried on this conspiracy.  He came here 26 years later and told you that it was nothing.  "I couldn't solve it."  Because he - - I guess, he didn't want to pen [sic] it on this guy.  I mean, this conspiracy - - these are things, Ladies and Gentlemen, that just don't make sense.  These are the conjecture thing.  There are the things Defense wants you to go down - - we call 'em "rabbit trails."  They're conceding everything.
> MR. TATUM:  I'm going to object, Your Honor.  We haven't conceded everything.
> THE COURT:  Sustained.
> MR. TATUM:  Ask the jury to be instructed to disregard the last statement of the prosecutor.
> THE COURT:  Jury will disregard the last statement.
> MR. TATUM:  Move for a mistrial.

---

[100] S.F. Trial, vol. 46 at 106-19.

[101] *Id.* at 120-24.

[102] S.F. Trial, vol. 46 at 124.

THE COURT: Denied. Proceed.

MR. KIRLIN: Ladies and gentlemen, counsel said, '[sic] we never said it wasn't consensual." So concede everything, except for murder. So now it comes down to not only what Dr. Gilliland tells you, but Sarah Williams. Sarah Williams told you that level of acid phosphates and that slide that she looked at, ever field of vision that she looked under, she saw nothing but intact sperm. Nothing. No heads. No tails. Nothing but intact sperm, which tells her - - she confirms what the doctor surmise [sic] when she first inspected and smeared - - this happened right about the time of Angela Samota's death.

You have Dr. Werner. We brought her in - - she's an OBGYN - - to confirm some of the same things that Dr. Gilliland and Sarah Williams told you. That is, gravity - - again, Ladies and Gentlemen, I apologize for everything you've heard. But that's what this case is about. Common sense. And immediately after intercourse, a woman gets up, walks around, carries on normal activities. Not only does the vaginal vault start attacking the enzymes, things like that. But just gravity itself.

And all three of those individuals: Dr. Gilliland, Dr. Werner and Sarah Williams said they would never expect - - they would never see the results that were on that rape exam, if a female had had intercourse and was alive for even an hour before she was murdered. That's how you know.[103]

In his seventh claim for state habeas relief, Petitioner complained that his trial counsel effectively conceded guilt to a charge of sexual assault in opposition to Petitioner's expressed wishes by doing nothing to challenge the DNA evidence, denying that Petitioner ever had consensual sex with Samota, requesting a jury instruction on the lesser-included offense of aggravated sexual assault, and thereby adopted a trial strategy Petitioner opposed.[104] The state trial court (1) heard testimony from Petitioner's trial counsel;[105] (2) found (a) Petitioner's trial

---

[103] S.F. Trial, vol. 46 at 151-53.

[104] Pet'r's App. for Writ of Habeas Corpus 83-85; State Habeas Tr., vol. II at 98-100.

[105] Attorney Richard Franklin testified during the evidentiary hearing in Petitioner's state habeas corpus proceeding that (1) the defense's trial strategy was to make the State prove a nonconsensual encounter and argue there was reasonable doubt as to whether it was connected to the murder; (2) the defense retained its own DNA expert, Dr. Robert Benjamin of the University of North Texas, who saw no reason to have the DNA retested and had no issue with the DNA testing or evaluation done in Petitioner's case; (3) the defense team watched the testimony of a SWIFS whistleblower named Dr. Nulf in another case but decided not to use his testimony at Petitioner's trial; (4) Petitioner had little memory of the time frame of the murder; (5) the defense team met regularly with Petitioner; (6) the DNA was the problem the defense faced at the guilt-innocence phase of trial; (7) the defense chose to put the burden on the prosecution to prove rape and murder; (8) the defense never conceded at trial that Petitioner sexually assaulted Samota;

75

counsel never conceded Petitioner was guilty of sexually assaulting Samota; (b) there was no evidence Petitioner ever had consensual sex with Samota; (c) Petitioner's trial counsel never argued Petitioner sexually assaulted Samota; (d) instead, Petitioner's trial counsel argued the State had failed to establish the sexual intercourse was nonconsensual; (e) the DNA test results were accurate and reliable; and (f) challenging the DNA test result would not have been successful; (3) concluded (a) Petitioner's trial counsel engaged in reasonable trial strategy, and (b) Petitioner was not prejudiced by the trial strategy of his defense team; and (4) recommended denial of this claim on the merits.[106] The Texas Court of Criminal Appeals denied the claim when it denied Petitioner's state habeas application. *Ex parte Bess*, 2016 WL 1470356, at *1.

---

(9) he watched Dr. Nulf's testimony in another case and was unimpressed; and (10) Dr. Benjamin did not believe Dr. Nulf's testimony was credible and recommended against using it in Petitioner's trial. S.F. State Habeas Hearing, Test. of Richard Franklin, vol. 2 at 36-37, 47-48, 50-51, 59-62, 78-80.

    Attorney Robbie McClung testified that (1) she tried to distance the sexual assault from the murder; (2) their trial strategy was to argue others had a motive to kill Samota and paint the offense as a murder unrelated to a sexual assault; (3) the defense relied upon the testimony of a Louisiana expert (Dr. Traylor) to support its position in this regard; (4) the defense team never conceded the Petitioner was guilty of sexual assault; (5) Dr. Nulf's testimony at the Ledbetter hearing did not impact the validity of the DNA testing done in Petitioner's case; and (6) Dr. Benjamin did not believe Nulf's testimony in the Ledbetter case and did not believe Dr. Nulf's testimony would help Petitioner. S.F. State Habeas Hearing, Test. of Robbie McClung, vol. 2 at 85-87, 94, 100-01.

    Attorney John Tatum testified that (1) Petitioner's memory was not good, but he adamantly asserted that he was not guilty of sexual assault or murder, and continued in that assertion even after he was convicted; (2) the defense was concerned the prosecution would introduce evidence of Petitioner's past rapes at the guilt-innocence phase of trial if the defense opened the door to such evidence; (3) this concern hamstrung the defense's trial strategy; (4) he never conceded that Petitioner sexually assaulted Samota; but (5) the Dallas Morning News distorted something attorney Franklin said during trial and erroneously reported that he had conceded sexual assault. S.F. State Habeas Hearing, Test. of John Tatum, vol. 3 at 13, 19, 40-41, 43.

    The state habeas court also heard from Dr. Nulf, who admitted on cross-examination that (1) DNA extraction was done separately from the serology work he did at SWIFS; (2) he had never worked in the DNA lab at SWIFS; (3) his allegations of inappropriate behavior and procedures related to the serology lab at SWIFS and not the DNA lab; and (4) he had no personal knowledge of the handling of any of the DNA involved in Petitioner's case. S.F. State Habeas Hearing, Test. of Dr. Christopher Nulf, vol. 2 at 170-76.

[106] State Habeas Trial Court's Findings & Conclusions 73-76; State Habeas Tr., vol. I at 116-19.

### 3. AEDPA Review

The state habeas court expressly found that Petitioner's trial counsel never conceded that Petitioner was guilty of sexually assaulting Samota. This Court has independently reviewed the entire record from Petitioner's trial and state habeas corpus proceedings, including the portions of the closing guilt-innocence phase jury argument identified in Petitioner's pleadings in this Court. There is simply nothing before this Court that can rationally be construed as constituting a concession by Petitioner's trial counsel that Petitioner was guilty of sexually assaulting Samota. Attorney McClung's jury argument quoted above, and subsequently quoted out of context by the prosecution, did little more than remind the jury that it was the prosecution's burden to prove the nonconsensual nature of the sexual interaction between Petitioner and Samota. Petitioner has failed to present this Court with any specific facts, much less any clear and convincing evidence, showing the state habeas court's factual finding (of no concession) was erroneous. Thus, the factual premise for this ineffective assistance claim fails. There is no showing before this Court, just as there was no showing before the state habeas court, that Petitioner's state trial counsel ever conceded that Petitioner was guilty of sexually assaulting Samota.

Furthermore, this Court independently concludes after de novo review of the entire record from Petitioner's trial and state habeas corpus proceeding, there is no reasonable probability that, but for attorney McClung's guilt-innocence-phase jury argument, the outcome of either phase of Petitioner's capital murder trial would have been any different. The evidence of Petitioner's guilt was, as the state habeas court determined, overwhelming. The evidence at the guilt-innocence phase of trial established a very narrow window of opportunity for the commission of both the sexual assault and murder of Samota. As prosecutor Kirlin correctly argued, the physical evidence and expert testimony left no rational conclusion but that Samota's murder took place in

very close proximity to her having engaged in sexual activity with Petitioner. Given the circumstances of the offense, including the fact Samota was stabbed eighteen times, with several of the stab wounds penetrating her sternum and several more penetrating deep into her heart and lungs, there can be no rational conclusion other than that her murder was intentional. Given the evidence, including Samota's defensive wounds, the ferocity of the fatal assault, and the absence of any evidence showing that Petitioner and Samota ever encountered one another prior to the very brief window of opportunity for her murder, no rational conclusion is possible other than that Petitioner murdered Samota at or near the time they engaged in sexual intercourse. These facts permitted not just a reasonable, but a compelling, inference that the sexual activity was nonconsensual.[107] Petitioner presented the trial court, the state habeas court, and this Court with no evidence permitting any other rational inference.

### 4. Conclusions

Petitioner's complaint that his trial counsel conceded that Petitioner was guilty of sexually assaulting Samota is based upon a factually inaccurate premise; Petitioner's trial counsel made no such concession before the jury.[108] The evidence of Petitioner's guilt in Samota's murder and

---

[107] For the reasons discussed at length above, see *supra* note 85, there is likewise no reasonable probability that, but for the failure of Petitioner's trial counsel to challenge the DNA evidence admitted during the guilt-innocence phase of Petitioner's trial, the outcome of the guilt-innocence phase of Petitioner's capital murder trial would have been any different. Petitioner presented the state habeas court with no evidence showing a reasonable probability that such a challenge would have had even a remote possibility of success, either in terms of excluding the DNA evidence pointing to Petitioner as Samota's assailant or in identifying another suspect.

[108] This factual determination by the state habeas court effectively renders moot Petitioner's complaint that his trial counsel's "concession" violated Petitioner's rights under the Supreme Court's holding in *Florida v. Nixon*, 543 U.S. 175 (2004).
  Moreover, Petitioner's factually erroneous allegation that his trial counsel conceded Petitioner's guilt on a sexual assault charge must be evaluated in proper context. The state trial court did not instruct Petitioner's jury at the guilt-innocence phase of trial on any lesser-included offense. Trial Tr., vol. I at 79-84. Petitioner's jury did not have a mechanism to convict Petitioner of sexual assault or aggravated sexual assault if it concluded Petitioner was guilty of only such an offense and not capital murder.

sexual assault was overwhelming. This Court independently concludes this complaint fails to satisfy either prong of the *Strickland* standard. The Texas Court of Criminal Appeals' rejection on the merits during Petitioner's state habeas corpus proceeding of this ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. Petitioner's sixth claim does not warrant federal habeas corpus relief.

### E. Failing to Subpoena TDCJ Employees to Testify at the Punishment Phase

#### 1. The Claim

In his fifth claim, Petitioner argues his trial counsel should have subpoenaed several TDCJ personnel who spoke with Dr. Vigen and Mr. Woods and had positive things to say about Petitioner's behavior while in prison.[109]

#### 2. State Court Disposition

While Petitioner did present a point of error on direct appeal challenging the state trial court's ruling excluding a portion of Dr. Vigen's hearsay testimony,[110] Petitioner did not include an ineffective assistance claim in his state habeas corpus application specifically complaining about his trial counsel's failure to subpoena the TDCJ personnel with whom Mr. Woods and Dr. Vigen spoke.

---

[109] First Am. Pet. 66-71.

[110] *See supra* § VI.B.

### 3. *De Novo Review*

Because Petitioner failed to fairly present this ineffective assistance claim to the state courts, this Court's review will be de novo. *See Porter*, 558 U.S. at 39; *Rompilla*, 545 U. S. at 390.

### a. *No Deficient Performance*

There was nothing objectively unreasonable with the decision by Petitioner's trial counsel not to subpoena the TDCJ personnel whom Dr. Vigen and Mr. Woods interviewed who had positive things to say about Petitioner's behavior while incarcerated. During Petitioner's state habeas corpus proceeding, his trial counsel testified without contradiction that (1) the only way they could gain the cooperation of TDCJ personnel with knowledge of Petitioner's disciplinary record and behavior was to send in Dr. Vigen and Mr. Woods; (2) the defense team was forced out of practical necessity to promise those TDCJ personnel the defense interviewed that they would not be called to testify on Petitioner's behalf at trial; and (3) subpoenaing and calling those individuals to testify at trial after promising not to do so would likely have resulted in those witnesses being hostile to the defense's efforts to secure a life sentence for Petitioner.[111] This testimony mirrored the testimony offered at trial outside the jury's presence by defense experts Mr. Woods and Dr. Vigen.[112] In addition, prosecutor Kirlin testified that if the defense team had

---

[111] *See* S.F. State Habeas Hearing, Test. of Richard Franklin, vol. 2 at 53-55 (the only way to get prison guards to talk to the defense's experts was to promise that they would not be subpoenaed); Test. of John Tatum, vol. 3 at 22-26 (the practical difficulty with subpoenaing prison guards after telling them they would not be subpoenaed was that they would then be hostile witnesses because they did not want to be seen as helping defense counsel in a death case).

[112] *See* S.F. Trial, Test. of S.O. Woods, vol. 51 at 192-95 (correctional officers were reluctant to talk with him and Dr. Vigen until they explained the officers would not have to testify in court and subpoenaing TDCJ personnel would have cut the flow of information to defense counsel in all cases). Test. of Dr. Mark Vigen, vol. 51 at 201-04 (he could not recall any correctional officer ever responding with favorable testimony once subpoenaed to testify in a death penalty case, he and Mr. Woods explained up front to everyone they interviewed that they were not planning to call the correctional officers to testify at trial, and testifying for a defense attorney could negatively impact a

called TDCJ personnel to testify on Petitioner's behalf, he was prepared to cross-examine those individuals about their knowledge of Petitioner's criminal record and history of multiple prison disciplinary violations using "did you know" and "have you heard" questions.[113]

This Court independently concludes after de novo review of the entire record from Petitioner's trial, direct appeal, and state habeas corpus proceedings that Petitioner's trial counsel acted in an objectively reasonable manner in choosing not to subpoena the correctional officers whom Dr. Vigen and Mr. Woods interviewed about Petitioner's behavior while incarcerated. As explained above, *see supra* § I.D.2, at the punishment phase of trial, Petitioner's trial counsel were able to advise the jury through the testimony of Dr. Vigen that numerous TDCJ personnel whom Dr. Vigen interviewed expressed the view that they had "no problem" with Petitioner's behavior while incarcerated and that they had never personally witnessed Petitioner engage in any violent or otherwise inappropriate behavior.[114] Subpoenaing the TDCJ personnel in question would have opened the door to extensive prosecutorial cross-examination into whether TDCJ personnel was aware of the details of Petitioner's capital offense, multiple sexual assault convictions, and numerous instances of threatening behavior while incarcerated. Petitioner's trial counsel could reasonably have believed that subpoenaing and calling the TDCJ personnel to testify live at trial had little potential to supplement the mitigating evidence already before the jury and could have had considerable negative consequences. Petitioner's unexhausted ineffective assistance complaint does not satisfy the first prong of the *Strickland* standard.

---

correctional officer's career).

[113] S.F. State Habeas Hearing, Test. of Patrick Kirlin, vol. 4 at 57.

[114] *See supra* notes 24-30 and accompanying text.

### b. No Prejudice

At the punishment phase of trial, the prosecution presented a total of seven TDCJ employees or former employees who testified about seven incidents which resulted in Petitioner receiving a disciplinary report: three of which involved Petitioner's use of vulgar language toward prison staff, three of which involved Petitioner refusing to obey orders or refusing to work, and one involving a combination of both those types of infractions. The main points of the prosecution's case at the punishment phase of Petitioner's capital murder trial focused on (1) reminding the jury of the details of Petitioner's capital offense, established by the crime scene evidence and autopsy results introduced during the guilt-innocence phase of trial; (2) showing the jury firsthand the terror experienced by Petitioner's surviving sexual assault and kidnap victims and Petitioner's ex-spouse; (3) showing the jury the Petitioner's continued propensity for aggressive, threatening language and gestures, as demonstrated by his hostile encounters with (a) a nurse and security guard at the Ellis Unit infirmary in November 2007, and (b) his fellow TDCJ inmate Henry Aguilar practically on the eve of Petitioner's capital murder trial in a Dallas County Jail hallway; and (4) attacking the credibility of Dr. Vigen's characterization of all of Petitioner's TDCJ disciplinary infractions as minor "traffic tickets." Outside of Dr. Vigen's testimony, the defense did not contest the factual accuracy of any of the incidents of Petitioner's threatening behavior within the TDCJ to which the prosecution's punishment phase eyewitnesses testified. And the defense did not challenge the factual accuracy of any of the testimony given by Petitioner's surviving sexual assault victims. The evidence of Petitioner's propensity for violent behavior was amply demonstrated by (1) the uncontradicted testimony establishing that Petitioner engaged in aggravated sexual assaults both before and after he murdered Samota, (2) the fact he murdered

Samota while on parole, and (3) he committed multiple violent felonies both before and after he served a lengthy prison sentence.

Any additional positive statements about Petitioner's docile behavior while incarcerated that might have been obtained from various TDCJ employees would have added little to the testimony Dr. Vigen gave before the jury in which he recounted that every employee whom he identified had stated that he or she had no problems with Petitioner. Calling those TDCJ personnel to testify live at trial would have opened the door to cross-examination reminding the jury of the details of Petitioner's capital offense, the nature of Petitioner's other sexual assaults, and incidents in which Petitioner threatened other TDCJ personnel.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the Petitioner's trial counsel chosen a different course). *Wong*, 558 U.S. at 20; *Wiggins*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong*, 558 U.S. at 27. Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different. *Hinton v. Alabama,* 571 U.S. 263, 275 (2014). To satisfy the prejudice prong, "[t]he likelihood of a different result

must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 693).

This Court independently concludes after de novo review of the entire record from Petitioner's trial, direct appeal, and state habeas corpus proceedings, that there is no reasonable probability that, but for the failure of Petitioner's trial counsel to subpoena and present the testimony of the TDCJ personnel whom Mr. Woods and Dr. Vigen interviewed, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different. Petitioner never expressed any sincere contrition or remorse for his capital offense. Petitioner never expressed any sincere contrition or remorse for any of his other violent felonies. Petitioner committed more violent felonies after he murdered Samota and after he had served a lengthy prison sentence for other violent felonies. Moreover, calling any of the TDCJ employees identified in Petitioner's amended petition or Motion for Discovery to testify at the punishment phase of Petitioner's capital murder trial would have furnished the prosecution with an opportunity to remind the jury of the crime scene evidence, the details of Petitioner's lengthy history of other sexual assaults, and Petitioner's established track record of threatening TDCJ staff. Evidence showing that Petitioner had not threatened or behaved disrespectfully toward *some* TDCJ staff would have done little to negate or lessen the evidentiary impact of the testimony of the prosecution witnesses documenting Petitioner's threats and disrespectful behavior directed toward other TDCJ staff. It would also have done little to negate the aggravating impact of the graphic details of Petitioner's capital offense and his other violent felonies that were already before his capital sentencing jury.

### 4. Conclusions

Under de novo review, Petitioner's unexhausted ineffective assistance complaint about his trial counsel's failure to subpoena TDCJ personnel fails to satisfy either prong of the *Strickland* standard.[115] This portion of Petitioner's fifth claim is plainly meritless and does not warrant federal habeas relief.

### F. Punishment Phase Closing Jury Argument

### 1. The Claim

In his third claim, for the first time in any court, Petitioner argues that his trial counsel Richard Franklin rendered ineffective assistance during closing jury argument at the punishment phase of trial by making comments which disparaged Petitioner's character, conceded Samota's murder was deliberate, conceded Petitioner's future dangerousness, and failed to point to Petitioner's advanced age and poor health as mitigating factors.[116]

### 2. State Court Proceedings

Petitioner identifies two specific passages in attorney Franklin's closing punishment-phase jury argument with which he now takes exception. Those passages are quoted at length below along with additional portions of attorney Franklin's jury argument to provide proper context:

> MR. FRANKLIN: May it please the Court. Distinguished and numerous counsel for the State. Counsel for the Defense. Ladies and gentlemen of the Jury.
> I'm not going to stand up here and beg for mercy. I'm not going to stand up here and ask you for sympathy. I'm not going to stand up here and do anything but ask you to follow the law that has been given to us in the State of Texas. That's

---

[115] Insofar as Petitioner argues that his state habeas counsel should have presented this same claim as part of Petitioner's state habeas corpus application, that complaint does not furnish a basis for federal habeas corpus relief. 28 U.S.C. § 2254(i) precludes this Court from granting federal habeas corpus relief premised upon the ineffectiveness or incompetence of counsel during federal or state collateral post-conviction proceedings. *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010); *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003).

[116] First Am. Pet. at 39-42.

it.

I do want to talk to you about voir dire again, about those questionnaires again, about what we talked to you about again. Now, you filled out the questionnaires. You knew what was going on. You knew that this was going to be a death penalty case. You knew that it was going to be involving an SMU coed.

And we talked over and over and over about what your responsibility was and what this was like and how emotional it was and how much family had an impact and how much friends had an impact and what went on in the courtroom, about how emotional it was, about how horrible the photographs were going to be, about how emotional the death of an innocent person was going to be.

You were given opportunity, after opportunity, after opportunity to bail. You didn't have to be here. You said you could be here. You promised to follow the law. When you filled out the questionnaires and when you answered the questions that Mr. Healy and the State is so enamored with, which is the facts of the case, the facts of the case, the facts of the case - - when you answered that question, you thought in your mind - - you all, all thought in your mind - - that if this is horrible enough, if this is heinous enough, if this is so gross, if the murder is so bad, then that person who committed that murder deserves to die. Because it looks like, from the questionnaire, that that's what a death penalty in the State of Texas: a bad murder, a heinous murder, a gross murder, an innocent victim, a female, a white female, a college student, that equals death. That's a no-brainer.

And then you come in, and then we talk to you. And then you find out, really and truly, that that's not what that question means at all. You find out that there are issues that you have to decide in a death penalty case. You find out that death penalty is reserved for only those people who are a continuing threat to society. You find out that the State has to prove to you beyond a reasonable doubt in the punishment phase of any death penalty case that the Defendant is a future danger to society, that there's a probability that he will commit continuing acts of violence.

That's what they must prove to you beyond a reasonable doubt. You didn't know that before you went in there. And you said, "Yeah, I can do that. I know this is going to be a heinous murder, or we wouldn't be here. I know that there's going to be a lot of family involved in this, or we wouldn't be here. I know there's going to be a lot of emotion involved in this, or we wouldn't be here."

Yeah, sure as heck is. But we don't kill people in the State of Texas just because we want to. We don't kill people in the State of Texas just because the crime is gross and just because the courtroom is full of family. If we did that, we'd just let the family sit up there and determine the punishment.

We can't do that. And we can't determine the punishment because a family member gets on the witness stand and says, "I can't have any kids." We're killing somebody here. We're trying to determine if we're going to kill somebody; if the State has proved beyond a reasonable doubt that this individual is a continuing threat to society. That's why we're here.

And, yeah, if you had been on a jury in 1984 and you heard the fact [sic] of this case, I guarantee you every one of you would have voted to kill this man. And

do you know what? I could see it. I'd say, "Yeah, I understand why that jury did what they did. I can see it's - - I mean, you have all these rapes, you have all these rape victims and then you have this horrible murder. And you have a vicious murder, and you have a stabbing of an innocent victim 18 times. I can agree with that. I am a defense lawyer, and I can agree with that verdict. But this ain't 1984.

Remember, the best way to determine how somebody is going to act in the future is how they've acted in the future [sic]. Now, you've convicted Donald Bess of this capital murder. *Donald Bess hasn't changed any overnight. Donald Bess has been the same individual he has been since forever. Since 1977, when he started doing weird stuff, bad stuff, evil stuff, he hadn't changed any because of his conviction. Once a jackass, always a jackass. Once a really bad person, always a really bad person. Once a murderer, who knows? Now, we've got to make a determination of always a murderer or not? Always a threat or not?*

He has been incarcerated in some sort of jail or prison for 32 years. Thirty-two years. That's over 11,000 days. 11,000 days in some sort of prison.

Now, we brought you Dr. Vigen. We brought you a person to explain to you what prison is like. And, believe me, if I could - - if we can do it - - if there was a way to do it - - I would take you all there. I would. I would let you look at it. I would let you feel it. I would let you smell it. But I can't do that. We can't do that. So we have to have somebody to come in here and explain it to you.

And there aren't that many people who can do that, Ladies and Gentlemen of the Jury. And that's why he'd testified in so many cases. It's like he's doing something wrong, if he comes in and explains to a jury what prison is like. He's not doing anything wrong. He's trying to tell you what's going on. He's trying to tell you that this particular prison system in the State of Texas is a good one and that that particular prison system in the State of Texas can control people, and that when somebody goes into that prison, they are watched and they are monitored and they are counted and they are dealt with on a daily basis by guards, by monitoring, by their system. And it works.

We have to have somebody to come in here and explain that to you. How else are you gonna know? And the reason that's important to you is, that is where he is. That's where he'd been, and that's where he's going. And so what he's done there, how he's acted there, how he's functioned there is a pretty good indication of how he's going to behave from now on.

Like I say, this conviction hadn't changed his nature any. It hadn't changed his character any. It hadn't changed his position any. In those 11,000 days that he has been incarcerated somewhere, we have - - if you want to take every one of 'em at face value, we have 29 violations in 11,000 days. And you know from the testimony of the guards and you know from the testimony of Dr. Vigen that those people in prisons, while they are watched and while they are monitored, they are out roaming around sometimes, even though that is controlled.

Sometimes, he would come in contact with female guards all by their tiny selves, with maybe one other guard a 100 yards away. And in one of those incidences where he came in contact with a female by herself, he was in a gym.

And we know that at one particular point in time in his career in prison, he worked out in a gym and he played handball.

In that particular condition, did he attack and rape that woman guard? He would have had plenty of time, wouldn't he? Did he hit that woman guard? Did he push that woman guard? Did he do anything to hurt her, but mouth off? And. Yeah, she was scared. She said she was. I believe that. As you well know, we've all been in that prison. And I can believe that, if you're alone with an inmate. Did anything happen to her? No.[117]

*     *     *     *     *

MR. FRANKLIN: In that 11,000 days, he never charged a razor wire. In that 11,000 days, nobody ever had to shoot him or shoot at him. So we know – we know. We have a history now. We have a history of prison incarceration. We have a 32-year history of this particular individual, and that's what a continuing threat to society if all about.

You don't have to guess. You don't have to guess here. You have it right in front of you. You have the facts right in front of you. You don't have to worry about it, because you know how he is. You know how he is in prison, which is where he's going to be.

Now, let's talk about the health. You heard from the doctor from Parkland. He's a professor, so he's an attending physician at Parkland. He treated Bess for his ailments. You heard him. You know what they are. You know, you can say all day long, "Okay. Fine. He's been treated." Yeah. But, again, this goes to future danger. This goes to how this person is in prison. And he may be more healthy than he has any right to be, but he's not the healthiest person in the world. And it kind of cuts down a tad on your violence, if that's where you're going to be going.

If you're going to be violent, it kind of inhibits you a little bit. You can't chase down the young female guards anymore and rape 'em, if that's what you did in the past. You can't chase 'em down and beat 'em up. But that never happened anyway. That didn't happen when he was healthy. That didn't happen when he was working in the gym. That didn't happen when he was playing handball. He wasn't violent when in prison, so what's going to make him violent now that he's older and less healthy?

It's going down. The potential, the probability, is going down. Like it's been going down ever since he's been in there this last time, since 1986. I was going to recite to you every single one of those 29 disciplinary actions, but I'm not going to do it. I think you can remember 'em. I think you know that they're not that serious. I think you know the thefts and larceny are those of hot dogs and pickle relish. Again, what does that do? What does that tell you? That tells you yet again that he's not even taking care of himself.

---

[117] S.F. Trial, vol. 52 at 32-38 (emphasis added).

Now, I didn't say that - - I didn't say that to generate anything other than the fact I'm talking about future danger. I'm not talking about sympathy. I'm not talking about mercy. You're not hearing that from me. What you're hearing from me is a recitation of the facts that you have to deal with.

What you're hearing from me is what you have to look at when you determine Special Issue Number Two and whether or not the State proved it to you beyond a reasonable doubt. Because this is one of those very rare instances where we know what the future holds with somebody like this. And I'm not saying - - all I'm saying is what we know. And we don't know that very often. This time, we know. This time, we can look at it. This time, we can see. This time, we can touch it and we can feel what happened and what happens to him when he is in this system.

And that's what we have to worry about, when we're deciding punishment. That's what we have to worry about, when we go to that Special Issue Number Two and determine if the State proved to you beyond a reasonable doubt that he's a continuing threat to society. That's what we have to worry about. That's what we have to know, before we're going to pull that death trigger. That's what we have to know. That's what we have to look at.

And liked [sic] we talked about, Ladies and Gentlemen - - you know, we had this discussion. Every one of you said. *What happens in a capital murder case when somebody is brutally murdered and there's no family? What happens in a capital murder case when the victim is some ugly guy like Josh? You know, I'd kill him every now and then. Say you want to kill me for killing him. No big deal. But if I killed Robbie, it would be different, wouldn't it?*

*You know, this is serious. This is serious stuff here. This is a death in the name of the state. This is serious. And it's not something you do just because you want to. It's not. It can't be. We'd be killing people everyday. Hell, Obama would invade us. We can't kill people everyday. That's outrageous.*

We have to make a determination on those issues. And every one of you said, "I will take those issues seriously. I will not ignore them. I will not set them aside. Once I find somebody guilty of a horrible capital murder, after I find somebody guilty of killing somebody in the course of committing an aggravated sexual assault, I will not automatically kill that person."

You all said that. "I will not automatically kill somebody who has committed a cap - - "a murder in the course of committing an aggravated sexual assault." And you can't do that anyway. And you all agreed that you can't do that and you wouldn't do that. You would listen to the evidence. You would make sure that the State proved to you every single thing they had to prove to you.

Was this murder deliberate? Absolutely. No questions asked. The answer to Special Issue Number One is "yes". Is there a continuing threat to society? You've got the evidence. You know it. You've seen it all. We know. We know what's going to happen with him. We know it. And that has to be "no". The answer to that Special Issue Number Two has to be "no" because of the evidence, because the State did not meet its burden to kill somebody. They did not meet their burden of proving beyond a reasonable doubt this man is a continuing

89

threat to society. And they've got to do that.[118]

### 3. De Novo Review

Because Petitioner failed to fairly present this ineffective assistance claim to the state courts, this Court's review is de novo. *Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.

### a. No Deficient Performance

Having independently reviewed the entire record from Petitioner's trial, direct appeal, and state habeas proceedings, this Court concludes the closing jury argument presented by attorney Franklin on Petitioner's behalf at the punishment phase of trial did not fall below an objective level of reasonableness. Far from conceding Petitioner's future dangerousness, attorney Franklin argued earnestly, albeit ultimately unsuccessfully, for a negative answer to the Texas capital sentencing issue addressing Petitioner's future dangerousness. Viewed in proper context, the highlighted passages identified by Petitioner in his federal pleadings merely emphasized to the jury (1) its duty to resolve the Texas capital sentencing Special Issues based upon the evidence and not an emotional response to Petitioner's capital offense; (2) regardless of the nature of Petitioner's capital offense and his admittedly vile sexual assaults in the free world, Petitioner's future dangerousness should be determined based upon the evidence showing his record of non-violent behavior over more than thirty-two years of incarceration; and (3) for those reasons, the jury should answer the future dangerousness special issue negatively. There was nothing objectively unreasonable about the manner in which attorney Franklin conveyed those arguments.[119] Furthermore, contrary to Petitioner's contention, attorney Franklin clearly did call

---

[118] S.F. Trial, Volume 52, at 44-48 (emphasis added).

[119] By the conclusion of the punishment phase of Petitioner's capital murder trial, the jury had already

90

the jury's attention to the evidence showing Petitioner's advancing age and poor general health and argued those factors called for a negative answer to the future dangerousness special issue.

It was reasonable for Petitioner's counsel to admit the heinous nature of Petitioner's capital offense and other violent felonies and the "deliberate" nature of a murder resulting from eighteen stab wounds while focusing the jury's attention on its duty to base its verdict on the evidence and pointing out the evidence showing Petitioner's history of relatively few, minor disciplinary infractions over more than three decades of incarceration. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in its closing presentations is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify them are questions with many reasonable answers." (citations omitted)); *see also Clark v.*

---

convicted Petitioner of Samota's murder, an offense that resulted in the death of an innocent college aged female from eighteen stab wounds to her chest. The evidence also permitted a compelling inference that Samota died at or very near to the time she was sexually assaulted by the much larger Petitioner, possibly while he brandished the murder weapon. The jury also heard from two of Petitioner's other sexual assault victims about the circumstances under which Petitioner intimidated and threatened them into submitting to their sexual assaults. The jury also heard about another sexual assault to which Petitioner pleaded guilty to, in which he brandished a knife.

Under such circumstances, it was objectively reasonable for attorney Franklin to admit in his closing jury argument that Petitioner had engaged in a horrific offense and also was responsible for other offenses which attorney Franklin characterized as "weird," "bad," and "evil." It was also objectively reasonable for attorney Franklin to have asked the jury rhetorically "Once a jackass, always a jackass?" He immediately followed that rhetorical question by arguing the evidence showed it was far less clear whether Petitioner would always be a murderer and urged the jury to focus on the evidence showing Petitioner's non-violent behavior in prison.

There was no evidence before the jury showing that Petitioner had ever expressed remorse for any of his criminal offenses or that, following his initial convictions and lengthy prison sentence, Petitioner ever displayed a change of personality reflective of growing maturity or a sense of personal responsibility. In fact, the evidence showed Petitioner murdered Samota and committed additional sexual assaults while on parole, all after Petitioner had served a lengthy term of incarceration. Under such circumstances, it was objectively reasonable for attorney Franklin to acknowledge that the evidentiary record did not include evidence showing Petitioner's personality had changed since Petitioner's initial wave of convictions and term of incarceration. Establishing rapport with a capital sentencing jury often requires defense counsel to admit the aggravating aspects of the punishment phase evidence, especially when that evidence is uncontradicted, as was the graphic and compelling testimony of Petitioner's other sexual assault victims.

*Thaler*, 673 F.3d 410, 427 (5th Cir. 2012) (holding defense counsel's summation objectively reasonable where defense counsel acknowledged the defendant was not likeable in an effort to gain credibility with the jury, the gravamen of counsel's argument was to focus the jury's attention on its own responsibility, and counsel emphasized the defense argument that the defendant would not present a significant danger in prison).

### b. No Prejudice

This Court independently concludes after de novo review of the entire record from Petitioner's trial, direct appeal, and state habeas proceedings, that there is no reasonable probability the outcome of the punishment phase of Petitioner's capital murder trial would have been any different but for attorney Franklin's closing jury argument. Petitioner was a confessed serial rapist whom the jury determined beyond a reasonable doubt had murdered Samota in the course of committing her aggravated sexual assault at the guilt-innocence phase of trial. The crime scene evidence told a story that one prosecution witness succinctly described as "evil preying upon innocence."[120] Another law enforcement officer testified that the crime scene left an equally lasting impression upon her.[121] The punishment phase evidence established that Petitioner confessed to committing and was convicted of other violent sexual assaults, including two which were described in graphic detail to the jury by his surviving victims. It was undisputed that Petitioner committed his capital offense after serving a term of incarceration and while on parole. There was also testimony Petitioner had been physically abusive toward his first wife. There was no evidence before the jury showing that Petitioner expressed any sincere contrition or remorse

---

[120] S.F. Trial, Test. of Kenneth Budjenska, vol. 42 at 62.

[121] S.F. Trial, Test. of Janice Crowther, vol. 43 at 108.

for his capital offense or any of his other violent felonies.[122]

### 4. Conclusions

Petitioner's unexhausted complaints about attorney Franklin's closing jury argument at the punishment phase of trial do not satisfy either prong of the *Strickland* standard. Petitioner's third claim is meritless and does not warrant federal habeas corpus relief.

### G. Failing to Present Expert Mental Health Testimony at the Punishment Phase

### 1. The Claim

In his second claim, Petitioner argues his trial counsel should have called a mental health expert to testify at the punishment phase of his capital murder trial on Petitioner's mental health status and the effects of Petitioner's dysfunctional background on his life.[123]

### 2. State Court Proceedings

As explained in Section I.D.2. above, at the punishment phase of Petitioner's capital murder trial, Petitioner's brother Gary testified (1) regarding their mother's alcoholism and mistreatment of Petitioner; (2) about their difficult and unstable childhood; (3) about the history of mental illness on their mother's side of their family as well as in both their mother and younger brother; (4) about Petitioner's diabetes, heart attacks, and other medical issues; (5) that Petitioner was not mentally retarded, bi-polar, or mentally ill; and (6) that Petitioner had never been abused as a child other than by spankings and had not been sexually abused.[124] Petitioner's defense team

---

[122] On the contrary, Petitioner's brother testified at the punishment phase of Petitioner's capital murder trial that while Petitioner has said he is sorry he is in prison, Petitioner has never really expressed remorse for his crimes. S.F. Trial, Test. of Gary Bess, vol. 53 at 63-65.

[123] First Am. Pet. 30-39.

[124] S.F. Trial, Test. of Gary Bess, vol. 50 at 36-77.

also presented testimony from a physician regarding petitioner's poor health (including his diabetes and coronary heart disease), a former cell mate of Petitioner (regarding Petitioner's poor health, lack of physical activity in recent years, and tendency to engage in trash talking with guards), and Dr. Vigen regarding the good things many TDCJ employees had to say about Petitioner, the non-violent nature of Petitioner's prison disciplinary history, and the low probability Petitioner would be violent in the future.

During Petitioner's state habeas corpus proceeding, his trial counsel testified regarding the scope of Petitioner's defense team's investigation into Petitioner's background, including the defense team's mental health expert's unhelpful conclusions regarding Petitioner's mental health.[125]

### 3. *De Novo Review*

Because Petitioner failed to fairly present this ineffective assistance claim to the state courts, this Court's review will be de novo. *See Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.

---

[125] More specifically, attorney Franklin testified that (1) the defense hired Dr. Kelly Goodness as its mitigation specialist; (2) only Petitioner's brother Gary cooperated fully with the defense team's efforts to investigate Petitioner's background; (3) Dr. Goodness had trouble locating witnesses and documents, including Petitioner's biological father's family; (4) Petitioner's mother died in 2004; (5) the passage of time since Petitioner's capital offense helped the defense at the punishment phase of trial; (6) Dr. Goodness found witnesses but some would not cooperate with the defense; (7) Petitioner's sister did not want to cooperate with the defense team; (8) defense mental health expert Dr. Michael Chafetz did a thorough mental health evaluation of Petitioner but nothing helpful resulted because Dr. Chafetz diagnosed Petitioner with anti-social personality disorder; (9) Gary Bess proved to be a helpful witness in terms of explaining to the jury Petitioner's mother's alcoholism and mental illness, and her mistreatment of Petitioner; (10) there was no evidence Petitioner suffered from intellectual disability or was mentally ill; and (11) there was no evidence Petitioner had been abused by his father although there was evidence Petitioner's mother verbally abused Petitioner. S.F. State Habeas Hearing, Test. of Richard Franklin, vol. 2 at 38, 41-44, 65, 67, 69-74.

Attorney Tatum testified that (1) the defense team's mitigation and fact investigators were very thorough; (2) Petitioner's sister and many other members of Petitioner's family and friends were not cooperative with the defense team; and (3) Gary Bess described their mother as not treating Petitioner well and described a history of mental illness in the Bess family which the defense presented during the punishment phase of trial, along with evidence of their mother's alcoholism. S.F. State Habeas Hearing, Test. of John Tatum, vol. 3 at 17, 44-50.

### a. No Deficient Performance

Having independently reviewed the entire record from Petitioner's trial, direct appeal, and state habeas proceedings, as well as the new evidence presented to this Court by Petitioner, this Court concludes the tactical decision by Petitioner's defense team not to present mental health testimony through an expert witness at the punishment phase of trial did not fall below an objective level of reasonableness. Petitioner's trial counsel testified without contradiction during Petitioner's state habeas corpus proceeding that their mental health expert, Dr. Michael Chafetz, conducted a mental health evaluation of Petitioner that produced no helpful information (i.e., no findings that Petitioner was mentally ill or intellectually disabled, and a conclusion that Petitioner displayed anti-social personality disorder). Petitioner alleges no specific facts, and presents no evidence, showing that it was objectively unreasonable for Petitioner's defense team to rely upon the conclusions reached by their own mental health expert, Dr. Chafetz.

Gary Bess testified without contradiction at the punishment phase of trial that their mother was an alcoholic who mistreated Petitioner, that there was a history of mental illness (schizophrenia and bi-polar disorder) on their mother's side of their family, including possibly both their mother and younger brother, but that Petitioner was not mentally ill and not intellectually disabled. For the first time in any proceeding, Petitioner presents this Court with a report from Dr. Robert Cohen, *see* Ex. 11 to Pet'r's First Am. Pet., which states that (1) the 2010 evaluation by Dr. Chafetz reported Petitioner had symptoms consistent with very mild frontal lobe dysfunction specifically in his executive functioning, with an overall neuropsychological profile that was average;[126] (2) during Dr. Cohen's February 2018 evaluation, Petitioner "revealed a

---

[126] Dr. Cohen's counter report included an extensive discussion of Petitioner's drug abuse in the mid-1960's which was not presented to the jury during the punishment phase of Petitioner's capital murder trial. First Am. Pet. Ex. 11 at 4. Petitioner apparently (1) reported to Dr. Cohen that he abused alcohol, Seconal, Quaaludes, and Cocaine

distinct worsening over the previous evaluation";[127] (3) Dr. Chafetz's diagnosis of anti-social

personality disorder ("ASPD") was based in part on "an invalid personality profile and a history

of certain behaviors years ago," and it was not clear Petitioner had ever met the DSM-V criteria

for ASPD;[128] (4) Petitioner's full scale IQ score was 89;[129] and (5) Petitioner suffers from mild

neurocognitive disorder/mild cognitive impairment due to vascular condition and depressive

disorder that is undifferentiated and of moderate severity.[130] Petitioner also presents, for the first

time, an April 2017 declaration from neuropsychologist Dr. Michael Gelbert, *see* Ex. 13 to Pet'r's

First Am. Pet., in which Dr. Gelbert states that (1) he reviewed the testing and reports of Dr.

Chafetz regarding the 2010 evaluation of Petitioner; (2) neuropsychologically, Petitioner

---

starting in the mid-sixties; (2) admitted to numerous periods of "blackouts" when he mixed drugs together; (3) reported an incident in 1977 when he awoke in a mental hospital in a strait jacket after assaulting police who were called to a gas station after Petitioner became upset and began kicking gas cans; (4) claimed no memory of the incident in 1977 or any of the sexual assaults or the kidnapping for which he was convicted but claimed he did not believe he had done any of those things; and (5) stated to Dr. Cohen that he was never physically violent with his first wife Diane. *Id.* at 3-4. The latter contention is contradicted by Diane Cotie's testimony at the punishment phase of Petitioner's capital murder trial, during which she described in detail an incident in which Petitioner threw her against a wall while she was five-months pregnant, resulting in her suffering two black eyes, and another incident in which Petitioner kicked the crib of their five-month daughter from one side of the room to the other. S.F. Trial, Test. of Diane Cotie, vol. 51 at 155-56, 159.

[127] First Am. Pet. Ex. 11 at 6-10. Dr. Cohen reported that Petitioner scored consistently lower in 2018 than he had in 2010 on a wide range of neuropsychological tests. *Id.*

[128] *Id.* at 10. While Dr. Cohen questioned the efficacy of Dr. Chafetz's 2010 ASPD diagnosis, it should be noted that the Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual, cited by Dr. Cohen in his report, was published in May 2013, almost three years *after* Dr. Chafetz completed his evaluation of Petitioner. Dr. Cohen's report issued in February 2018 did not specifically address whether Petitioner satisfied the criteria for ASPD included in the DSM-IV, which was in effect at the time Dr. Chafetz performed his 2010 evaluation. In rejecting Dr. Chafetz's ASPD diagnosis, Dr. Cohen also expressly relied upon Petitioner's denials that he murdered Samota and had ever been physically violent. As explained in note 126 above, however, at trial, Petitioner's first wife gave uncontradicted testimony about Petitioner's history of verbally *and physically* abusing her and their daughter. Likewise, the trial testimony of Petitioner's other sexual assault victims and the graphic evidence from Samota's crime scene and autopsy (all evidence which Dr. Cohen apparently never reviewed) spoke volumes regarding Petitioner's propensity for physical violence, as well as the pervasiveness and persistence of Petitioner's violent criminal behavior.

[129] *Id.* at 7.

[130] *Id.* at 10-11.

performed adequately in most areas, supporting the premise that, overall, he had a normally functioning brain; (3) Petitioner's tests scores suggest that he was suffering from mild cognitive impairment; and (4) further testing of Petitioner using Positron Emission Tomography (PET scanning) is warranted for Petitioner.[131]

Having reviewed the report of Dr. Cohen and the declaration of Dr. Gelbert, as well as all the other new evidence now before this Court, this Court concludes there was nothing objectively unreasonable in the decision by Petitioner's trial counsel not to seek additional testing or mental health evaluation of Petitioner in 2010 following their review of Dr. Chafetz's report. Other than Dr. Cohen's apparent disagreement with Dr. Chafetz's diagnosis of ASPD, neither Dr. Cohen nor Dr. Gelbert present any information significantly different from the conclusions reached by Dr. Chafetz. Neither Dr. Cohen nor Dr. Gelbert identify any information available at the time of Petitioner's 2010 evaluation by Dr. Chafetz which would have put Petitioner's defense team on notice of the need for additional mental health testing or evaluation of Petitioner. Indeed, as Respondent correctly points out, Dr. Chafetz did not testify about his diagnosis of ASPD and no prosecution mental health expert gave testimony suggesting Petitioner displayed ASPD. Therefore, it was unnecessary for Petitioner's trial counsel to seek out additional mental health expertise in a search for someone who could testify Petitioner did not display ASPD.

It was also objectively reasonable for Petitioner's trial counsel to conclude that further pursuit of evidence of Petitioner's "mild cognitive impairment" through PET scanning would be unlikely to produce compelling mitigating evidence. Gary Bess denied that Petitioner had shown any indication of mental illness or intellectual disability during childhood. Dr. Chafetz

---

[131] Pet'r's First Am. Pet. Ex. 13 at 2-4.

concluded, as have Dr. Cohen and Dr. Gelbert, that Petitioner suffers from mild cognitive impairment but does not suffer from intellectual disability or a recognized mental illness. A defense attorney preparing for the sentencing hearing of a capital trial is not required "to scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005). Rather, diligent counsel may draw the line when they have good reason to think that further investigation would be a waste. *Id.* at 383. Absent evidence showing reliance is objectively unreasonable, defense counsel may rely upon the views of their own mental health expert in determining whether to seek additional mental health evaluation of their client. *See Dowthitt v. Johnson*, 230 F.3d 733, 747-48 (5th Cir. 2000) (defense counsel reasonably chose not to seek a different mental health expert's testimony after the defense team's retained psychiatrist furnished a report containing statements detrimental to petitioner on future dangerousness and indicating an unwillingness to testify in petitioner's favor).

Petitioner's trial counsel could reasonably have concluded that introducing mental health testimony regarding Petitioner's mild cognitive impairment might have opened the door to a mental health evaluation by a prosecution mental health expert that could have produced a diagnosis similar to the one Dr. Chafetz obtained, i.e., that Petitioner displayed ASPD, or information on Petitioner's history of alcohol and drug abuse that Petitioner's jury ultimately did not hear. It is well-established that when a criminal defendant seeks to introduce mental health evidence through a psychological expert, the prosecution is entitled to have its own expert examine and evaluate the defendant. *Kansas v. Cheever*, 571 U.S. 87, 94 (2013). Thus, had Petitioner's trial counsel indicated an intention of presenting expert mental health testimony, Petitioner would have been required to submit to evaluation by a prosecution mental health expert.

Petitioner's trial counsel also could have reasonably concluded that investigation into the

causes of Petitioner's "mild cognitive impairment" by a prosecution mental health expert could very well have led to the prosecution's discovery of additional aggravating evidence, e.g., Petitioner's history of drug and alcohol abuse and his associated violent misconduct described in Dr. Cohen's report. Petitioner has failed to allege any specific facts showing it was objectively unreasonable for his trial counsel to rely upon the testimony of Dr. Vigen to establish Petitioner's future non-violence; especially when seeking further mental health evaluation of Petitioner could potentially have opened the door to additional aggravating evidence from a prosecution mental health expert. *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

### b. No Prejudice

As explained above, *see supra* § I.D.2, at the punishment phase of Petitioner's capital murder trial, Petitioner's trial counsel presented an extensive case in mitigation through the testimony of Petitioner's brother Gary (who testified about Petitioner's difficult childhood and good character), a physician who had recently treated Petitioner (who testified regarding Petitioner's poor health and serious medical problems), a former cellmate of Petitioner (who described Petitioner as someone who liked to trash talk to guards, but was basically non-violent and had been reduced to a sedentary lifestyle by poor health), and Dr. Vigen (who testified about the many TDCJ personnel who had no problems with Petitioner, the non-violent nature of the overwhelming majority of Petitioner's prison disciplinary infractions, and opined that Petitioner would not be a threat of future dangerousness if confined to prison).

Given the information reasonably available to Petitioner's trial counsel at the time of Petitioner's 2010 capital murder, including the information conveyed to the defense team by

defense mental health expert Dr. Chafetz, the relevant questions are whether Petitioner's trial counsel conducted an objectively reasonable investigation into Petitioner's background and presented an objectively reasonable range of the available mitigating evidence. *See Sears v. Upton*, 561 U.S. 945, 953-54 (2010) (the proper focus of an evaluation of trial counsel's performance at the punishment phase of a capital murder trial is on whether counsel fulfilled their obligation to conduct a thorough investigation of the defendant's background; the objective reasonableness of trial counsel's tactical decisions must be viewed in the context of the objective reasonableness of counsel's investigation into the defendant's background). In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence—such as mental illness or a history of childhood abuse—may be available. *See Porter*, 558 U.S. at 39-40 (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence—including evidence of mental illness—could be gleaned from investigation into the defendant's family background and military service); *Wiggins*, 539 U.S. at 524-26 (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams*, 529 U.S. at 395-96 (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).

Unlike the defendants in *Porter*, *Wiggins*, and *Williams*, Petitioner does not identify any new or additional mental health evidence in Dr. Cohen's report or Dr. Gelbert's declaration, the absence of which "prejudiced" Petitioner at trial. Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different. *Hinton*, 571 U.S. at 275-76. To satisfy the prejudice prong, the likelihood of a different result must be substantial, not just conceivable. *Harrington*, 562 U.S. at 112; *Strickland*, 466 U.S. at 693.

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* only by "'nam[ing] the witness, *demonstrate[ing] that the witness was available to testify and would have done so*, sett[ing] out the content of the witness's proposed testimony, and show[ing] the testimony would have been favorable to a particular defense.'" *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (emphasis added) (alterations in original) (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)). Petitioner has presented no factual allegations, much less any evidence, showing that Dr. Cohen or Dr. Gelbert were available and willing to testify in a manner favorable to Petitioner at the time of Petitioner's 2010 capital murder trial. Moreover, at best, their reports contain a challenge to Dr. Chafetz's diagnosis of ASPD and a desire for PET scanning of Petitioner.

There is no reasonable probability that either or both of Dr. Cohen's and Dr. Gelbert's expert opinions would have resulted in a different verdict at the punishment phase of Petitioner's capital murder trial. As explained above, merely negating Dr. Chafetz's diagnosis of ASPD or confirming Dr. Chafetz's other diagnosis of mild cognitive impairment (neither of which diagnosis was before Petitioner's jury), would have done nothing to overcome the overwhelming evidence

of the deliberateness of Samota's murder and Petitioner's future dangerousness. Nor would it have done anything of substance to warrant an affirmative answer to the mitigation special issue.

For the foregoing reasons, as well as those detailed above, *see supra* §§ IX.E.3.a. and IX.E.3.b., this Court independently concludes after de novo review that there is no reasonable probability that, but for the failure of Petitioner's trial counsel to present available mental health evidence, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

### *4. Conclusions*

Petitioner's unexhausted complaints about his trial counsels' failure to present mental health expert testimony do not satisfy either prong of the *Strickland* standard. Petitioner's second claim is plainly meritless and does not warrant federal habeas corpus relief.

### *H. Failing to Present Additional Mitigating Evidence at the Punishment Phase*

### *1. The Claim*

In his first claim, Petitioner argues his trial counsel should have further investigated Petitioner's background and presented additional available mitigating evidence at the punishment phase of his capital murder trial regarding Petitioner's dysfunctional family, including his family's history of mental illness, and Petitioner's traumatic background.[132]

### *2. State Court Proceedings*

At his first claim for state habeas relief, Petitioner argued that the passage of time between his capital offense and indictment effectively prevented his trial counsel from conducting an

---

[132] First Am. Pet. 11-30.

adequate investigation for mitigating evidence.[133]   Petitioner did not fairly present the state habeas

court with an ineffective assistance claim asserting that his trial counsel inadequately investigated

Petitioner's background or failed to present available mitigating evidence of Petitioner's

background.   During Petitioner's state habeas proceeding, the trial court heard testimony from

Petitioner's trial counsel regarding the scope of the Petitioner's defense team's investigation into

Petitioner's background.[134]   The state habeas trial court found that (1) the defense team's

investigation for mitigating evidence was thorough and exhaustive; (2) Dr. Goodness's records

established the defense team made contact with both of Petitioner's brothers Gary and William,

his sister Sharon, a maternal cousin named Susie, a female friend named Julie, his second ex-wife

---

[133] Pet'r's App. for Writ of Habeas Corpus 21-46; State Habeas Tr., vol. II at 36-61.

[134] Attorney Franklin testified that (1) the defense team's trial strategy included showing that Petitioner had been a good prisoner while incarcerated; (2) the defense retained Dr. Kelly Goodness as its mitigation expert; (3) only Petitioner's brother Gary cooperated fully with the defense team; (4) Dr. Goodness had trouble locating witnesses and obtaining documents; (5) the defense was unable to locate Petitioner's biological father's family and Petitioner's mother had died in 2004; (6) Petitioner could not recall the time period during which the murder took place; (7) the defense strategy was to have its experts Dr. Vigen and Mr. Woods talk with TDCJ personnel; (8) the defense team regularly met with Petitioner; (9) during the punishment phase of trial, the defense attempted to emphasize that Samota's murder was an anomaly and that Petitioner's record in prison had been non-violent; (10) the passage of time actually helped the defense at the punishment phase of trial; (11) Dr. Goodness found some witnesses who were not helpful; (12) Petitioner's sister Sharon did not want to help the defense; (13) other potential witnesses would not help, "were a mess," or had their own criminal histories to deal with; (14) Gary Bess was a helpful witness and testified regarding their mother's alcoholism and mental illness and about Petitioner's good character; (15) the testimony about their mother's alcoholism and mistreatment of Petitioner was double-edged in nature; (16) there was no evidence Petitioner was intellectually disabled or mentally ill; (17) there was no evidence Petitioner had been abused by their father; and (18) Petitioner was morbidly obese and diabetic but not mentally ill.   S.F. State Habeas Hearing, Test. of Richard Franklin, vol. 2 at 36, 38, 40-42, 44, 50-51, 53-55, 59, 63, 65, 67, 70-74.
    Attorney McClung testified (1) Dr. Compton did a psychological background on the victim; (2) the defense obtained very little cooperation from Samota's sorority sisters; and (3) Dr. Goodness found many witness, as did the defense investigator.   S.F. State Habeas Hearing, Test. of Robbie McClung, vol. 2 at 88, 94.
    Attorney Tatum testified that (1) some witnesses Petitioner identified were dead and some chose not to cooperate; (2) Dr. Goodness did the mitigation investigation; (3) it was difficult to get cooperation from TDCJ personnel so the defense relied on Dr. Vigen and Mr. Woods to do so; (4) there was no documentation of Petitioner's good behavior; (5) Petitioner's mitigation and fact investigators were very thorough; (6) Petitioner's sister Sharon was opposed to cooperating with the defense, as was Petitioner's cousin Suzie and the wife of a friend whom Petitioner identified; (7) Petitioner's brother Gary was cooperative; and (8) Gary described for the jury their mother's alcoholism, the history of mental illness in the Bess family, and their mother's mistreatment of Petitioner. S.F. State Habeas Hearing, Test. of John Tatum, vol. 3 at 16-17, 22-23, 25, 44, 46-50.

Margaret, a pair of former fellow inmates, and a friend's wife named Barbara; (3) the defense team

obtained access to a wide variety of records, including school records, records of Petitioner's prior

convictions, TDCJ disciplinary records, and probation records; (4) Petitioner and his sister Sharon

are estranged and have had little contact since the mid-1980's; (5) Petitioner's second ex-wife

Margaret, his sister Sharon, and his friend's wife Barbara were all unavailable to the defense at

Petitioner's capital murder trial because they did not want to cooperate with the defense team; (6)

Petitioner himself furnished his defense team with a substantial amount of information about his

past, including his family, his criminal history, his substance abuse, his education, and his health

problems; (7) at trial, Petitioner's trial counsel presented a thorough and detailed portrait of

Petitioner's personal and family history through Gary Bess; and (8) the prosecution did not

challenge Gary Bess's portrayal of Petitioner's childhood and family history.[135]

### 3. De Novo Review

Because Petitioner failed to fairly present this ineffective assistance claim to the state

courts, this Court's review will be de novo.  *See Porter*, 558 U.S. at 39.

### a. No Deficient Performance

Having independently reviewed the entire record from Petitioner's trial, direct appeal, and

state habeas proceedings, as well as the new evidence presented to this Court by Petitioner, this

Court concludes that the failures of Petitioner's defense team to further investigate Petitioner's

background and present any of the new mitigating evidence identified by Petitioner did not cause

the performance of Petitioner's trial counsel to fall below an objective level of reasonableness.

---

[135] State Habeas Trial Court's Findings & Conclusions 18-24; State Habeas Tr., vol. I at 59-67.  Petitioner has presented this Court with no clear and convincing evidence showing any of the state habeas trial court's factual findings regarding the availability of the identified witnesses were erroneous.

The affidavit of Toni Knox, *see* Ex. 4 to Pet'r's First Am. Pet., executed in May 2012, bears witness to the many practical difficulties confronting Petitioner's defense team when it embarked on its search for mitigating evidence prior to Petitioner's 2010 capital murder trial, including (1) most of Petitioner's life history witnesses, including both his parents, were deceased; (2) many of the normal life history witnesses in Petitioner's case, such as teachers, neighbors, and family friends, were not available due to his advanced age and the unavailability of records and information necessary to identify such individuals; (3) Petitioner could not recall many details of his earlier childhood; (4) many of Petitioner's family members were unwilling to be interviewed; (5) contacting Petitioner's family in person was made cumbersome by virtue of the fact that all of the family witnesses lived in and around the Memphis, Tennessee area; (6) Petitioner's late-mother's twin brother was unwilling to furnish family history information; (7) Petitioner lived in so many communities as a child that it was not possible to gather information about his exposure to psychosocial stressors growing up; (8) there were limited records available relating to Petitioner's childhood, particularly prior to age thirteen; (9) all of the maternal family members identified by Petitioner or his relatives as having mental health problems were deceased; and (10) drug treatment records for Petitioner after his release from prison in 1984 were not available.[136] The objective reasonableness of the scope of Petitioner's defense team's mitigation investigation must be evaluated in this context.

The record now before this Court includes the voluminous exhibits admitted into evidence during Petitioner's state habeas corpus proceeding, which establish the extensive nature of the investigation for potentially mitigating evidence undertaken by Petitioner's defense team.

---

[136] Affidavit of Toni Knox, First Am. Pet. Ex. 4 at 5-11.

Among these documents are (1) Dr. Kelly Goodness's investigative file, which includes detailed reports on interviews of potential witnesses, summaries drawn from the review of Petitioner's medical, criminal, and other records, as well as copies of Samota's autopsy photographs,[137] (2) attorney Tatum's investigative file, which includes crime scene photographs, Petitioner's school records and TDCJ disciplinary records, as well as extensive legal research,[138] (3) the more than two-hundred page file of Dr. Kristi Compton,[139] (4) the report and notes of defense mental health expert Dr. Michael Chafetz concerning his evaluation of Petitioner,[140] (5) Petitioner's voluminous medical records,[141] and (6) numerous witness statements and reports from defense investigators on their efforts to interview potential witnesses.[142]

The state habeas trial court accurately found that, prior to trial, Petitioner's defense undertook a thorough investigation into Petitioner's background, albeit an investigation hampered

---

[137] Dr. Goodness's file appears on Diskette 1 of 3 as part of the trio of CD's admitted into evidence during Petitioner's state habeas corpus proceeding as State Exhibit No. 3. This Diskette, as well as the other Diskettes admitted into evidence as State's Exhibit Nos. 3, 30, & 31 during Petitioner's state habeas corpus proceeding, was furnished to the Court on March 13, 2020 by Respondent. A copy of each of those five Diskette has been made a part of the record now before this Court.

[138] Attorney Tatum's file appears on Diskette 2 of 3 as part of the trio of CD's admitted into evidence during Petitioner's state habeas corpus proceeding as State Exhibit No. 3.

[139] Dr. Compton's file on Petitioner file appears on Diskette 3 of 3 as part of the trio of CD's admitted into evidence during Petitioner's state habeas corpus proceeding as State Exhibit No. 3.

[140] Dr. Chafetz's report dated April 2, 2010, and his notes from his interviews with Petitioner on March 31 and April 1, 2010 (as well as his notes from his interview with Petitioner's brother Gary on April 6, 2010) appear on Diskette 3 of 3 as part of the trio of CD's admitted into evidence during Petitioner's state habeas corpus proceeding as State Exhibit No. 3.

[141] More than 960 pages of Petitioner's medical records, including Petitioner's TDCJ medical records, appear on the CD admitted into evidence during Petitioner's state habeas corpus proceeding as State Exhibit No. 30.

[142] Extensive witness statements and reports from Petitioner's defense team on their efforts to interview potential witnesses, as well as witness statements obtained by Petitioner's investigators in connection with his state habeas corpus proceeding, appear on the CD's admitted into evidence during Petitioner's state habeas corpus proceeding as State Exhibit Nos. 30 & 31.

by the refusal of many of Petitioner's family and friends to cooperate and the unavailability of many other potential witnesses due to their demise prior to Petitioner's indictment for capital murder. Despite the difficulties facing Petitioner's defense team, at the punishment phase of trial, Petitioner's defense team presented extensive mitigating evidence (summarized in Section I.D.2. above), including testimony from Petitioner's brother Gary detailing the unstable childhood and parental abuse Petitioner experienced at the hands of their alcoholic mother. While Petitioner now complains that his trial counsel failed to call other family members to corroborate Gary Bess's testimony, Respondent correctly points out that the prosecution made no effort to challenge any of the testimony of Gary Bess regarding Petitioner's background.[143] Because the factual accuracy of Gary Bess's trial testimony was never contested by the prosecution, Petitioner's trial counsel could reasonably have believed that calling other family members to corroborate Gary Bess's testimony was unnecessary.

As explained in Section IX.G. above, defense mental health expert Dr. Chafetz concluded Petitioner did not suffer from an identifiable mental illness. There is no evidence currently before this Court showing that Petitioner has ever been diagnosed by a qualified mental health professional with any mental illness. For these reasons, Petitioner's trial counsel could reasonably have concluded that testimony from Petitioner's family members focusing on

---

[143] During cross-examination, the prosecution did not challenge Gary Bess's testimony regarding the circumstances under which he and Petitioner grew up or the abuse they suffered from their emotionally unstable, alcoholic mother. Instead, the prosecution focused on eliciting information from Gary Bess regarding Gary's opinions as to Petitioner's guilt (Gary Bess testified on cross-examination that he did not believe Petitioner was guilty of any of the crimes for which Petitioner had been convicted) and Petitioner's failure to express sincere contrition or remorse for his criminal misconduct (Gary Bess testified that while Petitioner had said he was sorry he was in prison, Petitioner had not really expressed remorse for his crimes). S.F. Trial, Test. of Gary Bess, vol. 53 at 57-70, 76-77. At no point did the prosecution seek to challenge the credibility of Gary Bess; rather, the prosecution sought to elicit testimony from Gary Bess that supported its contention that Petitioner had not shown remorse for his criminal misconduct. *Id.*

allegations of mental illness (such as schizophrenia and bi-polar disorder) among other members of Petitioner's family would likely be of little help to the defense in convincing the jury to return a negative answer to the Texas capital sentencing scheme's future dangerousness special issue. Indeed, Petitioner's trial counsel could reasonably have concluded that loose talk by lay witnesses about mental illness among Petitioner's relatives could negatively impact the defense team's effort to obtain a favorable answer to the future dangerousness special issue.

The focus of Petitioner's defense team at the punishment phase of trial was on attempting to convince the jury that Petitioner's record of relatively few, minor, non-violent disciplinary infractions during Petitioner's more than three decades behind bars showed there was little likelihood that Petitioner would commit criminal acts of violence in the future if incarcerated. Given Petitioner's TDCJ disciplinary records and the testimony of Dr. Vigen, this was an objectively reasonable trial strategy. Petitioner's trial counsel could reasonably have believed that presenting evidence such as that now urged by Petitioner, i.e., evidence emphasizing the difficult aspects of Petitioner's background and which portrayed Petitioner as the product of an abusive upbringing and parents prone to explosive violence,[144] would prove detrimental to their

---

[144] Petitioner presents the affidavit of his younger brother William Bess in which William Bess states that (1) he had very little contact with Petitioner after William reached age five; (2) their father traveled for work and was a large, scary person, who beat him savagely; (3) their mother was an alcoholic with a temper who also physically abused him; (4) Petitioner and their brother Gary "caught hell growing up," (5) he is prone to sudden bouts of anger, as was his father; (6) his father's temper was scary and explosive; (7) he is bi-polar and believes his father struggled with undiagnosed bi-polar disorder because his father was prone to unpredictable, quick, intense, shifts in mood; (8) he was scared of their father and believes his older brothers were as well; (9) Petitioner was nice to their mother and tried to avoid doing anything that would anger their father; (10) like himself, Petitioner experiences quick mood changes and suffers from unpredictable flashes of temper; (11) Petitioner experienced blackouts and memory loss; (12) Petitioner once repeatedly slapped a fellow employee multiple times but later claimed to not remember doing so; and (13) he (William) served a term of incarceration after being convicted of robbery. See Pet'r's First Am. Pet. Ex. 6 at 1-8.

Petitioner also furnishes a declaration from Gary Bess in which he states that (1) their father traveled extensively for his work; (2) their mother was an alcoholic who did not get along with Petitioner; (3) their family moved a lot when they were children - they lived in West Memphis, multiple locations in Memphis, Chattanooga, a trailer in Birmingham and Huntsville, Mobile, Bartlett, and Houston; (4) money was tight in their home during most of their childhood; (5) on one occasion as a teenager, Petitioner became drunk and was taken to a mental hospital, (6)

trial strategy. Petitioner's trial counsel could reasonably have concluded that the jury would have construed such evidence as suggesting that, as the product of an abusive childhood and the descendant of parents who were prone to violence, Petitioner was likely to commit criminal acts of violence in the future. Petitioner's trial counsel also could have reasonably concluded that seeking a favorable answer to the future dangerousness special issue was preferable to introducing evidence focusing the jury's attention on Petitioner's history of parental abuse, tendency to become violent suddenly, and history of drug and alcohol abuse, along with good character testimony from an ex-spouse whom he had brutalized, and then making an emotional appeal for mercy, as Petitioner now urges.

This Court concludes after de novo review of the record that Petitioner has failed to establish the objective unreasonableness of either the scope of his trial counsel's investigation into Petitioner's background or the case in mitigation his trial counsel actually presented at the punishment phase of Petitioner's capital murder trial.

---

Petitioner was accidentally shot while lifeguarding; (7) Petitioner subsequently lost several toes when a pipe fell on his foot while he was working in Dallas and he developed drug problems after his injury; (8) mental illness runs in their mother's family, (9) their brother "Butch" a/k/a William is bi-polar; (10) their mother was also prone to mood swings, was a difficult person who could be mean and hurtful, and often threw things at their father; (11) their father was fair and even-tempered, rarely talked much, but still regularly beat him and Petitioner at the urging of their mother; and (12) he had very little contact with Petitioner's attorneys prior to testifying and no contact after Petitioner's trial. *See* Pet'r's First Am. Pet. Ex. 7 at 2-13.

Petitioner presents no factual allegation, much less any evidence, showing that his defense team was unaware of any of the foregoing information. In fact, much of the foregoing is repetitive or cumulative of the trial testimony of Gary Bess. Petitioner's trial counsel could reasonably have concluded that calling William and Gary Bess to testify to the foregoing information would be unlikely to assist the defense team's efforts to convince the jury that Petitioner would *not* be a continuing threat to society. Petitioner's trial counsel could reasonably have concluded that, because of his criminal conviction and personal knowledge of Petitioner's tendency toward violence, William Bess would not be helpful to the defense at the punishment phase of Petitioner's capital murder trial. Petitioner's trial counsel could also reasonably have concluded that any new details in the declaration of Gary Bess were unlikely to assist the defense team's efforts to gain a negative answer to the future dangerousness special issue.

Petitioner also presents excerpts from medical records of William Bess. *See* Pet'r's First Am. Pet. Ex. 9. All these records post-date the date of Petitioner's 2010 capital murder trial. There is no showing the records were available at the time of Petitioner's trial. *Id.* Moreover, Petitioner alleges no facts showing the information contained in these records relating to William Bess's history of drug abuse and diagnosis of bi-polar disorder was unknown by Petitioner's defense team at the time of Petitioner's capital murder trial.

### b. No Prejudice

In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence—such as mental illness or a history of childhood abuse—may be available. *See Porter*, 558 U.S. at 39-40.

With regard to the prejudice prong of *Strickland*, the Supreme Court has held that petitioners were prejudiced where their trial counsel failed to fully investigate, develop, and present available mitigating evidence. For example, the Supreme Court found in *Wiggins* that his trial counsel failed to discover, develop, and present available mitigating evidence showing:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

539 U.S. at 535.

Moreover, in *Porter*, the new mitigating evidence undiscovered and undeveloped by trial counsel included lay and expert testimony showing (1) Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child; (2) Porter's father was violent every weekend and Porter was his father's favorite target, particularly when Porter tried to protect his mother; (3) on one occasion, Porter's father shot at him for coming home late but missed and beat Porter instead; (4) Porter attended classes for slow learners until he left school at age 12 or 13; (5) to escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War; (6) Porter suffered a gunshot wound to the leg yet fought heroically through two battles; (7) after the war, Porter suffered dreadful nightmares and would attempt to

climb his bedroom walls at night with knives; (8) Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all; (9) Porter suffered from brain damage that could manifest in impulsive, violent behavior; (10) at the time of the capital offense, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance; and (11) Porter had substantial difficulties with reading, writing, and memory. 558 U.S. at 449-51.

Finally, prejudice was established in *Williams* through testimony showing trial counsel failed to discover and develop available mitigating evidence showing (1) Williams experienced a nightmarish childhood; (2) Williams' parents had been imprisoned for criminal neglect of Williams and his siblings; (3) Williams had been severely beaten by his father, committed to the custody of the social services bureau for two years during his parents' incarceration, and then returned to his parents after they were released from prison; (4) Williams was borderline mentally retarded and did not advance beyond the sixth grade in school; (5) Williams received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet; (6) Williams was among the inmates least likely to act in a violent, dangerous or provocative way; (7) Williams seemed to thrive in a more regimented and structured environment; and (8) Williams earned a carpentry degree while in prison. 529 U.S. at 395-96.

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must "re-weigh all the evidence in aggravation against the totality of available mitigating evidence" (had the Petitioner's trial counsel chosen a different course). *Wiggins*, 539 U.S. at 534.

With respect to evidence in aggravation, as explained above, *see supra* §§ IX.E.3.b., IX.F.3.b., and IX.G.3.b., the prosecution's case at the punishment phase of trial was

overwhelming. It included just the sort of evidence likely to effectively counter the emotional appeal for mercy Petitioner now complains his trial counsel should have made: the details of Petitioner's capital offense were more than just grim, they were horrific (18 stab wounds violently inflicted at or near the time of a sexual assault); his capital murder victim was particularly sympathetic (a popular college coed pursuing a difficult academic course of study); his capital offense was committed while Petitioner was on parole and after he had served a term of incarceration (showing he had not been rehabilitated); Petitioner was convicted of another sexual assault committed *after* Samota's murder; and, according to Petitioner's brother, Petitioner has never expressed any sincere contrition or genuine remorse for any of his violent felonies.

In contrast, the "new" mitigating evidence Petitioner presents to this Court pales in comparison to the type of substantial, compelling mitigating evidence the petitioners presented federal habeas courts in *Porter*, *Wiggins*, and *Williams*. Besides those of his brothers, Petitioner presents several declarations purportedly containing "new" or additional mitigating evidence which he alleges his trial counsel should have presented during the punishment phase of trial. For example, the affidavit of mitigation specialist Danielle Mickenberg attached as Exhibit 5 to Petitioner's First Amended Petition presents hearsay accounts of her interviews with a trio of Petitioner's cousins, none of whom furnished much in the way of significant new mitigating information, i.e., information beyond that contained in the punishment phase trial testimony of Petitioner's brother Gary Bess.[145] Petitioner's first ex-wife furnishes a declaration that offers very

---

[145] Mickenberg reported that Robert Steven Burks recounted to her that (1) he had not seen Petitioner since Petitioner's first wedding in 1969; (2) Burks' father was the brother of Petitioner's mother; (3) Petitioner's father, Burks' "Uncle Don," had several jobs, including foreman supervisor for a tunneling company, and was a big and scary guy, tall, and strong; (4) mental health issues ran in the father's side of Burks' family; (5) while growing up, Petitioner lived for a time in Tennessee; (6) Petitioner's mother was an alcoholic; (7) Petitioner once ran away from home and was found in a local church; (8) Petitioner's father once beat Burks, Petitioner, and Gary Bess with "something like a belt" after the three boys destroyed good pillows; and (9) when contacted by Petitioner's defense team, Burks informed

112

little new information about Petitioner's background, beyond assertions of Petitioner's good

character traits, relevant to the issues before Petitioner's capital sentencing jury.[146] The wife of

Gary Bess furnishes a declaration that offers only good character testimony about Petitioner,

familiar comments about how "difficult" Petitioner's alcoholic mother was to be around, and

hearsay statements about his mother's family history.[147]

---

the person who contacted him that he did not know much because he had not spent much time with Petitioner. *See* First Am. Pet. Ex. 5 at 2-8. Mickenberg reported that Michael William Corley informed her that (1) his mother was the sister of Petitioner's mother; (2) he last saw and spoke with Petitioner in the 1960's when Petitioner was finishing high school; (3) the maternal side of his family has "problems," including both his mother and Petitioner's mother; (4) both his mother and Petitioner's mother had "an anger that never seemed to go away"; (5) Petitioner's mother used a belt to discipline her children, (6) he saw Petitioner a few times a year when they were growing up; (7) Petitioner's family lived at several different locations in Tennessee; and (8) money was tight in Petitioner's family. *Id.* at 8-10. Mickenberg reported that Susan Luhan stated that (1) she was eight years younger than Petitioner and last saw him when she was sixteen in the late-1960's; (2) her mother was a sister of Petitioner's mother; (3) Petitioner's mother married a man named Don who worked in the tunnels as the leader of a team; (4) mental illness, schizophrenia and bi-polar disorder, runs through the Burks family; (5) Petitioner's mother dealt with her illness by drinking, and became mean when she drank; (6) Petitioner's brother Butch has a drug problem; (7) she does not know Petitioner very well; (8) she once went to Houston to take care of Petitioner's mother who had liver issues; (9) Petitioner seemed to be afraid of his father but was obedient and respectful toward his father and was sweet toward his mother, whom Petitioner seemed to want to think he was perfect; (10) she once saw Petitioner's mother beat him with a board when they lived in Tennessee; (11) Petitioner's family home in Tennessee was loud, dirty, and had much going on; (12) six people lived in Petitioner's two-bedroom family home in Houston; and (13) during Petitioner's trial she was living in Memphis. *Id.* at 10-14.

[146] The declaration of Shirley Diane Cotie states that (1) Petitioner was kind, polite, patient, and courteous to her when they were dating and treated her well; (2) Petitioner was a great cook and taught her to cook; (3) Petitioner's mother drank every day until she became intoxicated; (4) Petitioner's mother once called the police because she was hallucinating; (5) Petitioner's mother showed affection for Gary and William but treated Petitioner as if she hated him—she was verbally and emotionally abusive toward Petitioner; (6) Petitioner was protective of his sister Sherry; (7) Petitioner responded to his mother by being quiet and never talking back to her; (8) Petitioner grew up in a troubled home because of his mother's drinking; (9) Petitioner's mother seemed to resent him and her other children; (10) when she first met Petitioner, he was working gainfully and was a hard worker; (11) their marital relationship began to break down after she took a trip home and returned to the residence she shared with Petitioner and his father in South Carolina; (12) from that point on, everything seemed to make Petitioner angry; (13) Petitioner became unable to sleep and withdrew from her; (14) she and Petitioner separated multiple times before they divorced; (15) she was shocked when she later heard about Petitioner's arrests; (16) a person representing Petitioner telephoned her, that person initially represented himself or herself as a friend of Petitioner from school but, when she challenged the person, only then did they admit they were part of Petitioner's defense team; and (17) she refused to speak with the person from Petitioner's defense team. *See* First Am. Pet. Ex. 8 at 1-8. It should be noted that this same witness testified for the prosecution at the punishment phase of Petitioner's capital murder trial, detailing horrific instances of physical violence Petitioner directed toward her while she was pregnant and, later, toward their five-month-old daughter.

[147] *See* First Am. Pet. Ex. 10 at 2-3. More specifically, Cindy Bess states in her declaration that (1) Petitioner's mother was tough to be around; (2) once falsely accused her of not loving Gary; (3) Petitioner's family does not tell stories about their memories together; (4) Petitioner's family members do not talk about what is going

In addition to not furnishing any mitigating evidence of substance that is truly "new," the declarations Petitioner presents to this Court for the first time contain a wealth of double-edged evidence that could easily have harmed the efforts of petitioner's trial counsel to obtain a favorable answer from the jury on the Texas capital sentencing scheme's future dangerousness special issue. For instance, the "new" declarations furnish the details of incidents in which either Petitioner behaved in an aggressive or violent manner or Petitioner's parents were physically abusive toward him. The former would not have helped Petitioner obtain a favorable jury verdict on the future dangerousness special issue. The latter are largely redundant of Gary Bess's trial testimony and double-edged in that it could have convinced Petitioner's jury that, as the product of an abusive childhood, Petitioner was likely to be a continuing threat to society. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (explaining that mitigating evidence is "double-edged" when it "'might permit an inference that the defendant is not as morally culpable for his behavior, [but] it also might suggest [that he], as the product of his environment, he is likely to continue to be dangerous in the future'" (first alteration added) (quoting *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)). There is no reasonable probability that, but for the failure of Petitioner's trial counsel to present any of the purportedly "new" mitigating evidence accompanying Petitioner's First Amended Petition, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

### 4. Conclusions

Petitioner's unexhausted complaints about his trial counsels' failure to present "new" mitigating evidence during the punishment phase of trial do not satisfy either prong of the

---

on in their lives; (5) Petitioner stayed with them after he got out of prison and sometimes cooked for them; and (6) Petitioner could be difficult but was never scary and did not hold a grudge. *Id.*

*Strickland* standard.   Petitioner's first claim is plainly meritless and does not warrant federal habeas corpus relief.

## X.  REQUEST FOR AN EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing.   *See* ECF No. 48.   Insofar as Petitioner's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of his direct appeal or state habeas corpus proceeding, he is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate court's or state habeas court's resolution of his claims.   Under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court.   *See Harrington*, 562 U. S. at 103 ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *see also Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court).   Where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.   Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.   This backward-looking language requires an examination of the state-court decision at the time it was made.   It follows that the record under review is limited to the record in existence at that same time—*i.e.,* the record before the state court.

Thus, Petitioner is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during his state habeas corpus proceeding.   *See Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("'If a claim has been

115

adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation

of § 2254(d)(1) on the record that was before that state court.'" (quoting *Cullen*, 563 U.S. at 185)),

*cert. denied*, 140 S. Ct. 167 (2019).

With regard to the new factual allegations and new legal arguments Petitioner failed to

fairly present to the state courts in his unexhausted claims for relief, and for which this Court has

undertaken de novo review, he is likewise not entitled to an evidentiary hearing.    In the course of

conducting a de novo review of Petitioner's unexhausted claims, this Court has assumed the factual

accuracy of (1) all the specific facts alleged by Petitioner in support of his unexhausted claims for

relief and (2) the documents Petitioner has presented in support of his unexhausted claims.    Even

when the truth of all of Petitioner's new factual allegations supporting his unexhausted claims is

assumed, his unexhausted claims do not warrant federal habeas relief.    *See Schriro v. Landrigan*,

550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court

must consider whether such a hearing could enable an applicant to prove the petition's factual

allegations, which, if true, would entitle the applicant to federal habeas relief."). Thus, Petitioner

is not entitled to an evidentiary hearing with regard to any of his unexhausted claims.

## XI.   CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed

under § 2254, the petitioner must obtain a Certificate of Appealability ("CoA").    *Miller-El*, 537

U.S. at 335-36; 28 U.S.C. § 2253(c)(2).    This Court is required to issue or deny a CoA when it

enters a final Order, such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules*

*Governing Section 2254 Cases in the United States District Courts* Moreover, under AEDPA,

appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See*

*Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is "'granted on an

issue-by-issue basis, thereby limiting appellate review to those issues'" (quoting *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)).

A CoA will not be granted unless a petitioner makes "a substantial showing of the denial of a constitutional right." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that "'reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further.'" *Tennard*, 542 U.S. at 282 (quoting *Miller-El*, 537 U.S. at 336).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Thompson v. Davis*, 916 F.3d 444, 453 (5th Cir. 2019); *Halprin*, 911 F.3d at 255, *cert. denied*, 140 S. Ct. 167 (2019). Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."). The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires that

117

federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt,* 571 U.S. at 15.

Reasonable minds could not disagree with the Court's conclusions that (1) all of Bess's complaints about the performance of his trial counsel fail to satisfy both prongs of the *Strickland* standard; (2) Petitioner's conclusory allegations of unreliability in connection with the DNA testing done in his case are factually inaccurate and do not furnish a basis for federal habeas relief; (3) the Texas Court of Criminal Appeals reasonably concluded Petitioner's *Batson* claim is without merit; (4) the Texas Court of Criminal Appeals reasonably concluded (a) the exclusion of the hearsay portion of Dr. Vigen's testimony and (b) the admission of Dr. Gilliland's opinion testimony did not deprive Petitioner of his due process rights; (5) Petitioner's federal constitutional rights were not violated by virtue of pre-indictment delay; (6) *Teague*'s non-retroactivity doctrine forecloses Petitioner's claim that the Eighth Amendment forbids his execution due to his advanced age or poor health; and (7) Petitioner is not entitled to an evidentiary hearing in this Court.

Accordingly, it is hereby ORDERED that:

1. All relief requested in Petitioner's First Amended Petition and Reply Brief is **DENIED.**

2. Petitioner's Motion for an Evidentiary hearing is **DENIED.**

3. Petitioner is **DENIED** a Certificate of Appealability on all his claims.

4. All other pending motions are **DISMISSED** as moot.

**SO ORDERED.**

SIGNED March 23, 2020.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**